IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

WALTER PETTAWAY
as administrator of the Estate
of Joseph Lee Pettaway, deceased,

           Plaintiff,

*versus*

NICHOLAS D. BARBER,
MICHAEL GREEN, JUSTIN
THRASHER, RYAN POWELL,
JOSHUA SMITH, KEIUNDRA
WATTS, BIANKA RUIZ and
NEAL FLOURNOY,

           Defendants.

Civil Action
2:19-cv-0008-JTA
Jury Trial Demanded

## SECOND AMENDED COMPLAINT

### Nature of the Action, Jurisdiction and Venue

1. This is a civil action brought pursuant to 42 U.S.C. §1983, et seq., to assert claims and recover damages for violations of the Fourth and Fourteenth Amendments to the U.S. Constitution by defendants, all of whom were policemen employed by the City of Montgomery, and all of whom at all times referenced herein were acting under color of state law when on July 8, 2018, in Montgomery, Alabama, they proximately caused of the death of Joseph Lee Pettaway; and to also assert pendant state law wrongful death claims against them arising from these acts and omissions.

2. This Court has original jurisdiction of this civil action pursuant to 28 U.S.C. §1331 and 1343(a)(3)-(4) as Plaintiff asserts claims arising under the laws of the United States including 42 U.S.C. §1983 and the Fourth and Fourteenth Amendments of the United States Constitution. This Court has supplemental jurisdiction over Plaintiff's state law wrongful death claim pursuant to 28 U.S.C. §1367(a), because that claim arises out of the same operative facts and

is so related to the federal claims that it forms a part of the same case or controversy under Article III of the United States Constitution.

3. Venue is proper in this Court under 28 U,S.C. §1391(b) because all defendants reside in the Middle District of Alabama and all incidents, events, actions, and occurrences giving rise to these causes of action occurred in the Middle District of Alabama.

## Parties

4. Plaintiff Walter Pettaway is the brother of Joseph Lee Pettaway, deceased, and is the duly appointed Administrator of his late brother's estate.

5. Defendants Nicholas D. Barber, Michael Green, Justin Thrasher, Ryan Powell, Joshua Smith, Keiundra Watts, Bianka Ruiz and Neal Flournoy are or were[1] policemen for the City of Montgomery Police Department (MPD) each of whom, while acting under color of law and within the line and scope of their authority and duties for the MPD, on July 8, 2018, went to and were present at 3809 Cresta Circle in Montgomery, where a MPD police dog was released unrestrained and off-leash into a house at that address with the knowledge and intent that the dog would attack whoever was in the house with its teeth; and which dog did thereafter attack, savagely rip, maul and kill Joseph Lee Pettaway in that house.

6. All claims made herein are made against each defendant in their individual capacity; and in all acts and omissions alleged herein, all defendants are alleged to have acted at all times under color of state law and within the line and scope of their authority.

---

[1] Defendant Nicholas D. Barber is no longer a City of Montgomery policeman. His employment was terminated after Nicholas D. Barber was found guilty by the City of Montgomery in disciplinary proceedings brought by the City in which the City found Barber guilty of misappropriation or misuse of city property or services on more than 50 occasions. Under the terms of the City's termination of his employment with the MPD, Nicholas D. Barber is not eligible for rehire.

### Allegations Common to All Claims

7. In early 2018, Joseph Lee Pettaway was and had been for several months assisting in making repairs to a very small, one-story, approximately 960 square foot house located at 3809 Cresta Circle ("the house") in Montgomery, Alabama.

8. In July, 2018, both the water supply and the electrical power supply to the house had been cut off or terminated many months previously; the house was in a dilapidated state; it was not and had not been inhabited as a residence for many months; and it had been actively undergoing repairs for several months beginning in early 2018.

9. Joseph Lee Pettaway was one of the workers who for several months prior to July, 2018, along with James Jones and Garry Dixon, had worked at the house to make these repairs, i.e., performing painting, sheet rocking, carpentry and other work to make the house habitable again as a residence.

10. Joseph Lee Pettaway was well known in that neighborhood and his mother lived only a block or two away from the house.

11. During these first several months of 2018 when these repairs were being made, James Jones, Garry Dixon and Joseph Lee Pettaway would occasionally spend the night or "camp out" overnight in this house despite its lack of electricity or water supply. James Jones had a lease agreement with the house's owner under which he agreed to repair it and Mr. Jones intended to move into it as his residence upon completion of the repairs.

12. Neither Garry Dixon nor Joseph Lee Pettaway was renting or subleasing the house from the owner or from James Jones. Neither Garry Dixon nor Joseph Lee Pettaway had any legal rights in the house, nor to its possession or occupancy.

13. On Saturday, July 7, 2018, Joseph Lee Pettaway, along with James Jones and Garry Dixon and others, were present at the house during the day and all worked on the house that day.

14. Later that evening, Mr. Jones, Mr. Pettaway and Mr. Dixon, together with Mr. Jones' girlfriend and several other persons from the neighborhood had a barbeque in backyard of the house and ate supper together there.

15. Garry Dixon either stayed at the house after the barbeque or he departed the house and later returned to it to camp out in the house for the night.

16. Sometime after midnight, apparently without Garry Dixon's knowledge, Joseph Lee Pettaway also returned to the house to also camp out in and spend the night at the house.

17. After Mr. Pettaway entered the house after midnight, unaware that it was his co-worker Joseph Lee Pettaway with whom he had eaten a barbeque supper only hours previously who had entered the house, Garry Dixon became alarmed and called the Montgomery Police Department to report that someone had entered the house. No report of any theft, physical assault, threat, possession of any weapon, or even contact between the two men was reported to the police. Garry Dixon reported only the presence of an unknown person (who turned out to be Mr. Pettaway) in the house.

18. Several Montgomery policemen, including Defendants Barber, Green, Thrasher, Powell, Smith, Watts, Ruiz and Flournoy (who are sometimes hereafter collectively referred to as "police defendants") went to the house to investigate the report of this unknown person's entry into the house.

19. Defendants Barber and Green were members of the canine (or K-9) unit of the Montgomery Police Department that was supposed to have been trained in the use and deployment of police dogs; and Barber transported a police dog to the house with him. Defendant Barber was that dog's handler and defendant Green, who was also assigned to the K-9 unit, was supposed to be Barber's supervising, superior officer at the house.

20. At the house, defendant Barber, with the knowledge and consent of Green, released the police dog into the house unaccompanied, without giving an adequate identifying warning that would have been clearly audible to anyone in the house to warn that they were policemen and that a police dog was about to enter the house. Barber did so with the knowledge and intent that the police dog which he was about to release would attack anyone it found in the house.

21. Subsequently, after defendant Barber released the police dog off-leash and unaccompanied into the house, Barber himself then entered the house alone, unaccompanied by any other policeman.

22. The actions of defendant Barber as well as most, if not all of the defendants present at the house that night, were recorded on body cameras worn by defendant policemen.

23. Barber's body camera recorded (a) Barber's sing-song, low-volume, rapid and virtually unintelligible chant which Barber made only twice outside the house which Barber will presumably contend was a "warning," (b) followed almost immediately and before any action by anyone in the house could be taken if Barber's chant could have been heard in the house by Barber's release of a police dog unaccompanied and off-leash into the house, (c) followed by Barber's entry into the house (d) the police dog's search for and subsequent attack on Mr. Pettaway, along with (e) the subsequent acts and omissions of the other police defendants over the next approximately 25 minutes.

24. Attached to this Amended Complaint as Exhibit 1 is a copy of an excerpt containing approximately 27 consecutive minutes of the video recording made by the body camera of defendant Barber. This recording, Exhibit 1, begins as Barber approached the door of the house and ended approximately 27 minutes later with Mr. Pettaway being loaded into an emergency vehicle for transport to the hospital at which Mr. Pettaway died. There have been no alterations, deletions or modifications of the approximately 27-minute recording excerpt which constitutes Exhibit 1.

25. Until late August, 2020, when plaintiff's counsel finally obtained from the City a copy of Barbers' and other policemen's body camera video recordings made that night, plaintiff's counsel had no knowledge, information or access to knowledge or information about most of the events that occurred on-site at the house that night, including most of the facts and circumstances appearing on those body camera recordings upon which the Third Claim for Relief contained herein are based.[2]

26. Upon arriving at the house, defendant Barber, standing outside the building, shouted in a sing-song, low-volume, rapid and virtually unintelligible manner into the outside of the building's wooden door words that are difficult to understand even on the audio recording made by Barber's own body camera microphone located only inches from his mouth. Barber and other

---

[2] Regarding plaintiff's inability to know of and complete lack of access to these facts, plaintiff adopts and incorporates by reference all of the facts and circumstances cited in the pleadings filed in this case, most of which are recited in plaintiff's Motion to Amend.

policemen had available to them loudspeakers' or other means of amplifying any oral communications they were required to make to adequately and properly warn whoever was in the house, but did not use them. Because Barber's sing-song, inaudible, unintelligible recitation of garbled words could not be understood within the house, those words, whatever they may have been, did not constitute the warning that is required to be given before releasing their police dog for the purpose of attacking the unknown person, i.e., whatever man, woman or child, was inside the house on the other side of the front door that Barber and his dog entered.

27. At the time that defendant Barber released the police dog into the building with the knowledge and consent of his superior, defendant Green, no police defendant had any reliable information or evidence with regard to any of the following facts about any person who may be in the house:

    (a) the person's identity,

    (b) the person's right or license to be in the building,

    (c) the person's purpose for being in the building,

    (d) the person's activities in the building,

    (e) whether the person possessed a weapon, or

    (f) whether the person posed any danger to anyone.

28. In view of the lack of any clear audible comprehensible warning by Barber in a manner that would have been heard inside the house, Joseph Lee Pettaway, who was in the house, to a virtual certainty either did not hear defendant Barber's sing-song words, or if he did hear someone of that noise, he again to a virtual certainty could not understand what was being said and/or had no knowledge of who was shouting and consequently grew alarmed by what would have appeared to him to be an invasion of the house by persons unknown.

29. In any event, there is no evidence that Barber ever gave an adequate warning of his identity as a policeman or his intention to release a police dog into the house or that Joseph Lee Pettaway ever heard defendant Barber identify himself or warn that the police dog was about to be released into the house.

30. Notwithstanding these facts, without any significant additional information about an unknown person being in the house, defendant Barber released a police dog into the house which

was trained to attack persons with his teeth. After this release and deployment, this police dog was not on a leash and was not effectively subject to control by defendants Barber or Green or any other policeman.

31. The deployment or release of this police dog into the house under all of these circumstances violated established principles, standards and guidelines for canine units that are adhered to by responsible, law-abiding police departments, and in these circumstances was either or both an unlawful seizure and excessive use of force in violation of the Fourth Amendment.

32. Defendant Green who also lacked any reliable information or evidence regarding the matters alleged in ¶27 hereof, acquiesced in, tacitly approved and/or authorized this use of force, i.e., the release and deployment into the house of a police dog which was trained to attack persons with his teeth with the knowledge that the dog would attack the unknown person in the house—man, woman, or child—with its teeth.

33. Upon information and belief, when Barber entered the house, Joseph Lee Pettaway likely believed that the house in which he had intended to bed down for the night was being invaded by persons he did not know and he hid under a cot or a bunk bed in one of the rooms in the house.

34. At the time Defendants Barber and Green released and deployed the police dog into the house, in addition to not knowing the identity, age or gender of the person in the house, they had no probable cause to use force as they had no probable cause to believe that the unknown, unidentified person in the house:

       a. was committing or had committed any serious or violent criminal offense,

       b. had any criminal intent,

       c. was armed with any type of weapon, or

       d. posed any immediate serious threat or danger to MPD police or others.

35. In fact, Mr. Pettaway:

       a. was not committing nor had he committed any serious or violent crime,

       b. had no criminal intent,

       c. was not armed with any type of weapon, and

       d. posed no serious threat or danger, immediate or otherwise, to police or others.

36. Prior to releasing and deploying the police dog in the house and letting it roam unleashed in the house, Defendants Barber and Green did not first exhaust other options, i.e., did not employ any other less dangerous or less violent actions, means, methods, or equipment to:

    a. investigate any further prior to the release of the dog or

    b. determine whether it was a man, woman or child in the house or

    c. determine the identity of the person in the house or

    d. determine the person's purpose for being in the house or

    e. determine whether the person's presence in the house was criminal or

    f. determine the person's license or right to be in the house or

    g. determine whether the person was armed with any weapon or

    h. determine whether the person posed any danger to anyone, or

    i. have the man, woman or child in the house peaceably leave the house.

37. Defendants Barber and Green released or authorized the release of the police dog unaccompanied and unattended into the house without any effective means of controlling the dog or controlling the violent attack that defendants knew the dog would make and which the dog did make on Mr. Pettaway, i.e., the dog was not subject to any effective and timely means of control by defendants Barber and Green.

38. As the MPD police Defendants Barber and Green expected, intended, and knew that it would, the police dog ferociously and unrelentingly attacked Joseph Lee Pettaway within the small, confined space of the house by ripping and tearing at Mr. Pettaway with its teeth without Barber or Green having any effective means of timely control or restraint or cessation of the vicious attack of the police dog.

39. At no time that night did Mr. Pettaway:

    a. actively resist police,

    b. make any verbal threats to MPD police,

    c. take any threatening actions,

    d. give any basis for reasonable suspicion he was armed or dangerous, or

    e. attempt to flee from MPD police.

40. From the screams and/or pleas of Mr. Pettaway during the attack which can be heard on the audio portion of the body camera recording, defendant Barber knew that the police dog was

attacking Joseph Lee Pettaway and knew that the dog was violently mauling, tearing and ripping Mr. Pettaway's flesh with his teeth.

41. Barber and Green knew that until they stopped this violent attack, their police dog would continue to maul and violently attack, injure, and tear at Mr. Pettaway with its teeth.

42. Despite this and with this knowledge, Barber allowed the dog to continue to attack Mr. Pettaway for almost two minutes.

43. When Barber attempted to control the dog by giving it verbal commands to cease its attack on Mr. Pettaway, the dog ignored those commands and continued its attack. Ultimately Barber was required to physically wrestle the dog off of Mr. Pettaway in order to end its attack on Mr. Pettaway.

44. The police dog continued its violent attack on Mr. Pettaway for almost two minutes during which time the dog continued to gravely and fatally injure Mr. Pettaway. The fatal injury was caused by the dog's teeth ripping into Mr. Pettaway's groin area and lacerating Mr. Pettaway's femoral artery.

45. After the dog had lacerated Mr. Pettaway's femoral artery, Mr. Pettaway began to bleed profusely and he soon went into shock, which is a common and known reaction to profuse bleeding or a substantial loss of blood.

46. This violent laceration of Mr. Pettaway's femoral artery by the police dog's teeth during this violent attack together with all police defendants' deliberate indifference to Mr. Pettaway's bleeding and their failure to take any action to prevent, stanch or retard the loss of blood combined to proximately cause Mr. Pettaway's death from exsanguination or loss of blood and/or shock.

### FIRST CLAIM FOR RELIEF
Unlawful Seizure
Fourth Amendment violation, §1983 liability

47. Plaintiff realleges and incorporates every allegation contained in paragraphs 1 through 46.

48. At the time Defendants Barber and Green arrived at 3809 Cresta Circle, they had no reliable information, evidence or basis for probable cause to believe that there was anyone inside the house committing or who had committed any serious criminal offense.

49. There was no probable cause for arresting Joseph Lee Pettaway and his seizure that was effected by the violent, uncontrolled attack by this police dog was an unreasonable seizure that violated the Fourth Amendment. The release of this police dog was not a Terry stop, but a Fourth Amendment warrantless arrest.

50. Defendants Barber and Green's unlawful seizure and arrest of Joseph Lee Pettaway which violated his Fourth Amendment rights, was a proximate cause of or the moving force behind the death of Joseph Lee Pettaway.

WHEREFORE Plaintiffs demand judgment against defendants Nicholas D. Barber and Michael Green in such sum as the jury may reasonably find appropriate to punish them for causing the wrongful death of Mr. Pettaway, and to deter them and others like them from such conduct in the future; for the costs of this action; for reasonable attorney's fees pursuant to 42 U.S.C. §1988; and for such further additional, necessary or proper relief the Court deems appropriate.

## SECOND CLAIM FOR RELIEF

Unlawful and Excessive Use of Force
Fourth and Fourteenth Amendment Violations, §1983 liability

51. Plaintiff realleges all of the allegations of the preceding paragraphs 1 through 46.

52. The release of a police dog with the knowledge or intent that the dog will attack a citizen is a use of force subject to the limitations and constraints of the Fourth and Fourteenth Amendments to the U.S. Constitution.

53. Under clearly established law, the use of force by Defendants Barber and Green in the manner and in the circumstances of this police dog attack, including:

> a. the unrestrained and uncontrolled release of the police dog into a confined space,
>
> b. with knowledge and/or intent that the dog would attack any man, woman or child within that confined space, unattended by any policeman or handler,

c. on a person who was not fleeing from, nor threatening any police or other persons and

d. who police had no knowledge or reliable information was armed with any weapon and

e. who police had no knowledge or reliable information was committing or had committed any violent or serious crime, nor who posed any immediate threat to the safety of the MPD policemen or others, and

f. with knowledge that the police dog would continue to attack, maul, lacerate, and violently injure the citizen until the dog was restrained,

g. coupled with an inordinate delay, after the unknown person was known to have been attacked by the dog, in effectively restraining or disengaging the police dog from this attack

h. was, in these circumstances, an unwarranted, excessive, and unlawful use of force that violated the Fourth or Fourteenth Amendment to the U.S. Constitution.

54. The conduct of the deployment of their police dog which killed Mr. Pettaway was contrary to the standards and the accepted practices adhered to by canine units of police departments across the country and those departures therefrom constituted an unlawful use of force which was a proximate cause of the death of Mr. Pettaway.

55. Defendants Nicholas D. Barber and Michael Green's unwarranted, excessive, and unlawful use of force was in violation of the Fourth and Fourteenth Amendments.

56. Defendants Nicholas D. Barber and Michael Green's unwarranted, excessive, and unlawful use of force was a proximate cause of the death of Joseph Lee Pettaway.

WHEREFORE Plaintiffs demand judgment against defendants Nicholas D. Barber and Michael Green in such sum as the jury may reasonably find appropriate to punish them for causing the wrongful death of Mr. Pettaway and to deter them and others like them from such conduct in the future; for the costs of this action; for reasonable attorney's fees pursuant to 42 U.S.C. §1988; and such further additional, necessary or proper relief the Court deems appropriate.

THIRD CLAIM FOR RELIEF

Deliberate indifference to an objectively serious medical need
Fourth or Fourteenth Amendment Violations, §1983 liability

57. Plaintiff realleges all of the allegations of the preceding paragraphs 1 through 56.

58. After almost two minutes of the police dog's ripping and tearing at Mr. Pettaway with its teeth, Barber finally ceased attempting to verbally command his police dog to discontinue his vicious attack and began to attempt to wrestle his dog off Mr. Pettaway. After the dog was finally wrestled off, Barber took no action to determine the nature and extent of the injuries and wounds his dog had inflicted on Mr. Pettaway, but rather immediately left Mr. Pettaway bleeding on the floor while Barber took his dog back to his police vehicle.

59. After Barber secured his police dog in his police vehicle, Barber then went back into the house with what appears to be a cell phone and took a photograph or photographs of Mr. Pettaway who was lying unconscious on the floor of the room in which he had been attacked several minutes previously by Barber's police dog.

60. After taking photographs of Mr. Pettaway lying bleeding on the floor, Barber then stated the word, "Awesome!" Barber then turned and again left Mr. Pettaway lying on the floor unconscious and profusely bleeding. These actions and this pronouncement of "Awesome!" by Barber are recorded on Exhibit 1, the approximately 27-minute excerpt of the Barber bodycam video.

61. Moments later, two of the police defendants then went into room of the house where Mr. Pettaway lay bleeding profusely, where they dragged or carried Mr. Pettaway, who remained unconscious and in shock, out of the house. They then lay him face up with the fronts of his shirt and pants soaked with blood on a concrete walkway just outside of the front of the house. As they carried his body, Mr. Pettaway continued to bleed and left a trail of his blood behind him.

62. For the next several minutes, as Mr. Pettaway lay bleeding on the concrete walkway, the police defendants gathered around him, stood over him and shone their flashlights on his bloody body while the laceration of Mr. Pettaway's femoral artery by the police dog continued to cause profuse, obvious bleeding that was seen, commented on and remarked about on Exhibit 1,

the audio portions of the body camera recording, by police defendants as they stood over Mr. Pettaway lying in shock and unconscious on the walkway outside the house.

63. As police defendants stood over Mr. Pettaway lying on the concrete walkway illuminating him with their flashlights, not one of the defendants made any effort to stanch or stem the obvious and abundant continuing flow of blood from his wound and it continued to soak the front of Mr. Pettway's shirt and pants and pooled around Mr. Pettaway's body on the walkway.

64. During this several minute period, among the police defendants surrounding and standing over Mr. Pettaway, there was joking and laughter from policemen that can be heard on the audio portion of Exhibit 1 on at least two occasions.

65. One of the policemen defendants joked about Mr. Pettaway's condition, i.e., in response to one remark by one of the police defendants that Mr. Pettaway was in "good condition," another joked that "well, good condition" was a relative term—that Mr. Pettaway was at least "still breathing."

66. From the time that the police dog attacked Mr. Pettaway until Fire and Rescue Squad personnel arrived and began to pull back Mr. Pettaway's blood soaked clothing to locate the source of his profuse bleeding, no police defendant made any effort to try to prevent, retard, reduce, stanch or stem the flow of Mr. Pettaway's blood from his wound.

67. The police dog's laceration of Mr. Pettaway's femoral artery and the profuse bleeding it caused created an obvious objectively serious medical need, one which was so apparent that even a lay person would easily recognize the necessity for immediate efforts to stop, stanch, reduce or retard the continuing flow of blood from Mr. Pettaway's wound.

68. No technical medical training or expertise was necessary to know and understand the threat to Mr. Pettaway's life posed by this bleedng: the excessive amount of prior blood loss and his continued blood loss posed not just an "objectively serious medical need," but an obviously serious threat to his life, one which ultimately caused his death. No medical training was necessary to understand in these circumstances the imperative need—the absolute necessity—to administer the most basic, primitive and rudimentary means of stopping or reducing Mr. Pettaway's loss of blood to save his life.

69. Plaintiff attaches as Exhibit 2, the 2017 Edition of the Boy Scouts of America's *Wilderness First Aid Curriculum and Doctrine Guidelines*[3] which describes the extremely basic and common-sense steps and actions which are essential to the preservation of life when a person sustains an injury that has caused or is causing a significant loss of blood. These are common sense actions that pre-teen and adolescent boys are taught to take and that must be taken where significant blood loss has occurred and, even more importantly, is <u>continuing to occur</u>.

70. None of these police defendants, who stood directly over Mr. Pettaway from a foot or two away from him as he lay unconscious and bleeding profusely, and who shone their flashlights down onto him, and had undeniable knowledge of the grave threat to Mr. Pettaway's life posed by his bleeding, took any of the most obvious of these actions—actions that, again, are taught to and learned by adolescent to teen aged boys—to attempt to stop or arrest the flow of his blood from Mr. Pettaway's body.

71. In failing to act, defendants Nicholas D. Barber, Michael Green, Justin Thrasher, Ryan Powell, Joshua Smith, Keiundra Watts, Bianka Ruiz and Neal Flournoy acted with deliberate indifference to that undeniably obvious and known need. Defendants thereby violated Mr. Pettaway's Fourth and/or Fourteenth Amendment rights.

72. The violations of these rights was a proximate cause of the death of Joseph Lee Pettaway.

WHEREFORE Plaintiffs demand judgment against defendants Nicholas D. Barber, Michael Green, Justin Thrasher, Ryan Powell, Joshua Smith, Keiundra Watts, Bianka Ruiz and Neal Flournoy in such sum as the jury may reasonably find and appropriate to punish them for

---

[3] The Boy Scouts of America's publication of this information about basic first aid is admissible under Rule 201, F.R.E., as it is a document "whose accuracy cannot reasonably be questioned." (quoting Rule 201(b)(2)).

Moreover, this Boy Scout publication simply states information that "is generally known within the trial court's territorial jurisdiction" (quoting Rule 201(b)(1)), i.e., virtually all adults in the Middle District of Alabama (and many children) know that when a person has been injured and is bleeding to the extent that it soaks their clothing and they are unconscious or non-responsive, that this is a life-endangering circumstance; and that some very basic, common sense things must immediately be done to stem, reduce or retard additional loss of blood, including one or more of the following: packing the wound with some absorbent material, applying pressure to the wound and/or applying a tourniquet to the wound.

causing the wrongful death of Mr. Pettaway, and to deter them and others like them from such conduct in the future; for the costs of this action; for reasonable attorney's fees pursuant to 42 U.S.C. §1988; and such further additional, necessary or proper relief the Court deems appropriate.

## FOURTH CLAIM FOR RELIEF
### Wrongful Death under state law
### §6-5-410, Code of Alabama

73. Plaintiff realleges and incorporates the allegations contained in paragraphs 1. through 72.

74. Defendants Barber and Green were guilty of negligence in the aforesaid acts and omissions.

75. The acts and/or omissions of Defendants Nicholas D. Barber, Michael Green, Justin Thrasher, Ryan Powell, Joshua Smith, Keiundra Watts, Bianka Ruiz and Neal Flournoy were a combined and concurring proximate cause of the death of Joseph Lee Pettaway.

WHEREFORE Plaintiff demands judgment against defendants Nicholas D. Barber, Michael Green, Justin Thrasher, Ryan Powell, Joshua Smith, Keiundra Watts, Bianka Ruiz and Neal Flournoy for damages in such sum as the jury may reasonably determine; for the costs of this action; and such further additional, necessary or proper relief the Court deems appropriate.

/s/ Griffin Sikes, Jr.

Griffin Sikes, Jr.
Attorney for Plaintiff
Post Office Box 11234
Montgomery, Alabama 36111
Phone: 334.233.4070
E-mail: sikeslawyer@gmail.com

/s/ H. E. Nix, Jr.

H. E. Nix, Jr.
Attorney for Plaintiff
7505 Halcyon Pointe Drive
Montgomery, AL 36117
Phone: 334.279.7770
E-mail: cnix@nixattorney.com

## Jury Demand

Plaintiff demands trial by jury of all issues in this cause.

/s/ Griffin Sikes, Jr.

Of Counsel

To Be Served by Process Server:

| | |
|---|---|
| Justin Thrasher<br>c/o Montgomery Police Department<br>320 N. Ripley Street<br>Montgomery, AL | Keiundra Watts<br>c/o Montgomery Police Department<br>320 N. Ripley Street<br>Montgomery, AL |
| Ryan Powell<br>c/o Montgomery Police Department<br>320 N. Ripley Street<br>Montgomery, AL | Bianka Ruiz<br>c/o Montgomery Police Department<br>320 N. Ripley Street<br>Montgomery, AL |
| Joshua Smith<br>c/o Montgomery Police Department<br>320 N. Ripley Street<br>Montgomery, AL | Neal Flournoy<br>c/o Montgomery Police Department<br>320 N. Ripley Street<br>Montgomery, AL |

## Certificate of Service

I certify that a true and correct copy of the foregoing has been filed on Pacer, the Court's electronic server, on this 1st day of February, 2021, for service on all counsel of record herein:

Chris East, Esq., at ceast@montgomeryal.gov

Madelyn Kay Mauldin, Esq., mmauldin@montgomeryal.gov

/s/ H. E. Nix, Jr.

H. E. Nix, Jr.
Attorney for Plaintiff
7505 Halcyon Pointe Drive
Montgomery, AL 36117
Phone: 334.279.7770
E-mail: cnix@nixattorney.com