IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

WALTER PETTAWAY
as administrator of the Estate
of Joseph Lee Pettaway, deceased,

        Plaintiff,

*versus*

NICHOLAS D. BARBER,
MICHAEL GREEN, JUSTIN
THRASHER, RYAN POWELL,
JOSHUA SMITH, KEIUNDRA
WATTS, BIANKA RUIZ,
NEAL FLOURNOY, ERNEST
N. FINLEY and THE CITY OF
MONTGOMERY, ALABAMA,

        Defendants.

Civil Action

2:19-cv-0008-ECM

Jury Trial Demanded

FIFTH CLAIM FOR RELIEF

Unconstitutional Policies, Customs and Practices of the City of Montgomery,
Violation of the Fourteenth Amendment's Requirement to Provide Medical Care
which was a Moving Force Behind and a Proximate Cause of the Death of Joseph Lee Pettaway

73. Plaintiff realleges and incorporates all of the allegations contained in paragraphs 1. through 72.

74. When using force to make arrests or apprehensions, police can and often do cause injuries which vary from very slight or minor injuries to very serious, life-threatening injuries.

75. Under the Due Process Clause of the Fourteenth Amendment, police who injure a person in the course of an arrest or apprehension must provide that person with proper medical attention or care in a prompt and timely manner. *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015)

1

76. One of the types of serious, life-threatening injuries that police can cause is an open wound that is bleeding heavily in an uncontrolled manner.  That is the type of injury that was inflicted on Joseph Lee Pettaway by the MPD police dog on July 8, 2018.

77. All adults (and, as the attached Boy Scout manual evidences, many adolescents) know or have learned that uncontrolled heavy bleeding from such a wound can cause death if actions are not taken immediately to diminish, retard or reduce the loss of blood from such a wound.

78. All police also know that when they summon or call for emergency medical technicians (EMTs) to come and treat a person that they injure, there will be an inevitable delay[1] between the time that the police on site make the call to summon EMTs and the time that those EMTs will arrive on site; and that this delay, as it was in this case, can and often will be ten minutes or longer.

79.  Depending on the nature and extent of the wound, as little as three to five minutes of heavy, uncontrolled bleeding from an open wound will cause either that person's death or serious permanent impairment.

80.  Thus, for police to provide such a person who is heavily bleeding with the medical attention or care that the Fourteenth Amendment requires, such medical attention or care will often have to be provided on site before the EMTs arrive.  In almost all of these instances, the only way for even the most rudimentary first aid or medical care to be provided is by the on-site police.

81.  Fortunately, the simplest, most basic and elementary first aid for a wound that is heavily bleeding in an uncontrolled fashion is uncomplicated, straightforward, common-sense based and easy to learn, i.e., the application of a make shift tourniquet; packing the wound with

---

[1] Deposition testimony of Chief Ernest Finley, p. 79:

> Q. Would you agree that there are unavoidable and inevitable delays between when someone suffers an injury at the hands of the police somewhere in the City of Montgomery and when these two calls, at least two calls have to be made and then the EMT unit has to go out to the location?  There's an inevitable delay in getting there, correct?
>
> MR. EAST:  Object to form.
>
> A.     Yes.

2

any available cloth, such as a shirt or T-shirt; and/or just applying steady pressure to the bleeding wound, will all significantly diminish, slow or retard bleeding from an open wound until EMTs arrive. These are not difficult to learn: they have been taught to thousands of adolescent and even pre-adolescent Boy Scouts.

82. In such cases of heavy uncontrolled bleeding, the failure by police to provide this type of basic, rudimentary first aid prior to the EMTs' arrival is a failure to provide the constitutionally required medical care because it often cannot be provided at a later time, i.e., a person bleeding heavily from a major blood vessel will often die or become terminal prior to the EMTs' arrival.

83. Accordingly, for police to discharge their constitutional duty to provide prompt and timely medical care, for certain types of injuries, including heavy bleeding from an open wound, police must themselves provide it in the form of rudimentary first aid until EMTs arrive.

84. Absent the provision of this basic and rudimentary care within the first several minutes after a serious wound to a major blood vessel is sustained, many persons bleeding heavily from such a wound will almost certainly die, become terminal, or will suffer irreparable permanent injuries before the EMTs can arrive.

85. Defendant Barber's body camera was activated and made a time stamped recording of all of the pertinent acts, omissions and events on July 8, 2018, concerning the police dog's attack on Mr. Pettaway and the preceding and ensuing on site events.  This body cam video was produced in discovery in this case in late June, 2020 and a copy of that recording (which may hereafter be referred to as "the Barber video") is conventionally filed as Exhibit A to this Fifth Claim for Relief. All of the times recited hereinafter are taken from the time-stamps that were imprinted by the MPD on the Barber recording.

86. As shown on Barber's July 8, 2018 body cam recording, Exhibit A, Nicholas Barber released an MPD police dog into the small house at 3809 Cresta Circle and the dog fatally attacked Joseph Lee Pettaway beginning at approximately 3:15:40 AM on July 8, 2018. (Exhibit C, 3:15:40)

87. Specifically, the police dog ripped, tore or cut Mr. Pettaway's femoral artery in a fatal attack by Barber's dog that Barber allowed to continue for almost two minutes until 3:17:38 AM. The attack ended only when Barber physically wrestled and choked the dog off of Mr. Pettaway.

88. The lacerations of Mr. Pettaway femoral artery caused by the dog's attack resulted in heavy, profuse bleeding, much of which bleeding is documented by Barber's body cam video. (Exhibit A)

89. After Barber wrestled and choked the dog off of Mr. Pettaway, Barber then exited the house leaving Mr. Pettaway lying unconscious and without medical or first aid attention for almost six minutes on the floor of the room in which the dog had attacked him.

90. After lying bleeding for almost six minutes, at approximately 3:23:14 AM, two defendant policemen dragged Mr. Pettaway's unconscious body out the front door of the house and lay him on the concrete sidewalk at the front of the house. (Exhibit D, 3:23:14)

91. There, as Mr. Pettaway lay unconscious and bleeding heavily on the sidewalk, defendants Barber, Green, Thrasher, Powell, Smith, Watts, Ruiz and/or Flournoy circled around him and stood over Mr. Pettaway for an additional six minutes as he lay unconscious on the sidewalk. (Exhibit E, 3:23:40).

92. As Mr. Pettaway lay on the sidewalk from 3:23:40 to 3:29:38, the police defendants shone flashlights on Mr. Pettaway as they stood over him, chatting and joking.

93. Each of them saw the heavy, profuse bleeding which had soaked Mr. Pettaway's pants and shirt and each saw his blood pooling on the sidewalk next to his unconscious body (Exhibit F-1, 3:25:03), (Exhibit F-2, 3:25:51), (Exhibit F-3, 3:26:32), (Exhibit F-4, 3:27:27), (Exhibit F-5, 3:28:15), (Exhibit F-6, 3:28:32) and (Exhibit F-7, 3:29:38).

94. During this six minutes, no defendant made any attempt or effort to aid him or to reduce, retard or diminish his loss of blood as he lay unconscious and bleeding in front of them.

95. Thus, combining the six minutes that Mr. Pettaway was left without first aid or medical attention inside the house after the dog's attack with the additional six minutes that Mr. Pettaway lay on the sidewalk, it was twelve minutes after Barber pulled the dog off Mr. Pettaway before Mr. Pettaway was first given any medical attention.

96. It was only at 3:29.39 AM when one of the EMT team members who had been summoned to provide medical care reached down and touched Mr. Pettaway (Exhibit F-7, 3:29:38) that Mr. Pettaway began to be provided with medical care for his injuries.

97. During the twelve minutes between 3:17:38 AM, when the police dog was forcibly wrestled off of his attack on Mr. Pettaway and 3:29.39 AM, when an EMT first touched Mr. Pettaway, no MPD policeman made any attempt to provide any first aid or attempted in any way to reduce, diminish, or retard Mr. Pettaway's bleeding from his femoral artery, despite Mr. Pettaway's obvious unconscious state or condition and his obvious heavy and profuse bleeding, as was abundantly clear and evident from the blood that had soaked his pants and shirt, stained the floor of the room in which the attack occurred, had trailed down the hallway through which Mr. Pettaway was dragged by two policemen and which also then spilled and pooled on the sidewalk on which he was lain.

98. The defendants' failure to provide basic first aid or to make any attempt to retard, diminish or prevent the heavy arterial bleeding by Mr. Pettaway was directly attributable to two of the customs and policies of the City of Montgomery that were established and/or were allowed to continue to exist by defendant Ernest Finley:

> (a) written policy 3.3.5 of the City's Police Department which prohibited police who were not trained and/or certified to render medical aid to make any effort to reduce, retard or diminish blood loss from heavy profusely bleeding wound.
>
> and
>
> (b) the custom or policy of the City's Police Department to not train or require its policemen to be trained in basic elementary first aid measures to reduce, retard or diminish blood loss from heavy profusely bleeding wound.

99. The Written Directive entitled MPD policy 3.3.5, a copy of which is attached as Exhibit B, defendant Ernest N. Finley, the MPD Police Chief, and final policy maker for the City of Montgomery Police Department created, established, ordered and defined the policy of the City of Montgomery's Police Department that governed its policemen's duties regarding their rendering of aid to persons injured by the police and which was in force and effect on July 8, 2018.

100. MPD policy 3.3.5 states that its "purpose . . . is to establish procedures for rendering aid after the use of force."

101. However, according to the testimony of both (a) Chief Ernest Finley,[2] the City's final policymaker, and (b) Lt. Andre Carlisle,[3] the City of Montgomery's Rule 30(b)(6) designee on MPD police training, under MPD customs and policies in effect in July, 2018, <u>under no circumstances were MPD policemen required or allowed to themselves render aid or perform basic, elementary first aid measures to diminish, reduce, or retard heavy and uncontrolled bleeding from a wound they had caused, even if such efforts were necessary to prevent that person's death</u>.

102. Amplifying and making the MPD policy clearer on this specific point, Chief Finley so testified, despite his admitting knowledge that if a major blood vessel is cut or torn or severed,

---

[2] Deposition testimony of Chief Ernest Finley, p. 39:

> Q. Okay. Your testimony is that MPD policy 3.3.5 did not require MPD policemen who cause say a life-threatening injury such as arterial bleeding, they don't have any obligation to themselves provide first aid to stop or reduce the flow of blood necessary to avoid loss of life, correct?
>
> MR. EAST: Object to form.
>
> A. Correct.

[3] Lt. Andre Carlisle, the City's Rule 30(b)(6) designee, testified by deposition, p. 42-43:

> Q. From 2015 until January of 2021, during that period of time, there were no circumstances under which Montgomery police officers were required to provide hands-on first aid or medical care to an injured person, correct?
>
> A. You mean where there's a policy in place?
>
> Q. Yes, sir.
>
> A. Is that what you're asking?
>
> Q. Yes, sir. Were they required by policy to --
>
> A. To do hands-on?
>
> Q. Right.
>
> A. No.
>
> Q. Okay. Under no circumstances that you know of was that required.
>
> A. Under no circumstances that I know of, yes.

that person must be treated "immediately" to "avoid loss of life"[4] and also admitting that if the policeman on site does not provide that treatment, it will not be treated immediately, but treatment will be delayed until EMTs are summoned and arrive.[5]

103.  Still further, the policies and procedures of the MPD in force and effect in July, 2018, not only did not require MPD policemen to render any type of first aid or medical attention to persons that the police seriously or even potentially fatally injured, MPD policies, procedures, customs and practices effectively prohibited or prevented MPD policeman from providing first aid or medical care of any kind for such injuries.

104.  This prohibition resulted from MPD policy 3.3.5, and another policy, procedure, custom or practice of the Montgomery Police Department.   Those two policies were:

>  (a) First, MPD policy 3.3.5 states that "Medical Aid is to be rendered by only those trained and/or certified to render such aid."

---

[4]  Deposition testimony of Chief Ernest Finley, p. 60:

> Q. Okay.  Do you know that if a major blood vessel in a person's body is cut or severed or torn and they are bleeding heavily, that person's blood is escaping from their body, that that must be treated immediately?
>
> MR. EAST:  Object to form.
>
> A. Yes.

[5] Deposition testimony of Chief Ernest Finley, p. 79:

> Q. All right.  Would you agree that there are unavoidable and inevitable delays between when someone suffers an injury at the hands of the police somewhere in the City of Montgomery and when these two calls, at least two calls have to be made and then the EMT unit has to go out to the location? There's an inevitable delay in getting there, correct?
>
> MR. EAST:  Object to form.
>
> A. Yes.

(b) Second, the MPD had no police trained or certified to render such aid,[6] i.e., the MPD did not train its policemen in first aid or medical care and did not require its policemen to receive training in first aid or medical care.[7]

---

[6] Lt. Andre Carlisle, the City's Rule 30(b)(6) designee to give the testimony of the City on MPD police training, testified, by deposition, p. 33:

> Q. Were there any Montgomery Police Department officers -- prior to this directive [3.3.5] being entered in April of 2018, were there any who were trained or certified with regard to providing medical aid?
>
> A. I'm not sure.
>
> Q. Okay. Do you know of any?
>
> A. I don't.
>
> Q. Okay. Did you consider persons who had had APOST training in first aid, did you consider those persons to be persons who were required to give first aid to persons injured by the police under this policy?
>
> MR. EAST: Object to form.
>
> A. No.

[7] Lt. Andre Carlisle, the City's Rule 30(b)(6) designee to give the testimony of the City on MPD police training, testified, by deposition, p. 11-12:

> Q. Okay. So the Montgomery Police Department doesn't require or provide any medical or first aid training to policemen, correct?
>
> MR. EAST: Object to form.
> A. No.
>
> Q. I'm sorry?
>
> A. No.
>
> Q. What I said is correct.
>
> A. Yes.

and deposition testimony of Lt. Carlisle, p.25:

> A. [D]id the City of Montgomery require its police officers after they became police officers to receive any kind of training in first aid or medical care?
>
> A. No.

8

105. Thus, in July, 2018, the policy, custom or practice of the MPD was not only that the MPD **did not require** its policemen to provide first aid to heavily bleeding persons they had injured, but the MPD effectively **prohibited** its policemen from providing first aid to such persons.

106. Further confirming this policy, defendant Finley testified that the "limit" of what MPD policemen are required to do when they have seriously injured a person who is bleeding profusely is to place a radio call for EMTs.[8]

107. Similarly, the testimony of the City itself, given by its Rule 30(b)(6) designee, Lt. Andre Carlisle, was that under no circumstances did MPD police have a duty to themselves render aid to a seriously injured and profusely bleeding person the police had injured.[9]

---

[8] Deposition testimony of Police Chief Ernest Finley, p. 38-39:

> Q. That's not an answer to my question. There are two possibilities. Again, I'll state it for you, sir. Either 3.3.5 required police who cause an injury to someone in the course of apprehending them, it requires them to themselves in appropriate circumstances to render first aid themselves and not simply make a call. That's one possibility. The other is that the only obligation that they have is to promptly summons medical care. I'm asking you which of those two is the policy?
>
>      MR. EAST: Object to form.
>
> Q. Which of those two?
>
> A. I think according to policy to summons medical care, and that's what they did.
>
> Q. That's the limit of what they're required to do, correct?
>
>      MR. EAST: Object to form.
>
> A. Yes.

[9] See the Rule 30(b)(6) testimony of the City's designee, Lt. Andre Carlisle, at p. 42-43:

> Q. From 2015 until January of 2021, during that period of time, there were no circumstances under which Montgomery police officers were required to provide hands-on first aid or medical care to an injured person, correct?
>
>                * * * * *
>
> A. No.
>
> Q. Okay. Under no circumstances that you know of was that required.
>
> A. Under no circumstances that I know of, yes.

108. Still further attesting to and confirming that the customs, policies and procedures of the City of Montgomery Police Department, as they existed on July 8, 2018, did not require MPD defendants on site at 3809 Cresta Circle to provide first aid or any type of medical care to retard or reduce the flow of blood from the police dog bite suffered by Joseph Lee Pettaway, the Montgomery Police Department did not cite nor bring disciplinary charges against any of these defendant policemen for failing to provide any such first aid or medical care to Mr. Pettaway.[10]

109. What the testimony of former Chief Finlay and Lt. Carlisle first revealed in June and July, 2021, in this case was theretofore both unthinkable and unconscionable: in the twenty-first century, in a capital city of a U.S. state, the persons in charge of the city's police department knowingly chose, created and allowed such policies and customs to exist.

110. The injury sustained by Mr. Pettaway was an injury that should not have caused his death and Mr. Pettaway would not have died if basic, elementary first aid measures to diminish, retard or reduce his heavy and uncontrolled bleeding had been administered to him by MPD police.

111. However, those life-saving measures—simple, basic actions that are taught to Boy Scouts—were not performed by MPD police to save Mr. Pettaway's life because MPD policy 3.3.5 not only did not **require** MPD policemen to perform them, but because of the lack of any training of MPD police in first aid, MPD policy **prohibited and prevented** MPD policemen from performing any of these life-saving measures.

112. The direct causal link between the MPD policies and customs and the constitutional deprivation or violation herein could hardly be clearer.

---

[10] Deposition testimony of Police Chief Ernest Finley, p. 122:

> Q. All right. Were any of the MPD officers involved in Mr. Pettaway's death, were any of those MPD officers ever cited or disciplined or have disciplinary charges brought against them for failure to provide first aid or medical attention to Mr. Pettaway?
>
> A. No.
>
> Q. None were disciplined about that.
>
> A. No, sir.

113. The combination of these two policies and customs:

> (a) MPD policy 3.3.5 which did not require to attempt and, in fact, prohibited MPD police who were not trained or certified in first aid from attempting to diminish, reduce, retard or lessen Mr. Pettaway's bleeding,
>
> and
>
> (b) the MPD custom or policy of not training or requiring its police to be trained in the basic, elementary first aid measures required to diminish, retard or reduce heavy and uncontrolled bleeding from an open wound

were a proximate cause of and the moving force behind the failure of MPD police to provide to Joseph Lee Pettaway first aid or any of the most basic, rudimentary forms of the medical care that the Due Process Clause of the Fourteenth Amendment required to be provided to him and were a proximate cause and the moving force behind Mr. Pettaway's death.

114. Defendant Ernest N. Finley, as the MPD Police Chief from January, 2015, until June, 2021, was the final policymaker for the City of Montgomery Police Department.

115. Defendant Finley created, approved and ordered into effect, MPD policy 3.3.5. Defendant Finley also caused, approved, tolerated and/or allowed to continue the existing policy, custom or practice of the MPD to not provide nor require basic, elementary first aid training for MPD policemen from the time Finley became MPD Police Chief in January, 2015, through July 8, 2018, the date of the death of Joseph Lee Pettaway from exsanguination caused by an MPD police dog attack and failure of MPD police to provide any first aid or other type of medical assistance to prevent his death.

116. These policies of the City of Montgomery's Police Department that were created, established, approved and ordered into effect by defendant Ernest Finley were a moving force and a proximate cause of the death of Joseph Lee Pettaway on July 8, 2018.

Wherefore, plaintiff demands against defendants the City of Montgomery and Ernest N. Finley for damages in such sum as the jury may reasonably find appropriate to punish them for causing the wrongful death of Mr. Pettaway, and to deter them and others like them from such conduct in the future, for the costs of this action, for reasonable attorney's fees pursuant to 42 U.S.C. §1988, and such further additional, necessary or proper relief the Court deems appropriate.

/s/ Griffin Sikes, Jr.

Griffin Sikes, Jr.
Attorney for Plaintiff
Post Office Box 11234
Montgomery, Alabama 36111
Phone: 334.233.4070
E-mail: sikeslawyer@gmail.com

/s/ H. E. Nix, Jr.

H. E. Nix, Jr. Attorney
for Plaintiff
7515 Halcyon Pointe Drive
Montgomery, AL 36117
Phone: 334.279.7770
E-mail: cnix@nixattorney.com

Jury Demand

Plaintiff demands trial by jury of all issues in this cause.

/s/ Griffin Sikes, Jr

Of Counsel

Certificate of Service

I certify that a true and correct copy of the foregoing has been filed on Pacer, the Court's electronic server, on this 20th day of August, 2021, for service on all counsel of record herein:

Chris East, Esq., at ceast@montgomeryal.gov
Madelyn Kay Mauldin, Esq., at mmauldin@montgomeryal.gov
John David Norris, Esq., at norrisj@bellsouth.net
William P. Gray, Esq., at wpg@grayattorneys.com

/s/ Griffin Sikes, Jr              .

Of Counsel

12