1    computer.

 2    A.              Phone or computer, yes, sir.

 3    Q.              All right.  Let me ask you about

 4    whether -- At any time while you were a Montgomery

 5    Police Department officer, were you ever instructed

 6    under any circumstances that Montgomery police

 7    officers were to render first aid or to try to

 8    provide any kind of medical assistance or care to a

 9    person that was injured by them?

10    A.              We were never directed to provide

11    medical care for anybody.  We were always told to

12    hold off and wait for medics, call medics.  The

13    moment that you recognize that there's an injury,

14    call medics.  And obviously, you know, if it's a

15    paper cut, you don't call medics for a paper cut

16    unless the person requests it.  But in situations

17    such as this, there's obviously something wrong,

18    call medics.

19    Q.              Okay.  So was the policy that you

20    weren't required to or was the policy that you were

21    told not to?

22    A.              It was -- The policy as written if I

23    remember was you basically have to be certified and

24    trained to perform medical things.  If you're not

25    certified, if you're not trained, then don't do it,

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 27

```
 1    call for medics, let them do it.  They're the
 2    medical professionals, let the medical
 3    professionals do medical stuff.
 4    Q.          So for all Montgomery police officers
 5    who weren't trained or certified with regard to
 6    first aid, they were all instructed not to provide
 7    any medical care or first aid.
 8    A.          Pretty much.
 9    Q.          Correct?
10    A.          Yes, sir.
11    Q.          Well, not pretty much.
12    A.          I'm sorry.  Yes, sir.
13    Q.          All right.  Were there any
14    circumstances under which you were required or
15    allowed to provide medical care even if you didn't
16    have training?
17    A.          That's a difficult question to answer.
18    Q.          Well, let me help you.  I'm going to
19    show you what -- Do you know Officer Andre
20    Carlisle?
21    A.          Yes.
22    Q.          Okay.  I'm going to show you what's
23    been marked Plaintiff's Exhibit B to his
24    deposition.
25                MR. EAST:  You said which number?
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 28

```
 1   A           Yes, sir.
 2               (Plaintiff's Finley Exhibit 3
 3               was produced for reference.)
 4   Q           Okay.  So you're familiar with the
 5   Plaintiff's Exhibit 3 to Mr. Finley's
 6   deposition?
 7   A           Yes, sir.
 8   Q           Did you make a copy of it by any
 9   chance?
10   A           I didn't know I had to print it out.
11   No, sir.
12   Q           But you saw it and read through it?
13   A           Yes, sir.
14   Q           Okay.  Well, I will -- you saw this
15   and knew of it -- and knew of its content prior
16   to July 8th, of 2018; correct?
17   A           That's correct.
18   Q           And how were -- how did you review
19   it or know of it prior to July 8, of 2018?
20   A           Through Power DMS.  We have a system
21   that puts our policies that -- and we have --
22   are required to read our policies, so I reviewed
23   that.
24   Q           All right.  Let maybe shortcut this.
25   Let me -- there has been testimony about that
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 34

1    earlier by other police officers.

2              And what they testified is that

3    there is -- this Power DMS that you're talking

4    about enables police officers, either with an

5    app on their phone or with a computer, that they

6    can pull up and look and view new policies,

7    regulations, or other communications from police

8    department addressing different issues with

9    regard to police operations; correct?

10   A          Correct.

11   Q          All right.  And there was also

12   testimony that these -- these type of policy

13   directives or policies and procedures as they

14   are -- as the police department puts them out,

15   they are put on that app; and you are required

16   to sign off on it that you have read and

17   understood it; correct?

18   A          That's correct.

19   Q          And you did that with this

20   particular 3.3.5 or Plaintiff's Exhibit 3 to

21   Mr. Finley's deposition; correct?

22   A          That's correct.

23   Q          I'm also going to direct your

24   attention to Plaintiff's Exhibits B and C that

25   were --

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 35

```
 1              MR. SIKES:  I'll ask that those be
 2    placed on the screen, please.
 3              (Plaintiff's Exhibit B was
 4              produced for reference.)
 5              MR. SIKES:  And the second page of
 6    it.
 7    Q          And take a moment and read that, if
 8    you would, please, ma'am.  And tell us when you
 9    have read it, and then we will turn to the next
10    page of it.
11    A          You can turn to the next page.
12    Okay.
13    Q          I will represent to you that is the
14    deposition testimony -- or a portion of the
15    deposition testimony of lieutenant Andre
16    Carlisle.
17              Do you know or do you recognize the
18    name lieutenant Andre Carlisle?
19    A          Lieutenant Carlisle?  Yes, sir.
20    Q          And who is Lieutenant Carlisle?
21    A          I just know -- I -- I just know he's
22    a lieutenant.  I've never personally worked with
23    him through patrol.
24    Q          Okay.  I'll represent to you that he
25    was produced by the City of Montgomery as their
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 36

 1   designee to give testimony with regard to police
 2   training.
 3   A          Uh-huh.
 4              MR. EAST:  With -- with regard to
 5   the -- the policies.
 6              MR. SIKES:  Right.
 7              MR. EAST:  Yeah.  You said
 8   "training."
 9              MR. SIKES:  I'm sorry.
10   Q          (By Mr. Sikes)  And have you seen
11   this -- this document?
12              Did you see it yesterday?
13   A          This?  No, I -- no.  No, sir.
14   Q          Had you ever seen this document
15   before?
16   A          No, sir.  No.
17   Q          Okay.
18   A          No, sir.
19   Q          And do you understand it to mean
20   that in July of 2018 and for some time prior to
21   that there were no circumstances under which
22   Montgomery police officers were required to
23   provide hands-on first aid or medical care to a
24   person they injure or who was injured in the
25   course of him being taken into custody; correct?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37

```
 1   A            That's correct.
 2   Q            Okay.  Is that -- is that what you
 3   understood Montgomery Police Department policy
 4   was in July of 2018?
 5   A            Yes, sir.
 6                (Plaintiff's Exhibit C was
 7                 produced for reference.)
 8   Q            I'll show you Plaintiff's Exhibit C
 9   also, and I'll represent to you this is a
10   portion of the deposition of Ernest Finley who
11   was taken in this case.
12                MR. SIKES:  Can you show us the
13   second page and let Ms. Ruiz read that.
14   Q            Tell us when you have finished
15   reading it, ma'am.
16   A            (Witness complies.)  I'm done.
17   Q            All right.  You understood then that
18   Mr. Finley, the former police chief, testified
19   that Montgomery Police Department policies and
20   procedures did not require Montgomery Police
21   Department policemen who cause a
22   life-threatening injury, such as arterial
23   bleeding, they don't have any obligation to
24   provide first aid to stop or reduce the flow of
25   blood necessary to avoid loss of life.
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 38

1          Do you understand that?

2    A          That's correct.

3    Q          That's what you were reading?

4    A          Yes, sir.

5    Q          Do you agree that that is what you

6    understood Montgomery Police Department policy

7    to be in July of 2018?

8    A          Yes, sir.

9    Q          I'm sorry.  Do you need to tend to

10   something, ma'am?

11   A          No.  I was -- I don't have a quiet

12   place, so -- and there are people talking; so I

13   was trying to get away from the noise.  There we

14   go.  So --

15   Q          All right.  Now, you saw and -- that

16   Mr. Pettaway as he lay out there on the sidewalk

17   was bleeding heavily; correct?

18   A          Yes.  I saw all the blood.  Yes,

19   sir.

20   Q          And you knew that if -- there was a

21   danger of him possibly dying if something wasn't

22   done to stop or reduce or retard the flow of

23   blood; correct?

24   A          It -- yes, sir.

25   Q          All right.  Is the reason that you

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 39

```
 1   didn't have a -- or take any action to reduce
 2   Mr. Pettaway's loss of blood was that you hadn't
 3   been trained in that and that Montgomery Police
 4   Department policies prohibited you from --
 5   prohibited you from doing that?
 6              Are those reasons why you didn't do
 7   that?
 8   A          That's correct.  Yes, sir.
 9   Q          Are there any other reasons you can
10   think of that you didn't provide -- make any
11   attempt to provide first aid to Mr. Pettaway?
12              Any other reasons you can think of?
13   A          I just don't have medical knowledge.
14   I don't have knowledge of assisting in that --
15   in that manner.
16   Q          All right.  The Montgomery Police
17   Department doesn't require you to be trained and
18   doesn't train you in first aid to stop bleeding,
19   does it; or did it?
20   A          At -- at that time; no, sir.  We
21   were only trained to do CPR.
22   Q          And -- well, Montgomery Police
23   Department didn't train you to do that.
24              You got that in -- in the police
25   academy; correct?
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 40

Walter Pettaway vs Nicholas D. Barber, et al.

Bianka Raquel Ruiz
10/8/2021

```
 1              MR. EAST:  Object to the form.
 2    A          That's correct.
 3    Q          Okay.  Did the -- after you left the
 4    police academy, did the Montgomery Police
 5    Department train you in any aspect of first aid
 6    or providing medical care in any area?
 7    A          No, sir.
 8    Q          I think that's all, ma'am.  Thank
 9    you.
10    A          Yes, sir.
11       (THE DEPOSITION WAS CONCLUDED AT 9:47 A.M.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 41

```
 1   deposition.  It was C to a deposition taken
 2   earlier also.
 3                   (Plaintiffs' Exhibit C was
 4                   marked for identification.)
 5   Q             And I'd ask you to take a look at
 6   the question on -- beginning on line five and
 7   the answer on line 13.
 8             Would you read that aloud for us,
 9   please, ma'am, from line five to the answer on
10   line 13.
11   A             (Witness complies.)
12   Q             If you would read it aloud, please,
13   ma'am.
14   A             Yes, sir.
15             Okay.  Your testimony is that MPD
16   policy 3.3.5 did not require MPD policemen who
17   cause, say, a life-threatening injury such as
18   arterial bleeding, they don't have any
19   obligation to themselves provide first aid to
20   stop or reduce the flow of blood necessary to
21   avoid loss of life; correct?
22   Q             That's fine.  Thank you, ma'am.
23             Do you agree or disagree with that
24   statement by Mr. Finley.
25   A             I agree.
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 44

1  Q          Okay.  Had anybody at the police

2  department ever in your time you were -- that

3  you were a police officer prior to July 8th, of

4  2018; anybody ever tell you or direct you that

5  you are to provide first aid if you see somebody

6  who has suffered an injury that looks to you to

7  be life threatening?

8  A          No.

9  Q          Okay.  I'm going to show you these

10 Plaintiff's Exhibit -- or I will -- I'll read

11 for you the testimony of Lieutenant Carlisle.  I

12 put his testimony in as Plaintiff's Exhibit B.

13 And, basically, I asked him some -- somewhat

14 similar question.

15          And that is:  From 2015, which was

16 when Mr. Finley began as the police chief, until

17 January of 2021; during that period of time,

18 there were no circumstances under which

19 Montgomery police officers were required to

20 provide hands-on first aid or medical care to an

21 injured person; correct?

22          And he went through and asked me to

23 clarify the question.  And then he said, That's

24 correct, that that -- there is not any

25 circumstances.

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 45

```
 1                    I then repeated it and said:  Under
 2    no circumstances that you know of was that,
 3    providing medical care, required?
 4                    And he said, Under no circumstances
 5    that I know of.
 6                    Is that also consistent with what
 7    you know and were trained and were taught by the
 8    Montgomery Police Department?
 9    A         Yes, sir.
10    Q         Okay.
11                    MR. EAST:  Are you introducing that?
12                    MR. SIKES:  Yeah.
13                    MR. EAST:  As an exhibit to this
14    one?
15                    MR. SIKES:  Yes.  Yeah.
16                         (Plaintiffs' Exhibit B was
17                         marked for identification.)
18    Q         Okay.  Are you trained in or are you
19    certified in any kind of medical care or first
20    aid?
21    A         Now.  Yes, sir.
22    Q         I'm sorry?
23    A         Yes, sir; I am now.
24    Q         When was that?
25    A         The beginning of this year, 2021.
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 46

1   Q           2021?

2   A           Yes, sir.

3   Q           Okay.  Prior to that time, were you?

4   A           No, sir.

5   Q           Okay.  Did the Montgomery Police

6   Department ever provide you with any kind of

7   medical training or first aid training prior to

8   2021?

9   A           Yes, sir.

10  Q           What was that?

11  A           CPR.

12  Q           You were taught that back at the

13  academy?

14  A           Right.

15  Q           Police academy?

16  A           Yes.

17  Q           I'm not -- I'm talking about the

18  police -- I'm talking about the Montgomery

19  Police Department.

20  A           That's part of the training.  No,

21  sir.  Other than that, no.

22  Q           Okay.  And you -- you -- do you know

23  what CPR is?

24  A           Yes, sir.

25  Q           What is CPR?

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 47

1   A          To resuscitate a subject if unable
2   to breathe or as --
3   Q          Okay.  It has to do with when
4   someone ceases breathing or their heart stops --
5   A          Correct.
6   Q          -- right?
7   A          Yes, sir.
8   Q          And, basically, the procedure is
9   that you compress --
10  A          Compress the chest.
11  Q          -- the chest --
12  A          Yes, sir.
13  Q          -- sort of rhythmically to try to
14  get either the heart started and/or to get them
15  to start breathing again; correct?
16  A          Yes, sir.
17  Q          Do you know what CPR stands for?
18  A          I can't remember off the top of my
19  head.  No, sir.
20  Q          Okay.  It stands for cardiopulmonary
21  resuscitation.
22  A          Resuscitation.  Yes.
23  Q          Right.  Cardio means heart.
24  A          Yes.
25  Q          Pulmonary is lung.

```
 1   A          Yes, sir.
 2   Q          Cardio -- CPR.  Okay.
 3   A          Yes, sir.
 4   Q          So -- but nothing you were ever
 5   taught had anything to do with how to treat a
 6   heavily-bleeding person?
 7   A          No, sir.
 8   Q          Okay.  There was a lot of blood out
 9   there on the sidewalk and in the house, wasn't
10   there?
11   A          Yes, sir.
12   Q          Okay.  Did Mr. Pettaway -- was he
13   unconscious as he was laying there on the
14   sidewalk best you could tell?
15   A          No, sir.
16   Q          He wasn't unconscious?
17   A          Not that I can remember.
18   Q          Did he ever say anything?
19   A          I can't recall.
20   Q          Did he ever move, turn over, or sit
21   up or change positions in any way on the
22   sidewalk?
23   A          No, sir.  Not that I can recall.
24   Q          So he didn't -- he didn't speak as
25   best you can recollect?
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 49

```
1    loses the volume of blood that you see in these
2    photographs, do you understand that is a
3    potentially life-threatening circumstance?
4    A          Sir, I'm not able to determine the
5    amount of volume of blood that he has lost.
6    Q          Do you see that it's a lot of blood?
7    A          Yes, sir.
8    Q          Okay.  Do you understand when
9    somebody -- there's uncontrolled bleeding from a
10   wound and that no attempt is made to stop or
11   retard the flow of blood that that is a
12   potentially life-threatening event or
13   circumstance?
14   A          Potentially; yes, sir.
15   Q          Okay.  And in that case that is
16   exactly what occurred; correct?
17   A          I guess so.  Yes, sir.
18   Q          Did the Montgomery Police Department
19   provide you any training in any kind of medical
20   care or first aid?
21   A          CPR.
22   Q          Well, I -- I think that that was
23   given to you by APOST in your training.
24              Is that what you were talking about?
25   A          Yes, sir.
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 40

1   Q            Before you were a sworn police

2   officer?

3   A            Yes, sir.

4   Q            Okay.  I'm not talking about what

5   APOST gave you about CPR training.

6                And CPR now, for the record, what do

7   you understand CPR to mean?

8   A            If someone has stopped breathing,

9   you then perform CPR.

10  Q            Okay.  Do you know what the initials

11  CPR stand for?

12  A            I can't recall that, sir.

13  Q            How long was this training that you

14  got in APOST -- from APOST?

15  A            The whole extent of training --

16  Q            No, sir.

17  A            -- or just the CPR, sir?

18  Q            No, sir.  The CPR training.  That's

19  what we're talking about.

20                How long was that -- was it a

21  one-hour course?

22  A            I don't recall.

23  Q            Okay.  And you don't even know what

24  CPR means, do you?

25  A            No, sir.  I can't remember what the

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 41

1   abbreviation stands for.

2   Q          Okay.  That's the only training that

3   you got from anybody, and it was from APOST;

4   correct?

5   A          Yes, sir.

6   Q          All right.  And this -- the

7   Montgomery Police Department provided you no

8   training with regard to first aid or medical

9   care at all; correct?

10   A          Yes, sir.

11   Q          What I said is correct?

12   A          Correct.

13   Q          Okay.  And they didn't require you

14   to be trained in any kind of medical care or

15   first aid; correct?

16   A          Correct.

17   Q          And to the best of your knowledge,

18   they didn't require any police officer to be

19   trained in medical care or first aid to your

20   knowledge; correct?

21   A          Correct.

22   Q          You don't know of any Montgomery

23   police officer who's ever received any training

24   from the Montgomery Police Department in medical

25   care or first aid; correct?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 42

```
 1   A              I do not personally know, sir.
 2   Q              Okay.  Do you understand what the --
 3   the -- you are being sued for, what the charges
 4   against you are in the complaint filed in this
 5   case?
 6   A              Yes, sir.
 7   Q              And what do you understand that to
 8   be?
 9   A              I believe it's a negligence death.
10   Q              And what in particular is -- are you
11   charged with doing or not doing?
12   A              I believe it's having not rendered
13   any aid to the victim.
14   Q              Okay.  All right.  Are you familiar
15   with the Montgomery, or were you -- in July of
16   2018, were you familiar with the Montgomery
17   Police Department policies and procedures?
18   A              Yes, sir.
19   Q              And how were you made -- how were
20   they made known to you?
21   A              I'm not sure what the app is called,
22   but there was an app that you had on your phone.
23   And you had to go through all policies, and it
24   made every policy available on your phone.
25   Q              Were you required to read them all?
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 43

```
 1    A          Yes, sir.
 2    Q          And were you required to sign off on
 3    it in some way electronically --
 4    A          Yes, sir.
 5    Q          -- that you had confirmed that you
 6    had seen it and read it and knew it?
 7    A          Yes, sir.
 8    Q          Okay.  Were you ever tested on it?
 9    A          I don't recall, sir.
10    Q          Okay.  I'm going to show you what's
11    been marked -- this was Plaintiffs' Exhibit 3 to
12    Ernest Finley's deposition.
13               Ernest Finley was in the chief of
14    police in July of 2018; correct?
15    A          Yes, sir.
16          (Plaintiffs' Finley Exhibit 3
17           was marked for identification.)
18    Q          Okay.  Have you seen that document
19    before?
20    A          Yes, sir.
21    Q          Have you seen that before?
22    A          Yes, sir.
23    Q          And what is that document?
24    A          It is the use of force, rendering
25    aid policy.
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 44

```
 1    Q            Okay.  And that was in force at -- I
 2    believe in July of 2018; correct?
 3    A            I -- yes, sir.
 4    Q            Okay.  The CPR training we talked
 5    about -- CPR, by the way, stands for
 6    cardiopulmonary resuscitation.
 7                 Does that jog your memory now?
 8    A            Yes, sir.
 9    Q            Okay.  You had been -- that's the
10    only training you had ever had, and that was
11    given to you by APOST.  And it has to do with
12    when someone has stopped breathing or their
13    heart has stopped beating.  It is to compress
14    their chest to cause them to begin breathing
15    and/or their heart to start beating again.
16                 Is that a fair statement of what CPR
17    is?
18    A            Yes, sir.
19    Q            Okay.  But as far as any kind of
20    bleeding, especially a major artery being
21    severed or cut, you had received no training
22    about that at all; correct?
23    A            No, sir.
24    Q            And don't know that any other police
25    officer had ever received any training from the
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 45

1   Montgomery Police Department about that,

2   correct, to your knowledge?

3   A            That is correct, sir.

4   Q            Okay.  I'm going to show you the

5   portion of Chief Finley's deposition.  It's been

6   marked as Exhibit C to a prior deposition.

7                      (Plaintiffs' Exhibit C was

8                      marked for identification.)

9   Q            And I'll ask you to take a look at

10  that.

11  A            Do you need these back, sir?

12  Q            Just you can put them right here.

13  That's fine.  This lady here is going to take

14  them after we're through.

15  A            (Witness complies.)

16  Q            Would you read the question and

17  answer there, please, sir, for us.

18  A            Out loud, sir?

19  Q            Yes, sir.

20  A            Okay.  Your testimony is that MPD

21  policy 3.3.5 did not require MPD policemen who

22  cause, say, a life-threatening injury such as

23  arterial bleeding, they don't have any

24  obligation to themselves provide first aid to

25  stop or reduce the flow of blood necessary to

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 46

1    avoid loss of life; correct?

2                    MR. EAST:  Object to form.

3                    Answer:  Correct.

4                    Question:  You were the policy maker

5    who made or created or put 3.3.5 into effect as

6    MPD policy; correct?

7                    Answer:  Correct.

8    Q           Okay.  Do you understand that the

9    testimony of -- of Chief Finley then to be that

10   there were no circumstances under which any MPD

11   officer was required to provide medical care or

12   first aid to anybody who was injured and even to

13   the extent they had a life-threatening injury;

14   correct?

15   A           Correct.

16   Q           Okay.  Do you agree with that or

17   disagree with that?

18   A           I'm not sure I understand your --

19   Q           Do you agree that that was the

20   policy or not as -- as Chief Finley testified?

21   A           That -- yes, sir; that was the

22   policy.  Yes, sir.

23   Q           Okay.  All right.  In fact, let me

24   ask you to take a look back at Plaintiffs'

25   Exhibit 3 to Mr. Finley's deposition.

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 47

```
 1              Do you see the last sentence there,
 2   paragraph C?
 3              Would you read that out loud.
 4   A          Yes, sir.  Medical aid is to be
 5   rendered by only those trained and/or certified
 6   to render such aid.
 7   Q          Okay.  So not only you were not
 8   required to.  If you weren't trained or
 9   certified in the medical care or first aid, then
10   you were prohibited from providing any first
11   aid; correct?
12   A          Yes, sir.
13   Q          Okay.  I'll show you the exhibit --
14   Plaintiffs' Exhibit B to a prior deposition.
15                        (Plaintiffs' Exhibit B was
16                        marked for identification.)
17   Q          This is the testimony of Lieutenant
18   Andre Carlisle.
19              Do you know Lieutenant Carlisle?
20   A          I believe I remember the name.
21   Q          Okay.  But not -- that's fine.
22              He was designated by the City to
23   give testimony with regard to the training of
24   Montgomery Police Department officers.  And he
25   -- I asked him there at his deposition:  From
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 48

1   2015 until January of 2021, during that period

2   of time; there were no circumstances under which

3   Montgomery police officers were required to

4   provide hands-on first aid or medical care to an

5   injured person; correct?

6           And then he asked me, When there's a

7   policy in place?

8           I said, Yes, sir.

9           Is that what you're asking?   .

10          I said, Yes.

11          And he then said, Okay.  Under no

12   circum -- I then asked him:  Okay.  Under no

13   circumstances that you know of was that

14   required?

15          And he answered, Under no

16   circumstances that I know of.

17          Do you agree with that testimony

18   also?

19   A       Yes, sir.

20   Q       There weren't any circumstances

21   under which any Montgomery police officer was

22   required to provide medical care to someone

23   injured, even when they had a life-threatening

24   injury; correct?

25   A       Yes, sir.

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 49

```
 1   Q          You know that of course -- I believe
 2   you know that Mr. Pettaway died.
 3              You know that; correct?
 4   A          Yes, sir.
 5   Q          Do you know what he died from?
 6   A          No, sir.
 7   Q          Do you know that he -- you don't
 8   know that he died from loss of blood?
 9   A          I wasn't aware, sir.
10   Q          What other reason would you have --
11   do you have any reason to believe he died from
12   anything else?
13   A          No, sir.
14   Q          Okay.  All right.  Had anyone at the
15   Montgomery Police Department, during the whole
16   period of time you were employed there, did
17   anyone ever instruct, train, or tell you that if
18   a person is being arrested or apprehended and
19   suffers a -- what looks to you to be a
20   life-threatening injury that you should take any
21   action at providing first aid to prevent that
22   person's death?
23              Has anybody ever told you that, that
24   you should do that?
25   A          That we should get medics in route,
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 50

1    and then when I --
2    Q            I'm not asking that.  Again, we can
3    do this a lot quicker if you'll answer what I
4    ask you.  I understand you were -- you were
5    supposed to call the medics.  That's not what
6    I'm asking you.  Again, if you would listen to
7    the question and answer that question and not
8    another question that you might want me to ask
9    you or that your lawyers might ask later.
10                I'm asking you:  Did anyone at the
11   Montgomery Police Department ever tell,
12   instruct, direct you that where you came upon in
13   the course of arresting somebody a potentially
14   life-threatening injury that you had the
15   obligation to provide any medical care or first
16   aid care of any type to that person to prevent
17   their death?
18   A            No, sir.
19   Q            Okay.  In retrospect, do you believe
20   that's a wise policy?
21   A            I'm not sure, sir.
22   Q            You have -- you -- well, I will tell
23   you that the death certificate indicates that
24   Mr. Pettaway died of exsanguination, which is
25   another -- which is a medical term for saying

```
 1    you that, Hey, we need to do something to stop

 2    this bleeding?

 3              That never occurred to you?

 4    A         It did not.

 5    Q         Okay.  Do you feel any guilt or

 6    remorse about your role in causing this man's

 7    death?

 8              MS. MAULDIN:  Object to the form.

 9    A         I -- I do not.

10    Q         If it occurred again -- you're a

11    police officer now; correct?

12    A         Correct.

13    Q         If it occurred tomorrow, would you

14    do exactly the same thing you did on this

15    occasion?

16    A         No.

17    Q         What would you do?

18    A         I would attempt to stop the

19    bleeding --

20    Q         Okay.

21    A         -- in any way I could.

22    Q         Since we filed the claim against you

23    and the other police officers, there has been

24    testimony given by former police chief Ernest

25    Finley -- he was the police chief at the time in
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 35

1    July of 2018; correct?

2    A         Correct.

3    Q         I'm going to ask you -- I'm going to

4    show you what's a Montgomery Police Department

5    directive.  It was Exhibit 3 to Mr. Finley's

6    deposition.

7              (Plaintiff's Finley Exhibit 3

8              was produced for reference.)

9    Q         And I'm going to ask you if you can

10   recollect seeing that?

11   A         Correct.

12   Q         I'm sorry?

13             You'd seen that before?

14   A         I have.

15   Q         Okay.  When did you see that?

16   A         I don't recall.  Prior to that date,

17   though.

18   Q         Prior to what date?

19   A         The incident at Cresta Circle.

20             MR. SIKES:  Here, do you want a

21   copy?

22             MS. MAULDIN:  I'm just going to

23   write down the policy number.

24             MR. SIKES:  3.3.5.

25   Q         Did the Montgomery Police Department

1  give you any training in first aid or certify

2  you in first aid or any other kind of medical

3  care?

4  A          Only CPR.

5  Q          Sorry.  And, actually, the

6  Montgomery Police Department didn't train you in

7  that, did they?

8             Wasn't that APOST?

9  A          Correct.

10 Q          At the academy?

11 A          Correct.

12 Q          And it was about a one-hour course

13 or something like that?

14 A          Correct.

15 Q          Okay.  Other than that, that -- and

16 tell me what CPR is.

17 A          I don't recall the official acronym

18 for CPR.

19 Q          That is the official acronym:  CPR.

20 A          I don't recall what that stands for.

21 Q          Cardiopulmonary resuscitation.

22            Does that help you?

23 A          Yes.

24 Q          Okay.  And what is cardiopulmonary

25 resuscitation?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37

Walter Pettaway vs Nicholas D. Barber, et al.

Ryan Powell
10/5/2021

```
 1   A          It is when they are having irregular
 2   beats of the heart, you attempt to correct it by
 3   manually --
 4   Q          Okay.  Compressing the chest --
 5   A          Compressing.  Yes, sir.
 6   Q          -- to get the heartbeat started
 7   again?
 8   A          Yes, sir.
 9   Q          Other than that, do you recall any
10   training by APOST prior to becoming a police
11   officer?
12   A          No.
13   Q          And after you became a police
14   officer -- sworn as a police officer, did the
15   Montgomery Police Department ever provide you
16   with any training in any kind of first aid or
17   medical care?
18   A          No.
19   Q          Okay.  Do you know if it provided it
20   to any other police officer?
21   A          Not that I'm aware of.
22   Q          Okay.  And did you consider yourself
23   trained or certified to render aid to people who
24   were profusely bleeding?
25   A          I've never been trained to stop
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 38

1  bleeding.

2  Q          Okay.  And so you know -- the answer

3  is, no, you didn't consider yourself trained?

4  A          Correct.  That is --

5  Q          And, certainly, you weren't

6  certified to stop or arrest or retard people who

7  had suffered a wound that was -- they were

8  bleeding heavily from; correct?

9  A          Correct.

10  Q          Look at the last line of directive

11  3.3.5 in front of you.

12             Do you see the paragraph C there?

13  A          Yes, sir.

14  Q          Would you read that?

15  A          Medical aid is to be rendered by

16  only those trained and/or certified to render

17  such aid.

18  Q          And you had no such training?

19  A          Correct.

20  Q          And you know -- you don't know of

21  any other police officers that had that

22  training; correct?

23  A          Correct.

24  Q          Well, so did you understand this to

25  be a directive to you to not -- for you not to

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 39

1   provide any medical care or attempt to try to

2   provide medical care?

3   A          Correct.

4   Q          Okay.  I'm going to show you the

5   deposition of Ernest Finley, a portion of the

6   deposition that has been marked Plaintiff's

7   Exhibit C to a prior deposition.

8              (Plaintiff's Exhibit C was

9              produced for reference.)

10  Q          I'll represent to you this is the

11  deposition testimony given by Chief Finley.

12  And the question put to Chief Finley was:  Your

13  testimony is that MPD policy 3.3.5 did not

14  require a policeman who caused, say, a

15  life-threatening injury such as arterial

16  bleeding, they don't have any obligation to

17  themselves provide first aid to stop or reduce

18  the flow of blood necessary to avoid loss of

19  life; correct?

20             And what was Chief Finley's answer?

21  A          Correct.

22  Q          And do you agree with Chief Finley

23  about that?

24  A          I do.

25  Q          Okay.  Do you remember or do you

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 40

1   know Lieutenant Andre Carlisle by any chance?

2   A           I know him.  Yes, sir.

3   Q           Okay.  Did he train you, or was he

4   head of training when you were there, or do you

5   know?

6   A           He was not.

7   Q           Okay.  I'm going to show you

8   Plaintiff's Exhibit B.  It's a portion of

9   Lieutenant Carlisle's deposition.

10              (Plaintiff's Exhibit B was

11               produced for reference.)

12  Q           And Lieutenant Carlisle there was

13  asked:  From -- from 2015 until January of 2021,

14  during that period of time, there were no

15  circumstances under which Montgomery police

16  officers were required to provide hands-on first

17  aid or medical care to an injured person;

18  correct?

19              And the answer was:  You mean when

20  there's a policy in place?

21              And he answers, Yes, sir.

22              And I -- he asked:  Is that what

23  you're asking?

24              Yes, sir.  Were they required by

25  policy?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 41

1              And he says, To do hands on?

2              I said, Right.

3              And he said, No.

4              Correct?

5     A        Correct.

6     Q        I then asked:  Under no

7     circumstances that you know of was that

8     required?

9              And his answer was what?

10    A        Under no circumstances that I know

11    of.

12    Q        Is that consistent with your

13    understanding of what Montgomery Police

14    Department policy was in July of 2018?

15    A        Yes, sir.

16    Q        There were no circumstances.  It

17    didn't matter what the injury was, how severe it

18    was, how likely it was that, if not treated,

19    death would ensue.

20             Under no circumstances were you

21    required to provide medical care; correct?

22    A        Correct.

23    Q        All right.  And, in fact, if you

24    weren't trained for it, you were prohibited from

25    doing it; correct?

```
 1    A           Correct.

 2    Q           Is that correct?

 3    A           Yes, sir.

 4    Q           Okay.  Well, we were talking about

 5    in retrospect a while ago.

 6                And let me ask you about in

 7    retrospect, does that seem like a very wise and

 8    good policy?

 9                MS. MAULDIN:  Object to the form.

10    A           Without medical training; if an

11    officer was to give aid and that aid somehow

12    made the condition worse, they would be held

13    liable --

14    Q           We can --

15    A           -- for that worsening condition.

16    Q           No, sir.  We have a Good Samaritan

17    law in Alabama, but I'm not -- that's not an

18    answer to my question.

19                MR. SIKES:  Move to strike as

20    nonresponsive.

21    Q           I'm asking you about whether you

22    think the policy of -- of prohibiting -- first

23    of all, not training -- let me back up and start

24    again.

25                The policy of Montgomery Police
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 43

```
 1    Department was not to provide any kind of
 2    medical training or first aid to any of its
 3    police officers; correct?
 4    A          Correct.
 5    Q          All right.  And coupled with that,
 6    it also provided that if you weren't trained or
 7    certified in providing first aid or medical
 8    care, then you were prohibited from providing
 9    medical aid or first aid; correct?
10    A          Correct.
11    Q          In retrospect, do you think those
12    two policies are good and wise policies?
13    A          In retrospect with this incident?
14    No.
15    Q          Okay.  Were you in the Boy Scouts?
16    A          No.
17    Q          Now, you have described this as a
18    burglary call; correct?
19    A          Correct.
20    Q          Do you know what burglary is?
21    A          Yes, sir.
22    Q          What is burglary as you understand
23    it?
24    A          It is when a subject makes forced or
25    unforced entry into a residence or occupied -- a
```