1          IN THE UNITED STATES DISTRICT COURT

2             MIDDLE DISTRICT OF ALABAMA

3                 NORTHERN DIVISION

4

5   WALTER PETTAWAY          )

6   as administrator of     )CIVIL ACTION

7   the Estate of Joseph     )2:19-CV-0008

8   Lee Pettaway,           )

9   deceased,               )DEPOSITION OF:

10       Plaintiffs,        )NICHOLAS D. BARBER

11  VS.                     )

12  NICHOLAS D. BARBER,     )

13  et al.,                 )

14       Defendants. )

15

16          S T I P U L A T I O N S

17       IT IS STIPULATED AND AGREED, by and between

18  the parties through their respective counsel, that the

19  continued deposition of NICHOLAS D. BARBER, may be

20  taken before Sandra Bain Moon, Commissioner and Notary

21  Public, State at Large, at the City of Montgomery

22  Legal Department, 103 North Perry Street, Montgomery,

23  AL  36104, on the 3rd day of September, 2021,

24  commencing at 9:00 a.m.

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 1

```
1            IT IS FURTHER STIPULATED AND AGREED that
2   the signature to and reading of the deposition by the
3   witness is waived, the deposition to have the same
4   force and effect as if full compliance had been had
5   with all laws and rules of Court relating to the
6   taking of depositions.
7
8            IT IS FURTHER STIPULATED AND AGREED that
9   it shall not be necessary for any objections to be
10  made by counsel to any questions, except as to form or
11  leading questions, and that counsel for the parties
12  may make objections and assign grounds at the time of
13  the trial, or at the time said deposition is offered
14  in evidence, or prior thereto.
15                        ***
16
17
18
19
20
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 2

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

```
 1                 A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:
 4            H.E. NIX, JR.
 5            Attorney at Law
 6            Law Offices of H.E. Nix
 7            7515 Halcyon Pointe Drive
 8            Montgomery, AL  36117
 9            cnix@nixattorney.com.
10            lawyernix@gmail.com
11
12            GRIFFIN SIKES, JR
13            Attorney at Law
14            P.O. Box 11234
15            Montgomery, AL  36111
16            sikeslawyer@gmail.com
17
18    FOR THE DEFENDANT:
19            CHRIS EAST
20            MADELYN MAULDIN
21            Attorneys at Law
22            City of Montgomery Legal Department
23            103 North Perry Street
24            Montgomery, AL  36104
25            ceast@montgomeryal.gov
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 3

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

```
 1            mmauldin@montgomeryal.gov

 2

 3   ON BEHALF OF THE DEFENDANT:

 4            WILLIAM GRAY    (via videoconferencing)

 5            Attorney at Law

 6            Gray & Associates

 7            3500 Blue Lake Drive

 8            Suite 455

 9            Birmingham, AL  35243

10            wpg@grayattorneys.com

11

12   Also Present:

13            Otis Pettaway

14            Walter Pettaway

15

16

17

18

19               EXAMINATION INDEX

20
     NICHOLAS D. BARBER
21        BY MR. SIKES . . . . . . . . . . . . . . .    6

22

23

24

25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 4

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

```
1                          EXHIBIT INDEX

2        Plaintiff's Exhibit

3

4        1       Departmental Disciplinary File; Nicholas    23
                 D. Barber
5
         2       Photo                                        79
6
         3       Photo                                        81
7
         4       Dictionary Definition of the word "sic      94
                 'em."
8
         5       Audio Portion of warning given              132
9
         6       Photograph                                  137
10
         7       Photograph                                  138
11
         8       Photograph                                  138
12
         9       Photograph                                  140
13
         10      Photograph                                  140
14
         11      Photograph                                  140
15
         12      Photograph                                  140
16
         13      Photograph                                  140
17
         14      Photograph                                  140
18
         15      Photograph                                  140
19
         16      Excerpt of Earnest Finley                   143
20
         17      Photo                                       144
21
         18      Photo                                       148
22
         19      Photo                                       148
23
         20      Photo                                       148
24
         21      Time line taken from Barber's Body Camera   160
                 Video
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 5

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

```
 1              I, Sandra Bain Moon, a Court Reporter of
 2    Birmingham, Alabama, and a Notary Public for the State
 3    of Alabama at Large, acting as Commissioner, certify
 4    that on this date, as provided by the Federal Rules of
 5    Civil Procedure and the foregoing stipulation of
 6    counsel, there came before me on the 31st day of
 7    August, 2021, at the City of Montgomery Legal
 8    Department, 103 North Perry Street, Montgomery, AL
 9    36104, commencing at 9:00 a.m., NICHOLAS D. BARBER,
10    witness in the above cause, for oral examination,
11    whereupon the following proceedings were had:
12                        NICHOLAS D. BARBER,
13    having been duly sworn was examined and testified as
14    follows:
15                          EXAMINATION
16    BY MR. SIKES:
17    Q.        Will you state your name for the record,
18    please?
19    A.        Nicholas Barber.
20    Q.        You have a middle name?
21    A.        David.
22    Q.        And where do you live?
23    A.        1196 Liberty Road, Tallassee, Alabama 36078.
24    Q.        Who lives there with you, please, sir?
25    A.        Just me.
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 6

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

```
 1    Q.        What is your date of birth?
 2    A.        [Redacted] 1985.
 3
 4
 5
 6
 7
 8    Q.        Where were you born?
 9    A.        Where was I born?
10    Q.        Yes, sir.
11    A.        Rochester, Minnesota.
12    Q.        Did you grow up there?
13    A.        Yes.
14
15
16
17
18
19
20
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 7

15    Q.      You graduated I suppose from high school

16   sometime in 2003 or so?

17   A.      It was in 2004.

18   Q.      And did you go directly after you graduated,

19   you enlisted in the service in the Army?

20   A.      That's right.

21   Q.      Didn't have a job in between?

22   A.      No, just work at a grocery store.  It

23   wasn't --

24   Q.      Full-time?

25   A.      Correct.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 8

1

2

3

4

5

6

7

8

9     Q.         How long were you in the Army?

10    A.         I'm still in the Army in the reserve capacity

11    now, but I was active duty for eight years. Q.

12    So that would have been 2004 until 2012?

13    A.         Yes, sir.

14    Q.         Did you have any other jobs during that

15    period, 2004 to 2012?

16    A.         No.

17

18

19

20

21

22

23

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 10

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

1

2

3

4

5

6

7

8

9

10   Q.        When you left employment with the Army, whom

11   did you seek employment with?

12   A.        Montgomery Police Department.

13   Q.        Did you get your APOST training here in

14   Montgomery?

15   A.        Yes.

16   Q.        When was that period of training?

17   A.        I don't know the exact month I started, but

18   it was -- I think I started the employment would be

19   the summer of 2012 to the academy and then graduated

20   in the spring of 2013.

21   Q.        And did you go on duty then as a police

22   officer in the Montgomery Police Department then

23   sometime around the spring of 2013?

24   A.        Yes.

25   Q.        Now, when you left the Army, you had an

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 14

1    honorable discharge, I suppose, correct?

2    A.        Yes.

3    Q.        Had you already planned to be a police

4    officer and move to Montgomery or did you leave the

5    Army and then looked at your options and settled on a

6    police officer in Montgomery, Alabama?

7    A.        I had already made the decision I was going

8    to apply for them.

9    Q.        In Montgomery?

10   A.        Correct, yes.

11

12

13

14

15

16

17

18

19   Q.        Trace for me, if you would, what your --both

20   ranks and job duties and assignments were from the time

21   that you began as a police officer in 2013 up until

22   we're here about an event that occurred in July of

23   2018.  Trace for me your progress through both ranks

24   and also what duty assignments you had from 2013 until

25   July of 2018.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 15

1    A.        I started off as patrol officer.  I stayed

2    in patrol until 2017.

3    Q.        Any change in rank during that period?

4    A.        Right before I went to -- when I tried out

5    for canine, I was promoted to corporal.

6    Q.        So that would have meant you were a corporal

7    sometime in 2018 -- I mean, excuse me, 2017?

8    A.        Yes.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    Q.        Now, you have -- where are you presently

21    employed?

22    A.        Tallassee Police Department.

23    Q.        In what capacity are you there?

24    A.        The night shift supervisor as a corporal. Q.

25    And when did you begin work with the

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 17

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

1    Tallassee Police Department?

2    A.        July of 2020.

3    Q.        You have a more specific date?

4    A.        I think it was the 6th.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 18

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    Q.        Why did you decide to move from Montgomery

22    Police Department to the Tallassee Police Department?

23    A.        I had already planned on leaving once my dog

24    retired and just to -- change of scenery.

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 19

```
 1
 2
 3
 4   Q.        Any other reason for changing from Montgomery
 5   to Tallassee?
 6   A.        I had gotten in trouble in Montgomery, but I
 7   was already planning on leaving anyways, so I
 8   resigned.
 9   Q.        In fact, you were about to be fired, weren't
10   you?
11             MR. EAST:  Object to the form.
12   A.        That was -- they were trying to, but I was
13   already going to resign, so I resigned.
14
15
16
17
18
19
20
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 20

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

1

2

3

4

5

6   Q.       Yes, sir.  We have the disciplinary file and

7   we'll go through it in a moment.  As I understand the

8   charges, that you were accused of misappropriating

9   information that you came into possession of because

10  you were a police officer; is that accurate?

11  A.       I wouldn't necessarily say that.

12  Q.       What would you say then?

13  A.       It would be more, you could say I was accused

14  of that, but that's not what happened.

15  Q.       Again, I understand you take the position

16  that you didn't do anything wrong; is that right?

17  A.       To a degree, yes.

18  Q.       We'll get into the degree in a moment.  I'm

19  not talking about what you're admitting to now.  I'm

20  talking about what you were charged with.  And as I

21  understand it in laymen's terms, that would be you

22  were accused of misappropriating information about a

23  girlfriend of yours and her ex-husband that you came

24  into possession of only because you were a police

25  officer; is that accurate?  That's what you were

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 21

1  charged with, the gist of it?

2  A.        Yeah.   I mean, it wasn't her ex-husband, it

3  was an ex-boyfriend.   But you could say yes, that I

4  was -- they said that -- they said that --

5  Q.        Charged with misappropriating that

6  information, correct?

7  A.        Yeah, accused of it, yes.

8  Q.        Do you deny that you took the information?

9  A.        I mean, I accessed it, but I didn't give it

10 to her or anybody.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 22

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

1

2

3

4

5

6

7

8

9

10

11

12

13   Q.       I'm going to show you what I have marked as

14   Plaintiff's Exhibit 1 to your deposition.   That is a

15   group of documents taken from the disciplinary file on

16   you and your personnel file.   And it came numbered --

17   it has Bates numbers as the bottom of it.   As they

18   came to us, they were, the documents were sort of

19   higgledy piggledy.   They were not in any kind of

20   order.   I put them in roughly what I think to be

21   chronological order.   What I'd like to do is go

22   through those with you.

23                    (Plaintiff's Exhibit 1 was

24                     marked for identification.)

25            MR. EAST:   Mr. Sikes, so the record is

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 23

```
1

2

3

4

5    Q.        It will be the third page down, I believe.

6    It's COM 1069.  Have you seen that document before?

7    A.        Which one, the third page?

8    Q.        1069 at the bottom, COM 0010?

9    A.        Okay, I see it.

10

11

12

13   Q.        It says that from October of 2017 to November

14   of 2018, you utilized LETS.  That's a database,

15   electronic database available to Montgomery Police

16   officers?

17   A.        Yes.

18   Q.        And another one, is that another database,

19   that New World/Mobile Software?  Is that another

20   database?

21   A.        That's right.

22   Q.        They're restricted to use for -- police

23   officers are restricted to use of them for police

24   purposes, correct?

25   A.        Correct.
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 24

1   Q.        You used it to research your girlfriend
2   Raven Hordge, and her ex-husband, Michael Eldridge; is
3   that what it says?
4   A.        It does.
5   Q.        Is that what you understood you were charged
6   with doing?
7   A.        Yes.
8   Q.        And it talks about you using the systems 58
9   times?
10  A.        Correct, it says that.
11  Q.        And 10 times were conducted while you were
12  off duty?
13  A.        That says that, yes.
14  Q.        What of that do you dispute?
15  A.        I don't specifically remember doing it off
16  duty, so.
17  Q.        Well, do you dispute it or you can't confirm
18  it?
19  A.        I just can't confirm it.
20  Q.        But you don't dispute it?
21  A.        I wouldn't say that, but --
22  Q.        Well, you do dispute it, then?
23  A.        Pick my -- pick my battles.
24  Q.        I don't know what that means, "pick my
25  battles"?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 25

```
 1   A.        That means like I'm not going to argue with
 2   them about it.
 3   Q.        I'm not going to argue either.
 4   A.        Oh.
 5   Q.        I'm just going to ask you if you dispute it
 6   or you don't dispute it.  You've given me two
 7   different answers.  Do you dispute that that occurred?
 8   A.        I'll say no.
 9   Q.        Did you make traffic stops on Mr. Eldridge?
10   A.        I did one traffic stop.
11   Q.        No more than one, you say?
12   A.        Correct.  The stop says plural on this, but
13   it was just one.
14   Q.        Did you issue traffic citations?
15   A.        Yes.
16   Q.        How many?
17   A.        I don't remember, maybe two possibly.
18   Q.        What were they for?  Do you recall?
19   A.        I don't remember specifically.  It may have
20   been driving while suspended, something along those
21   lines.
22   Q.        You were part of the canine unit at that
23   time?
24   A.        Yes.
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 26

```
1

2

3

4

5

6

7            Do canine units typically do traffic

8    citations?  Is that typically part of their duties?A.

9    Yes.  It depends on the person and what they are

10   actually doing.

11   Q.       But it says that you didn't issue any other

12   traffic citations in a one-year period except to

13   Mr. Eldridge, correct?

14   A.       Correct.

15   Q.       Do you agree with that or you dispute that?A.

16   Oh, I primarily gave warnings so I'm not going to

17   dispute that.

18   Q.       You don't dispute that, then.  Okay. Correct?

19   A.       Correct.

20

21

22

23

24

25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 27

1

2

3

4

5

6    Q.        Did you make an arrest of Mr. Eldridge?

7    A.        Yes.

8    Q.        And did you take him into custody?

9    A.        Yes.

10   Q.        Where did you take him?

11   A.        Called for another -- for a patrol unit to

12   respond and then they transported him to the City jail.

13   Q.        Most traffic tickets don't result in somebody

14   going to jail.  You said earlier you didn't recall what

15   you charged him with.  It would be fairly serious if it

16   took him to jail for a traffic incident. A.        No.

17   He had -- not, it wasn't for a traffic, he had an

18   outstanding warrant.

19   Q.        What was the outstanding warrant he had?

20   A.        Domestic violence.

21   Q.        When did you first meet Ms. Hordge?

22   A.        According to this, it would have been October

23   2017.

24   Q.        I'm not talking about "according to this."

25

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 28

1

2

3    Q.        And how did you meet her?

4    A.        When I was working, she was working at the

5    Days Inn and that was my area.   So I would check on the

6    businesses up and down Troy Highway.

7

8

9

10

11

12

13

14

15

16

17   Q.        When is the first time you recall dating her?

18   A.        I really don't recall.

19   Q.        What year?

20   A.        2018.

21   Q.        When in 2018, spring, summer, fall, winter?A.

22   Probably in the spring.   It's my best guess. I can't

23   really -- it wasn't like in the wintertime or anything,

24   so.

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 29

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

```
 1    Q.        Was it before your police dog killed
 2    Mr. Pettaway?
 3    A.        Yes, before July, yes.
 4    Q.        How far before that?
 5    A.        Few months.
 6    Q.        Were you married to Catherine Elizabeth when
 7    you were dating Ms. Hordge?
 8    A.        Technically, yes, so.
 9    Q.        Technically yes.  People are married or they
10    aren't.  Were you married to Ms. Hordge at the time
11    you were dating Ms -- married to Catherine Elizabeth
12    at the time you were dating Ms. Hordge?
13    A.        At the end of the marriage, yes.
14
15
16
17
18
19
20
21
22
23
24
25
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 30

```
 1
 2
 3
 4
 5    Q.        How did you come into possession of the
 6    knowledge that there was an arrest warrant for
 7    Mr. Eldridge?
 8    A.        Because I signed the warrant myself and I
 9    showed it in the system.
10    Q.        What was the warrant for?
11    A.        Domestic violence, what is it called,
12    protection order.
13    Q.        Let me ask you before we go any further, let
14    me ask you about Ms. Hordge.  At some point, did
15    affections wane and you and Ms. Hordge cease seeing
16    each other?
17    A.        Correct.
18    Q.        When was that?
19    A.        2018.  I don't -- I can't give you an exact
20    time.
21    Q.        I'm not looking for an exact date.  Just your
22    best judgment about that.  Would it have been before
23    or after Mr. Pettaway died?
24    A.        I'd say before is my best.
25    Q.        The first half of 2018, correct?
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 31

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

1    A.        Correct.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 32

1

2

3

4

5

6    Q.        All right.  Look at the next page of

7    Plaintiff's Exhibit 1, please.  And that was the page

8    COM 1072 on the same page?

9    A.        I'm on 1072.

10   Q.        That's a memo from Lieutenant Champlin,

11   correct?

12   A.        Yes.

13   Q.        And it certifies that you were served with a

14   copy of departmental charges pending against you,

15   correct?

16   A.        Correct.

17   Q.        You signed that as receiving it, that's your

18   signature?

19   A.        That's -- that's correct.

20   Q.        So you were aware of it in June, on June 12

21   of 2020, correct?

22   A.        Correct.

23   Q.        Had you been interviewed by Lieutenant

24   Champlin at that point, prior to that?

25   A.        Prior to that, yes.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37

```
1

2

3

4

5    Q.        The next page is 1073.  And it indicates that

6    after your interview, Lieutenant Champlin -- am I

7    pronouncing it correct, Champlin?

8    A.        Champlin.

9    Q.        All right.  He found that your conduct was,

10   quote, untolerable.  Do you see that?  Last paragraph.

11   A.        That's right, I see it.

12   Q.        And he recommended your employment be

13   terminated?

14   A.        Yes, I read that, correct.

15   Q.        Do you know who Mickey McInnish is?

16   A.        I do not.

17   Q.        But he indicates he's consulted with

18   Mr. McInnish and he agrees with the recommendation; do

19   you see that?

20   A.        I see that.

21

22

23

24

25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 38

18    Q.        Lieutenant Champlin interviewed you,

19    correct?

20    A.        Correct.

21    Q.        Anybody else there present?

22    A.        There was one other person.  I'm not sure who

23    it was, but he was like Lieutenant Champlin's

24    partner.

25    Q.        Did you deny all of the charges against you,

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 44

1   or did you admit some and deny others?  What was the

2   story that you told Lieutenant Champlin when he

3   interviewed you?

4           MR. NIX:  This was related to the

5   disciplinary proceeding?

6           MR. SIKES:  Yes.

7   A.      That was a long time ago, basically that --

8   what happened.

9   Q.      Tell me what -- I don't need --

10  A.      I mean, so --

11  Q.      What did you tell him happened is what I'm

12  asking you?  You maintained you were innocent with

13  Lieutenant Champlin; is that right?

14  A.      Correct.

15  Q.      Did you admit to any part of misconduct to

16  Lieutenant Champlin?

17  A.      I believe I told him how I was seeing

18  Ms. Hordge at that time and I did arrest him,

19  Mr. Eldridge.

20  Q.      That was on your own warrant?

21  A.      Correct.  And then --

22  Q.      What became of those charges?

23  A.      They ended up dismissing it.

24  Q.      Did you appear in court before a judge on

25  the matter?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 45

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

1   A.       Correct.

2

3

4

5

6

7

8

9

10  Q.       Did Lieutenant Champlin believe you?

11  A.       I can't speak for him, so I don't know.

12  Q.       Well, I think he spoke for himself.

13  A.       Uh-huh.

14  Q.       He recommended you be terminated, correct?

15  A.       That's what it says right here, but I don't

16  think he's the deciding factor.

17  Q.       I'm not talking about whether he's the final

18  deciding factor.  He didn't believe you.  He believed

19  that you were guilty of these charges, correct?

20           MR. EAST:  Object to the form.

21  A.       According to this, yes.

22  Q.       You know any different than this?

23  A.       Not specifically, no.

24  Q.       Generally, do you know any different?

25  A.       No.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 46

```
 1  Q.      You can answer out loud.

 2  A.      No, I don't.

 3  Q.      So neither generally or specifically, do you

 4  know any difference than this?

 5  A.      No.

 6  Q.      The limit of what you know is that

 7  Lieutenant Champlin did not believe you and he

 8  recommended you be terminated, correct?

 9          MR. EAST:  Object to the form.

10  A.      According to the paperwork, yes.

11  Q.      The limit of what you know, also.  Not only

12  according to the paperwork, but according to all that

13  you know, he didn't believe you and he recommended you

14  be terminated to the best of your knowledge, correct?

15          MR. EAST:  Object to form.

16  A.      Correct.

17  Q.      He made a recommendation to Captain Hall,

18  correct?  The next page is page 1068.  Is that

19  correct, is that what you understand?

20  A.      That was from Captain Hall to the Chief

21  Finley.

22  Q.      I know that's what that is, but I'm asking

23  you, it appears that Lieutenant Champlin reported to

24  Captain Hall.  Is that your understanding or not?

25  A.      I guess so.
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 47

1    Q.       All right.  Captain Hall recommended to
2    Chief Finley that the allegations were substantiated,
3    correct?
4    A.       Correct.
5    Q.       Look at the next page, 1074.  Again, this is
6    also dated June 12.  You requested a meeting before
7    Chief Finley to dispute the charges, correct?
8    A.       Correct.
9    Q.       And you were suspended as of duty on
10   June 12, correct?  Look at the next page.
11   A.       Correct.
12   Q.       Correct?
13   A.       Yes.
14            MR. EAST:  That's 1093.
15            MR. SIKES:  Yes.
16   Q.       That's what 1092, next page says also.  I
17   believe you were -- notice from Major Wheeler to Chief
18   Finley that you were relieved of duty pending
19   investigation?
20   A.       Yes.
21   Q.       The next document is 1066.  That's a memo
22   from Chief Finley to the mayor, correct?
23            MR. EAST:  You said 1066.
24   Q.       1065, pardon me.
25   A.       Yes.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 48

1

2    Q.        Chief Finley didn't believe you, either, did

3    he?

4              MR. EAST:  Object to the form.

5    A.        It appears not, so I would say no.

6    Q.        Now, you hadn't made any application for

7    employment with the Tallassee Police Department as of

8    June 24, 2020, had you?

9    A.        I don't recall specifically, no.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 50

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19   Q.      You didn't resign, though, until July 9,

20   correct?

21   A.      Correct.

22   Q.      And you had already started employment

23   there, correct?

24   A.      Correct.

25
```

I-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 52

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

1

2

3

4

5

6

7

8

9

10   Q.        Is there a benefit to a Montgomery Police

11   Department officer who is charged with serious

12   misconduct that is about -- the possibility at least

13   exists that he will be fired or terminated, his

14   employment will be terminated.  Is there an advantage

15   to that police officer retiring just before he's

16   fired?

17           MR. EAST:  Object to the form.

18   A.        Is there an advantage?

19   Q.        Yes.

20   A.        Yeah.

21   Q.        And what is that advantage?

22   A.        You retire, yeah.

23   Q.        You don't retire.  You resign, correct?

24   A.        Resign, correct.

25   Q.        So, a resignation on your resume or your CV

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 53

```
 1    or any application you had looks a lot better than you
 2    getting fired, doesn't it?
 3    A.        It would, yes.
 4    Q.        It does, doesn't it?
 5    A.        Yes.
 6    Q.        You understand that all police officers in
 7    the State of Alabama have to be certified by a central
 8    agency to be hired as a police officer, correct?
 9    A.        Correct.
10    Q.        And that organization is called APOST,
11    correct?
12    A.        Correct.
13    Q.        Alabama Peace Officers Standards and
14    Training Commission?
15    A.        Yes.
16    Q.        Look at the next to last page of Exhibit 1,
17    that's 1062.  That's a letter that indicates that --
18    let me back up a second.  Do you know who Alan
19    Benefield is?
20    A.        I do not.
21    Q.        He's identified in that letter, both on the
22    letterhead and by underneath his signature as
23    executive secretary for the Alabama Peace Officers
24    Standards and Training Commission, correct?
25    A.        Correct.
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 54

```
 1   Q.        And that letter is written regarding you,
 2   correct?
 3   A.        Correct.
 4   Q.        And in particular, the termination of your
 5   employment with the Montgomery Police Department,
 6   right?
 7             MR. EAST:  Object to the form.
 8   Q.        I'm sorry?
 9   A.        Repeat the question.
10   Q.        Yeah.  The letter is about you and the
11   termination of your employment with Montgomery Police
12   Department, correct?
13             MR. EAST:  Object to the form.
14   A.        Correct.
15   Q.        And it indicates that should an agency
16   request to hire Nicholas Barber, he would have to
17   stand before APOST commission for a character review.
18   Do you see that sentence?
19   A.        Correct.
20   Q.        Now, this letter is dated July 14, correct?
21   A.        Yes.
22   Q.        You say that you applied and went to work as
23   a Tallassee Police Department officer on July 6?
24   A.        Yes.
25   Q.        So you beat the wire there, so to speak,
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 55

1  didn't you?  You got hired by another agency before

2  this letter?

3  A.       According to this, yes.

4  Q.       Do you know any different?

5  A.       No.  I couldn't know about it being locked

6  or -- like it says right here.

7  Q.       In any event, you didn't because you went

8  ahead and got hired before Mr. Benefield wrote this

9  letter or he became aware of it.  You didn't have to

10  stand for APOST character review before being hired by

11  Tallassee, correct?

12  A.       Correct.

13

14

15

16

17  Q.       The events that this lawsuit is concerned with

18  occurred on the night of July 7 going into July 8 of

19  2018.  You recall that night, correct?

20  A.       Correct.

21  Q.       As I understand it, and you tell me if I'm

22  wrong or you know differently, as I understand it, all

23  of this began with a phone call from a person who

24  identified himself as Gary Dickson and who complained

25  about somebody coming into a house he was sleeping in

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 56

1   on Cresta Circle.   Is that your recollection of how

2   this got started?

3   A.          Correct.   Yeah, he dialed 911 or called the

4   police department, dispatch.

5   Q.          Where is Cresta Circle?

6   A.          It's off of -- it's near Smiley Court.

7   Q.          Is that in your sector?

8   A.          At that time, since it was Sunday night --

9   no, Saturday night going into Sunday morning, during

10  those times, there's only one canine handler on duty

11  and we cover the entire city.   So on -- as an example,

12  so I was off Sunday nights and Monday nights.   Then

13  the other handler who was on duty or who was off

14  Friday and Saturday night, he would have the whole

15  city when I'm off as well.

16

17

18

19

20

21

22

23

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 57

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18    Q.       Is Cresta Circle over -- it's an

19    economically disadvantaged part of the city?

20    A.       You could say certain houses are.

21    Q.       You were called by whom, dispatcher?

22    A.       Correct.

23    Q.       And what were you told by the dispatcher?A.

24    Basically that Sergeant Green, who was the sergeant

25    on that side of town, had requested a canine

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 58

```
 1    unit to respond if we were available.
 2    Q.        Did the dispatcher give you any other
 3    information other than that, that you recall?
 4    A.        Basically that it was a burglary, but I
 5    don't recall specifically verbatim what they -- what
 6    was said.
 7    Q.        Did you know the dispatcher?
 8    A.        I did not.
 9    Q.        Any other information you got from the
10    dispatcher?
11    A.        Not that I recall.
12    Q.        Did they tell you anything other than
13    Sergeant Green wants a canine unit?  They have a
14    possible burglary over in the west side of town and
15    gave you the address, I suppose?
16    A.        Yes.
17    Q.        Is that right?
18    A.        I would assume so, yes.
19    Q.        Anything else different from what I said in
20    the way of information that you were given?
21    A.        Not that I recall.
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 59

1

2

3

4

5

6

7

8

9

10

11    A.        When the homeowner showed up and gave

12    permission to Sergeant Green and I overheard it.

13    Q.        Who did you understand the homeowner to be?A.

14    I can't remember his name.  It wasn't the Gary Dickson

15    guy.  It was the second guy that showed

16    up.  I don't recall his name.

17    Q.        Do you know him to be the homeowner?

18    A.        He said he was, yes.

19    Q.        Did he say that on the video?

20    A.        You should be able to hear it, correct.

21

22

23

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 61

1

2

3    Q.        There are some things that occurred.  You

4    were wearing your body camera during the whole of

5    this, correct?

6    A.        Yes.

7    Q.        All of this incident?

8    A.        Yes.

9    Q.        From the time you pulled up in your cruiser?

10   A.        Yes.

11   Q.        You activate it actually inside your vehicle

12   before you got out, correct?

13   A.        Correct.

14   Q.        It ran continuously until well after

15   Mr. Pettaway's body was removed and gone to the

16   hospital, correct?

17   A.        Correct.

18   Q.        You never turned it off?

19   A.        Correct.

20   Q.        It didn't malfunction at any time?

21   A.        No.

22   Q.        Where is it worn?

23   A.        On your vest.

24   Q.        Show me on your body.

25   A.        Anywhere in the torso area.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 62

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20   Q.        And do you know what the angle of the camera
21   was, what it saw?
22   A.        I don't know the angle.
23   Q.        But for the most part, anything that occurred
24   in front of you would be recorded, correct, if you
25   were facing that direction?
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 63

```
 1    A.        Correct, if I was facing it, yes.
 2    Q.        Right.  And also any conversation that
 3    occurred in front of you that was audible to you would
 4    be recorded, correct?
 5    A.        Yes.
 6
 7
 8
 9
10
11
12
13    Q.        Tell me, if you would, what you recall. You've
14    told me about everything you heard from the dispatcher,
15    right?  We've been over that and that's very brief,
16    correct?
17    A.        Correct.
18    Q.        Only that Sergeant Green requested canine unit
19    for possible burglary, wanted a canine unit there,
20    correct?
21    A.        Correct.
22    Q.        Who is the second person that you received any
23    information that night from about the events and what
24    was going on on Cresta Circle?
25    A.        The second, I would -- Sergeant Green.
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 64

1

2

3

4

5

6

7

8

9

10

11

12

13   Q.      The video indicates that you exited your

14   vehicle -- and some of this I can't be -- you can -- I

15   suppose you could -- two or three seconds one way or

16   the other making a judgment on the video and looking at

17   it and determining, looks like you got out of your

18   vehicle right at 2:59 in the morning.  Is that

19   consistent -- do you have any reason to disagree with

20   that?

21   A.      I don't.

22   Q.      Again, we can confirm that and look at the

23   video and see it.  And it looks to be that you released

24   the dog into the house at about 3:11:45 according to

25   the video.  So that would be

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 66

```
 1   approximately 12 minutes and 45 seconds elapsed that
 2   you were out there on the scene before the dog was
 3   released.  Do you have any reason to disagree with
 4   that or think that's inaccurate or off somehow?
 5   A.       I have no reason to disagree.
 6   Q.       Again, we can play it and confirm it.
 7            What I'd like to know is who all were the
 8   persons that you received any information from during
 9   that 11 minutes and 45 seconds?  We know you got
10   information from Sergeant Green, correct?
11   A.       Correct.
12   Q.       Did your receive any information from Gary
13   Dickson?
14   A.       Yes.
15   Q.       Did you receive any information from Gary
16   Dickson that does not appear on the video?
17   A.       Should not have, no.  It all should be on
18   there.
19   Q.       Right.  And you don't recall any that you
20   received other than what appears on the video?
21   A.       Correct.
22   Q.       I would suppose that whoever this person
23   that you believed to be the homeowner, you received
24   some information from him also, correct?
25   A.       He is the one, yes, a little bit of
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 67

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

```
 1    information from him.   Sergeant Green was the one that
 2    was --
 3    Q.        Questioning?
 4    A.        Correct.
 5    Q.        You were there, witnessed it, though, and
 6    overheard it?
 7    A.        Correct.
 8    Q.        So, what we've got so far is your sources of
 9    information prior to your release of the dog into the
10    house were your dispatcher?
11    A.        Yes.
12    Q.        Correct?
13    A.        Yes.
14    Q.        Sergeant Green?
15    A.        Yes.
16    Q.        Gary Dickson?
17    A.        Yes.
18    Q.        And the person you think was the homeowner?
19    A.        Yes.
20    Q.        Anybody else that you received information
21    from?
22    A.        Not that I recall.
23    Q.        Well, I want you to think about it.  Is it
24    possible that there's somebody else that you're not
25    thinking of now?  Are you relatively certain those are
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 68

1      the only sources of information you had?

2      A.          I'm relatively certain that's the only

3      source of information I had.

4      Q.          All of the information you received, I would

5      suppose would be you received it verbally?  Somebody

6      said it in front of you or to you, correct?

7      A.          Correct.

8      Q.          No other written materials of any sort or

9      recorded materials of any sort.  You had no source of

10     information from any of those.

11     A.          Correct.

12     Q.          The sole course of information was what you

13     saw or heard from the dispatcher, Sergeant Green, Gary

14     Dickson and the person who is the homeowner, correct?

15     A.          Correct.

16     Q.          What I'd like for you to do now is tell

17     me -- and I know you can't -- I mean, nobody can

18     recall two years exactly what a conversation was.  But

19     I would suppose that you would retain all in your

20     memory, all of the significant things that Sergeant

21     Green told you.  Same way with all of the really

22     significant things that Gary Dickson told you and same

23     way with all of the significant things that the

24     homeowner, you say the person you think is the

25     homeowner told you, correct?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 69

```
 1              MR. EAST:  Object to the form.
 2   A.         Correct.
 3   Q.         That's fair, correct?
 4   A.         Yes.
 5   Q.         I don't want you to leave anything out.  I
 6   don't want you to tell me -- omit telling me some
 7   things that you didn't think were insignificant.  If
 8   you do recall some insignificant things, tell me those
 9   also.  But I think it's fair that you would recall
10   everything all three of these people told you that was
11   significant, correct?
12   A.         Correct.
13   Q.         What I'd like to do now is for you to tell
14   me -- let's take them one at a time.  Sergeant Green,
15   what is all of the information that you got from
16   Green, significant or insignificant?
17   A.         So when I first pulled up -- and this is all
18   going to be paraphrased, but he basically advised me
19   that the guy that he was talking to was not the
20   homeowner.  So, and he knows that the policy requires
21   that the homeowner be present and give permission to
22   prevent any accidents.  So he told me that.  I believe
23   I asked him when has he -- has the homeowner been
24   contacted and he said yes.  At some point, then,
25   that's why I put Niko back inside the -- inside my
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 70

```
1   truck.  And then I started talking to -- after I did
2   that --
3   Q.        What I'd like to know did you ever receive
4   any other information from Sergeant Green that was
5   significant before you released the dog?
6   A.        Okay.  So you want it just specifically
7   Sergeant Green, not chronological.
8   Q.        Yeah, let's do it that way if you don't
9   mind.
10  A.        So, and then it was after -- after that when
11  the homeowner did show up.  I heard Sergeant Green
12  talking to him and then he basically said -- I don't
13  remember exactly what he said, but it was something
14  along the lines of like everything is good, like
15  meaning he gave permission, like reconfirmed what I
16  had heard, that he was given permission to utilize.
17
18
19
20
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 71

1

2

3

4          What I want to do first is finish up anything

5  else of any type, any information you received from

6  Sergeant Green that night other than these two pieces

7  of information you've told me so far.

8  A.        That's all I can recall.

9  Q.        The next source of information you said that

10  you had is that you had some information received from

11  Gary.   The person identified himself as Gary Dickson,

12  right?

13  A.        Correct.

14

15

16

17

18

19

20

21

22

23

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 72

1

2

3

4

5

6   Q. Tell me all of what you can recall the information

7   was that Gary Dickson gave you.

8   A.        I remember him saying he was in the bedroom

9   asleep.  That's when he heard the noise.  Went to go

10  and investigate it.  And he went into the -- across the

11  hallway to a different room and he saw the -- a hand in

12  the closet.  And then I asked him if he had any, like,

13  clothing description of any kind and he said no, all he

14  could see was a hand.  And I remember him specifically

15  saying I know a man's hand when I see one.

16  Q.        Did he say a man's hand or did he say a human

17  hand?

18  A.        Man's hand.  And he -- then I asked him where

19  -- where the homeowner was coming from.  He had

20  mentioned an apartment by Eastdale Mall area, that he

21  was en route to that.  Let me back up.  I apologize.

22  Before we got to that part, he said he walked outside

23  to act like he's going to smoke a cigarette, but really

24  just grabbed the phone and smoked a cigarette

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 73

1  also.  And then called the police to report the
2  burglar.
3  Q.       Anything else he told you?
4  A.       Not that I recall.  Let me take that back.
5  After the bite, then I got his information.
6  Q.       No, no, I'm not talking about -- I'm talking
7  about -- we're talking about the information you had
8  at the time you released the dog.
9  A.       Okay, yes.  Then that's all I really
10  remember, just that he was woken -- the key points
11  would be that he was woken up.  He could see a hand in
12  the closet.  Then he came outside and called 911.  Or
13  called the police department.
14  Q.       Did you -- this noise, was he more specific
15  about the noise that he heard that woke him up?
16  A.       Not that I can remember, no.
17  Q.       Do you recall him telling you that there was
18  somebody knocking on the door?
19  A.       I don't recall that.
20  Q.       You didn't see that in the video?
21  A.       Not that I remember, no.
22  Q.       Well, that would be significant, wouldn't
23  it?
24  A.       It would be.  I don't recall him.
25

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 74

1

2

3   Q.     All right.  Let's see what other information

4   you had.  From the last person that you or last source

5   of any possible information you would have about these

6   events or who was in the house or what was going on in

7   Cresta Circle would have been the person you think was

8   the homeowner, correct?

9   A.     Correct.

10   Q.     We've got them all, dispatcher, Sergeant

11   Green, Gary Dickson, and the homeowner.  No other

12   sources of information about anything that bore any

13   relationship on whether the release of the police dog

14   into the house on this occasion would have been lawful

15   or appropriate, correct?

16         MR. EAST:  Object to the form.

17   A.     Correct.

18   Q.     I'm sorry, you need to answer.  Correct?

19   A.     Correct.

20   Q.     All right.  Tell me all of what the homeowner

21   told you.

22   A.     I overheard him telling Sergeant Green that no

23   one else is allowed inside the house.  And I asked him

24   if there was any weapons or pets inside, and which he

25   replied no.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 76

```
 1   Q.       Anything else?
 2   A.       Not that I recall.
 3   Q.       Take a moment, if you want.
 4   A.       That was basically it.  He said no one
 5   should be in there.  Only Mr. Dickson was allowed in
 6   there, no weapons, no pets, yes.  And I need to take a
 7   break at some point.
 8   Q.       And certainly there was nothing else of
 9   significance that he told you.  You would recall it if
10   it was a significant factor that involved your
11   decision about whether to deploy the dog or not,
12   correct?
13            MR. EAST:  Object to the form.
14   A.       Correct.  I believe so, yes.
15
16
17
18
19                 (
20
21   Q.       (By Mr. Sikes) Let me include one other I
22   guess potential source of information that you had
23   available to you.  We've identified that there were
24   only four people you spoke to, dispatcher, Sergeant
25   Green, Gary Dickson and the person that you think was
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 77

1    the homeowner, correct?

2    A.        Correct.

3    Q.        One other I guess possible source of

4    information is what you saw and heard when you arrived

5    there, correct?

6    A.        Correct.

7    Q.        Tell me what you saw or heard other than

8    conversations -- I mean, other than overhearing

9    Sergeant Green and Mr. Dickson and the person you

10   think was the homeowner, what else did you hear or see

11   after you got there?  What other information did you

12   get from your observations at the scene prior to

13   releasing the dog?

14   A.        Just looking at the house.  I really don't

15   understand.

16   Q.        Did you see anything -- you're taking in and

17   you're trying to process what is going on here and is

18   the deployment of a dog lawful or appropriate here, I

19   suppose.  Is that part of what you were looking at,

20   taking in the scene, so to speak?

21   A.        Yes, I can say yeah.

22   Q.        What did you see in that regard that had any

23   significance to whether it looked like the deployment

24   of the dog would be appropriate or useful or lawful?

25   Anything else that you saw in particular that sticks

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 78

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

1   out in your memory about that?

2   A.        No, nothing sticking out.

3   Q.        Let me ask you if you can identify

4   Plaintiff's Exhibit 2.

5                   (Plaintiff's Exhibit 2 was

6                   marked for identification.)

7   Q.        Does that look like the house that you went

8   to on the night of July 8, early morning hours of

9   July 8?

10  A.        Yes.

11  Q.        That's the house at Cresta Circle we're

12  talking about, correct?

13  A.        Correct.

14

15

16

17

18

19

20

21

22

23

24

25

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 79

1

2

3

4

5  Q.      Right.  Okay.  Do you have any idea how small

6  a house that was, square footage?

7  A.      No.

8  Q.      Can you approximate it from that or not?

9  A.      Maybe 1000, 1100 maybe.

10  Q.      I think I've seen some reference to 900 square

11  feet earlier, 900 and some change maybe.  Would that be

12  within the range of what you think that might be

13  accurate?

14  A.      Yes, close enough.  Mine is a guess, so.

15  Q.      I'm going to show you also what's been

16  marked as Plaintiff's Exhibit 3.

17              (Plaintiff's Exhibit 3 was

18              marked for identification.)

19

20

21

22

23

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 81

1

2

3

4

5

6    Q.            Did you notice that there

7    were building supplies located all over the house?

8    A.        Yes, I saw that in the video.  I don't

9    think -- I don't recall specifically when I was inside

10   taking notice of it.

11   Q.        It wasn't apparent to you that it was

12   undergoing repair when you were in it that night?

13   A.        Not that night, no.

14   Q.        The evidence will be that the house was

15   undergoing repairs and had been vacant for some time

16   before the repairs.  Did you know that?

17           MR. EAST:  Object to the form.

18   A.        I did not know that.

19   Q.        The evidence will be also that both water

20   supply and the electrical power supply to the house had

21   been turned off.  Did you know that?

22           MR. EAST:  Object to the form.

23   A.        I did not know that.

24   Q.        Didn't you know that there weren't any lights

25   in the house?

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 83

1    A.        I didn't notice.

2    Q.        I think the evidence will be that Gary

3    Dickson and the man in the house that died, Joseph Lee

4    Pettaway, had been part of a work crew working on the

5    house in the preceding months.  Did you know that?

6    A.        I did not know that.

7              MR. EAST:  Object to the form.

8    Q.        I think there will be evidence also that

9    both Mr. Dickson and Mr. Pettaway, along with some of

10   the other work crew members, had eaten a barbecue

11   supper in the back yard of this house six or eight

12   hours earlier.  Did you know that?

13             MR. EAST:  Object to the form.

14   A.        I did not know that.

15   Q.        Would these pieces of information have been

16   useful and significant to you had you known about it

17   before you released the dog in the house?

18             MR. EAST:  Object to the form.

19   A.        Correct.

20   Q.        Mr. Dickson was not harmed in any way, was

21   he?

22   A.        Correct.  He was not harmed.

23

24

25

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 84

1

2   Q.      But he did tell you, you do recollect, the

3   only part of the person that he saw was a hand,

4   correct?

5   A.      Correct.

6   Q.      Do you recall whether Mr. Dickson said that

7   he had had or had attempted to communicate in any way

8   with the person before he left the house and made the

9   call to the police?

10  A.      I don't recall.

11  Q.      You don't recall that he did or didn't?

12  A.      Correct.

13  Q.      When you got there, had there been any

14  attempt by any of the police at Cresta Circle house

15  to -- for them to try to communicate with the person

16  in the house before you got there?

17  A.      I don't recall.

18  Q.      You weren't made aware of it if there was;

19  is that right?

20  A.      Correct.

21  Q.      What about after you got there, anybody make

22  any attempt to communicate with the person in the

23  house prior to the time that you went to the door with

24  the police dog and released him into the house?

25  A.      Not that I recall.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 85

```
1    Q.        And your body cam audio portion, it would
2    have picked that up, wouldn't it?
3    A.        If I was -- if I was close to that, yeah.
4    Q.        Well, to communicate with somebody in the
5    house, you would have to yell from the outside,
6    wouldn't you?  If you were standing outside of the
7    house on the street where the police were and you yell
8    and you were trying to communicate with anyone in the
9    house, you would have to raise your voice if you were
10   making an honest attempt to communicate with somebody
11   in the house, wouldn't you?
12   A.        Yes.
13   Q.        So there's no yelling on the tape, as you
14   recall it, of anybody making that attempt, correct?
15   A.        Correct.
16   Q.        You don't recall anybody yelling or making
17   any attempt to communicate with the person in the
18   house, correct?
19   A.        Correct.
20   Q.        By any of the police out there, correct?
21   A.        To my knowledge, yes, correct.
22   Q.        You didn't hear it, see it, know of it at
23   any time that night, correct?
24   A.        Correct.
25   Q.        And I think this is accurate, but you tell
```

```
 1   me if it's not.  Dickson told you nothing about any
 2   information he had with regard to the purpose of the
 3   person entering the house; is that correct?
 4   A.        Not that I recall.
 5   Q.        So, he didn't communicate anything to you
 6   that gave you any indication the person's intent was
 7   to steal anything from inside the house, correct?
 8   A.        If he did, I don't recall.  It would be on
 9   the camera.
10   Q.        Right.  Did Mr. Dickson tell you anything
11   about the house being in the process of repair or
12   being restored?
13   A.        Not that I recall.
14                   (Off the record.)
15   Q.        (By Mr. Sikes)  Now, you have a police
16   vehicle.  You were issued a police vehicle that night?
17   A.        Yes.
18   Q.        And you had had that vehicle for some period
19   of time?
20   A.        I'm not sure which vehicle I was --
21   Q.        On that night?
22             Do all of the police vehicles have --
23   generally have a loud speaker or some way of something
24   that will amplify voice and project it outward?
25   A.        Patrol vehicles do.
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 87

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

1    Q.      Okay.

2    A.      The canine trucks do not.  They're not

3    equipped with that.

4    Q.      Okay.  But there were -- there were four or

5    five patrol vehicles there, correct?

6    A.      Yes.

7    Q.      Okay.  And I know you didn't inspect each

8    one of them, but in the ordinary scope of things, all

9    patrol vehicles -- with maybe some exceptions maybe,

10   all patrol vehicles have that ability?  They have an

11   interior microphone, where the police officer in the

12   vehicle can amplify his voice and project out through

13   a loudspeaker to communicate, correct?

14   A.      With some exceptions, yes.

15   Q.      Right.  Do you know if any of the vehicles

16   out there were not equipped with a loud speaker?

17   A.      I don't know that.

18   Q.      Okay.  I want to make certain I'm clear

19   about this.  To the best of your knowledge, there was

20   no effort or attempt made by any Montgomery Police

21   Department policeman to communicate with any person in

22   the house before you went to the door of the house

23   with your dog and just before you released the dog,

24   correct?

25   A.      Yeah, besides my warnings.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 88

1    Q.        I know.  We're going to get to your, quote,
2    warnings in a moment.
3              But other than whatever it is you said at
4    the front door, prior to that time, you know of no
5    attempt by anybody out there with the Montgomery
6    Police Department to try to communicate with whoever
7    was inside the house, correct?
8    A.        Correct.
9    Q.        Do you have any way of knowing and do you
10   have any knowledge that the person inside the house
11   that turned out to be Mr. Pettaway, that he knew that
12   there were policemen outside the house?
13   A.        Rephrase that question again.
14   Q.        Yes, sir.  Do you have any way of knowing
15   whether Mr. Pettaway knew that there were policemen
16   outside the house that night?
17   A.        No.
18   Q.        Let me ask you about dog commands.
19             What does the term "Voran" -- am I
20   pronouncing it correct, Voran?
21   A.        Voran.
22             MR. NIX:  Voran.
23   Q.        Voran.  Excuse me.  Voran.  What does the
24   term "Voran" mean?
25   A.        To apprehend.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 89

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

```
1    Q.        To apprehend?

2    A.        Correct.  Or to search and -- search and

3    apprehend is a better way to put it.

4    Q.        You're telling the dog to go put handcuffs

5    on him?

6    A.        Not to put handcuffs, but to search and

7    then, if you find someone, subdue them.

8    Q.        "Subdue them"?  To tackle them?

9    A.        To bite them.

10   Q.        To bite them.  Is there a predatory command

11   prior to "Voran" being given?

12   A.        Not necessarily.  You can say -- tell them

13   "Pass auf," which translates roughly to be on alert,

14   kind of.

15   Q.        But "Voran" could be used without any

16   preparatory language, or at least could be with your

17   dog, correct?

18   A.        Yes, that's right.

19   Q.        Okay.  Is there any way a dog can, quote,

20   apprehend somebody other than biting them?

21   A.        No.

22   Q.        So, "Voran" is a command to bite a person,

23   isn't it?

24             MR. EAST:  Object to form.

25   Q.        (By Mr. Sikes)  Find and bite the person,
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 90

```
 1   that's what the command is, isn't it?
 2   A.        Basically, yes, or at least -- not
 3   necessarily.  So, if they -- as an example, if someone
 4   has like locked themselves in a bathroom.  Let's say
 5   they can't open up the door, but they smell and they
 6   know that someone is in there, then they'll bark, or
 7   they should.
 8   Q.        I'm not talking about what the dog will do.
 9   I'm talking about what the command means.  The
10   command, when you give it, means to find him and bite
11   him when you find him.  The door may be locked to keep
12   him from -- and he may not be able to do that, but
13   that doesn't change the command, does it?
14           MR. EAST:  Object to the form.
15   A.        No.  But it also does -- I'm just saying,
16   like, if they -- if they can't find someone, but they
17   know where someone is at, they will also bark --
18   Q.        I know.
19   A.        -- and alert that someone is in there.
20   Q.        But the command -- that isn't to find an
21   bark.  It is only to find and bark if he can't bite
22   him, correct?
23   A.        Correct.
24   Q.        And you don't know at the time whether the
25   guy is locked in there and can't get out or not.  The
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 91

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

1    command, when you give it, what your intention is, is

2    for the dog to find and bite the person, correct?

3    A.       Correct.

4    Q.       Okay.  Are you familiar with the term "Sic

5    'em"?

6    A.       I've heard it.

7    Q.       I'm sorry?

8    A.       I don't -- "Sic 'em"?

9    Q.       Sure.

10   A.       I mean, I've heard people say that.

11   Q.       You've heard "Sic 'em" dog on somebody,

12   haven't you?

13   A.       Correct.

14   Q.       Okay.  You're familiar with the term, "Sic

15   'em," then?

16   A.       Yes.

17   Q.       "Sic 'em, Fido," you're familiar with that?

18   A.       Correct.

19   Q.       Okay.  Is there any practical difference in

20   "Voran" and "Sic 'em"?

21            MR. EAST:  Object to the form.

22   A.       "Voran," you don't even know if someone is

23   there or not, but I see what you're talking about.

24   Q.       Okay.  Is there any practical difference in

25   the word "Sic 'em" and "Voran"?

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 92

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

```
 1              MR. EAST:  Object to the form.
 2   A.         Not that I can think of right now.
 3   Q.         Okay.  I know you didn't grow up in the
 4   South, but do you know that we have an ugly history
 5   here in the South about white policemen siccing police
 6   dogs on black men?  Do you know about that?
 7              MR. EAST:  Object to the form.
 8   A.         A little bit.  I seen it on TV.
 9   Q.         How long had you and your dog been assigned
10   to each other in July of 2019 -- excuse me -- 2018?
11   A.         Eight months, roughly.
12   Q.         How much of that was training?
13   A.         Two and a half months, roughly.
14   Q.         And when were you certified as a unit?
15   A.         It would have been end of January 2018.
16   Q.         So, you've been there February, March,
17   April, May, June and four days of -- eight days of
18   July, correct?
19   A.         Correct.
20   Q.         So, you had only been a K-9 unit team for a
21   little over five months?
22   A.         Correct.
23   Q.         Were you the most inexperienced K-9 team
24   that the Montgomery Police Department had in July of
25   2018, you and your dog?
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 93

```
 1              MR. EAST:  Object to the form.
 2    A.        Yes.  Yes, I would have been the newest one.
 3    Q.        I'm sorry.  I haven't got an extra copy of
 4    this, but I just pulled this off the internet.
 5              This is a dictionary definition of the word
 6    "sic 'em."  Would you read that and see if that's
 7    consistent with what you understand the word "sic 'em"
 8    to mean?
 9                      (Plaintiff's Exhibit 4 was
10                       marked for identification.)
11              MR. EAST:  Griff, Plaintiff's Exhibit 2
12    came from the SBI file?
13              MR. SIKES:  I think it did.
14              MR. EAST:  I thought so.  I was just making
15    sure.
16              MR. SIKES:  Yeah.
17    Q.        (By Mr. Sikes)  Is the definition given
18    there consistent with what you had understood the word
19    "sic 'em" to mean and what you understand it to mean
20    today?
21    A.        Yes.
22    Q.        Okay.  I was asking you earlier about --
23    just to make certain -- I want to make certain that I
24    know all of anything you saw or heard there other than
25    these conversations that we've talked about.
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 94

```
 1              Anything else that you saw or heard on site
 2     that night at Cresta Circle that was significant or
 3     factored into your decision to release the dog into
 4     the house other than what you've already told us
 5     about?
 6     A.        None that I can think of right now.
 7     Q.        If you think of any during the course of
 8     this deposition, would you stop and tell me about it?
 9     A.        Yes.
10     Q.        Okay.  Under the Montgomery Police
11     Department policies and procedures, when you and your
12     dog arrived at Cresta Circle, you had sole control
13     over whether that dog would be released or deployed
14     that night, correct?
15     A.        Correct.
16     Q.        Now, Sergeant Green was your -- technically
17     he was your superior in rank, correct?
18     A.        Yes.
19     Q.        And he was the highest-ranking person out
20     there -- policeman out there at the site, correct?
21     A.        Yes.
22     Q.        But with regard to deployment of the dog --
23     with regard to deployment of the dog, that was totally
24     your call, correct?
25     A.        Correct.
```

1    Q.        You had sole and final authority about
2    whether the dog would be put into the house or not?
3    A.        Correct.
4    Q.        Okay.  And that's based on Montgomery Police
5    Department policies, correct?
6    A.        Correct.
7    Q.        What did you know about Gary Dickson's
8    presence in the house and his right to be in the
9    house?
10   A.        He was -- I mean, he was in there asleep.
11   Then when the homeowner showed up, he wasn't --
12   Q.        Upset about the fact he was there?
13   A.        Correct.
14   Q.        Anything else?
15   A.        He says -- I believe I remember him saying
16   that he's -- he doesn't live there, but he's from the
17   Birmingham area, I believe.
18   Q.        Okay.
19   A.        So, it was -- he wouldn't be considered like
20   an authorized tenant to give permission, so --
21   Q.        In fact, the indication was that he was not
22   only not the homeowner; he wasn't a tenant there
23   either?
24   A.        Correct.  He was visiting --
25   Q.        Right, okay.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 96

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14   Q.       Do the Montgomery Police Department policies
15   for the K-9 Bureau require you to give three loud,
16   clear warnings that you're a police officer and you're
17   about to release the dog in the house if they do not
18   come out or identify themselves or surrender?
19   A.       That's right.
20   Q.       Okay.  Is the purpose of giving those three
21   loud, clear warnings to avoid having to release the dog
22   and have the suspect give up voluntarily?  Is that the
23   purpose?
24   A.       Yes, that's correct.
25   Q.       You had only been on a K-9 unit with your
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 100

1  dog for a little over five months.  Had you deployed

2  your dog previously?

3  A.      Yes, I have.

4  Q.      How many times had you deployed the dog

5  previously?  I'm talking about -- what I'm talking

6  about between January of 2018, when you were certified

7  as a team, police dog team, and July 8.

8          MR. NIX:  You're talking about like in a

9  real situation?

10          MR. SIKES:  Certainly, yeah.

11  A.      Maybe possibly up to ten times maybe, give

12  or take.

13

14

15

16

17

18

19

20

21

22

23

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 101

13  Q.       Now, you say you deployed your dog ten

14  times.  I'm using the word "deployed," and maybe I

15  don't know what I'm talking about.  I want to make

16  sure certain I understand.

17          By deploying the dog, it is when you tell

18  them to "Voran," to go and search and find and bite

19  somebody, correct?

20  A.       Correct.

21  Q.       And you've done that ten times previously?

22  A.       That's a rough number, but --

23  Q.       I know.  I'm sorry.  I didn't mean to imply

24  you were being exactly precise.  You think it was

25  around ten times?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 102

1    A.        Yes, sir.

2    Q.        Now, on the video -- you've heard the video,

3    and there's talk about getting a bite, unquote -- or,

4    quote, getting a bite, unquote, correct?

5    A.        I believe so, yeah.

6    Q.        What's that refer to?

7    A.        What's what refer to?

8    Q.        "Getting a bite"?

9    A.        Dog apprehending somebody, biting them.

10   Q.        Is that sort of a right of passage with a

11   new dog handler, to -- and his team to get their first

12   bite?

13   A.        I guess you could say that, yeah.

14   Q.        Okay.  In any of these previous ten

15   deployments, had you gotten a bite?

16   A.        No.

17   Q.        Were you eager to get a bite?

18   A.        I mean, everyone would be, so --

19   Q.        I take that as a "yes," correct?

20   A.        Yes.

21   Q.        Okay.  And in order to get a bite, you've

22   got to turn your dog loose and tell him to go bite

23   somebody, don't you?

24   A.        Correct.

25   Q.        Now, you said earlier the purpose of giving

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 103

Walter Pettaway vs Nicholas D. Barber, et al.                          Nicholas D. Barber
                                                                          9/3/2021

1    three loud, clear warnings is to avoid releasing the

2    dog, correct?

3    A.        Correct.

4    Q.        If that is actually -- or if that was

5    actually your purpose out there on July 8, wouldn't

6    you wait a period of time after you gave the last

7    warning to see if the person is going to come out,

8    surrender voluntarily, give themselves up?

9    A.        I normally do, yes.

10   Q.        Okay.  Did you do it on this occasion?

11   A.        I'd have to rewatch the video, but I don't

12   recall specifically.

13   Q.        Well, we're going to watch it in a minute

14   and we'll see.  You can tell me.

15             If you don't allow a sufficient time for a

16   person to react to your, quote, warning, unquote, then

17   you defeat the whole purpose of giving a warning,

18   don't you?

19   A.        I gave pauses in between.

20   Q.        Listen to my question and answer that

21   question.

22             If you don't allow sufficient time for the

23   person to react to your warning, then you defeat the

24   whole purpose of giving a warning, don't you?

25   A.        Correct, yes.

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10   Q.        But it's implicitly part of the policy,
11   isn't it, to, again, wait for a period of time in order
12   to be able to -- the person to be able to present
13   himself or give up if they're going to do that,
14   correct?
15   A.        Correct.
16   Q.        Okay.
17             MR. NIX:  Did he say "correct"?
18             Did you say "correct?"
19             THE WITNESS:  Yes, I did.
20             MR. NIX:  Okay.  I just have a little hard
21   time hearing you.  I'm a little hard of hearing
22   anyway.
23             THE WITNESS:  I understand.
24   Q.        (By Mr. Sikes)  On July 8 of 2018, you
25   didn't follow MPD policy, did you?
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 105

```
 1              MR. EAST:  Object to the form.
 2   A.         It was made apparent later on that I --
 3   Q.         I'm sorry?
 4   A.         It was made apparent later on I gave two
 5   warnings instead of three.
 6   Q.         Well, they were very indistinct and almost
 7   unintelligible warnings, weren't they?
 8              MR. EAST:  Object to the form.
 9   A.         No, I don't believe so.
10   Q.         Did you give them in sort of sing-song sort
11   of chant?
12   A.         What's -- I don't know what a sing-song
13   chant is.
14
15
16
17
18
19
20
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 106

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19          do you not understand what I'm talking about
20      sing-song?
21              MR. EAST:  Object to the form.
22      Q.      That didn't seem sing-song to you?
23      A.      No.
24      Q.      Did you slur the words and run them together?
25      A.      That's the way we've always --
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 107

1  Q.        Again, we can get through a lot quicker if
2  you'll answer my question.
3  A.        Well, it could be clearer, I guess.
4  Q.        Did you slur the words and run them
5  together?
6  A.        Yes.
7  Q.        Okay.  Let's also take a look -- it looks to
8  me like as soon as you finished -- you tell me if you
9  see any difference than this.  It looks to me like
10 after you finish giving the second what you call a
11 warning, it looks like that there was an immediate
12 release of the dog.  There was no pause at all between
13 the end, when -- the reverberation of your voice from
14 that last incantation that you made and the release of
15 the dog was just -- it was instantaneous.
16           Tell me if you see any difference, please.
17           MR. EAST:  Object to the form.
18                    (Video playing.)
19 Q.        Is there any pause?
20 A.        A short pause.  Not a long, multi-second
21 pause.
22 Q.        Would you say that it's more than a second,
23 if it was that even?  Is it more than a second, you
24 think?
25 A.        I would say right around a second.

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 108

1    Q.       One second is what you think the pause was,

2    okay.

3             Now, you testified you were eager to get

4    your first bite there that day, right?

5             MR. EAST:  Object.

6    A.       Not necessarily right there, but, in

7    general, at some point, yes.

8    Q.       Yeah.  And this was an opportunity to do

9    that, wasn't it?

10            MR. EAST:  Object to the form.

11   A.       Correct.

12   Q.       What you call a warning -- you didn't give a

13   warning with any intention of having the person come

14   out, did you?

15            MR. EAST:  Object to the form.

16   Q.       You intentionally made your warning -- what

17   you call a warning unintelligible so that you could

18   release your dog, didn't you?

19            MR. EAST:  Object to the form.

20   A.       No.

21   Q.       Do you see how somebody could infer that

22   from what we've just seen and witnessed?  You

23   understand how somebody could conclude that?

24   A.       Someone could think that, yeah.

25   Q.       Do you know how long your dog bit

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 109

1    Mr. Pettaway before you forced his jaws loose from
2    Mr. Pettaway's thigh?
3    A.        Roughly a minute.
4    Q.        Roughly a minute?
5    A.        Correct.  Is my best guess, yes.
6    Q.        That's your best guess.  You never have
7    looked at it and watched it and calculated it?
8    A.        I have, but I don't recall what that was.
9    Q.        Well --
10   A.        So, I -- I don't remember what that was, but
11   I remember it being roughly a minute.
12   Q.        Well, I think the tape will show it to be
13   almost two minutes, but it's hard to tell exactly when
14   the dog releases because you were having to struggle.
15             When -- you struggled with the dog to get
16   the dog off of him, correct?
17             MR. EAST:  Object to the form.
18   A.        No.
19   Q.        Don't you use force around his throat to
20   choke him off?  Is that how you brought the dog off of
21   him?
22   A.        Yeah, but I wouldn't say I struggled.
23   Q.        Well, all I can go by is that you're -- the
24   camera, the body camera, shakes as you are struggling
25   with the dog, it looks like, for some period of time.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 110

```
 1              MR. EAST:  Object to the form.
 2    Q.        That is not how you recall it?
 3    A.        I wouldn't use "struggle" as the word.  You
 4    choke him off.
 5    Q.        Did you have to wrestle the dog off of him?
 6    A.        No.  You just --
 7    Q.        How would you explain it?
 8    A.        You just choke him off.  You just -- you
 9    hook the leash up to the chain, thumbs inside the --
10    inside the chain, and you just twist and lift up.
11    Q.        Have you ever been bitten by a dog?
12    A.        No.
13    Q.        So, you don't have any --
14    A.        Not like in that sort of way, no.
15    Q.        So, don't have any conception of what it's
16    like, do you?
17    A.        No.
18    Q.        What was Mr. Pettaway doing from almost the
19    instant that this police dog of yours bit him?  What
20    was he doing and saying?
21    A.        He was underneath the bunk bed.
22    Q.        What was he doing and saying?  I wasn't
23    asking where he was.  What was he doing and saying?
24    A.        Hiding.
25    Q.        What was he saying when the dog was biting
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 111

1   him?  He wasn't hiding under the bed during this two
2   minutes because he had already been found, so hiding
3   is not an answer.
4           What was Mr. Pettaway doing and saying after
5   the dog bit him?
6           MR. EAST:  Object to the form.
7   A.      He was trying to come out from underneath
8   the bunk bed.  And I don't recall what he was saying.
9   Q.      Do you recall that he was screaming in pain
10  for almost that whole period?
11  A.      Yeah, but I don't know what he was saying.
12  If he had any words, I don't recall --
13  Q.      Okay.  You didn't know the words.  You
14  didn't hear any of the words he said?
15  A.      I don't recall.
16  Q.      Did you hear him saying:  I'm trying to get
17  out.  Please don't send the dog?
18          MR. EAST:  Object to the form.
19  A.      No, I didn't hear that.  I remember the --
20  Q.      Did you hear --
21  A.      I remember the -- in that full sentence, no.
22  But I did -- when I gave the command to get out from
23  underneath the bed.
24  Q.      Do you remember him saying, I'm trying to
25  come out?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 112

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

1   A.        Yes.   And that was when I went to lift the

2   bed up as best I could.

3   Q.        Do you remember him telling you he's

4   bleeding?

5   A.        I don't remember that.

6   Q.        You didn't remember him telling you that

7   he's bleeding?

8   A.        No.

9   Q.        Do you remember him saying that more than

10  once?

11  A.        No, I don't.

12  Q.        Do you remember effusively praising your

13  dog?

14  A.        That was a normal praise.

15  Q.        I didn't ask you what's normal or what isn't

16  normal.   Do you remember repeatedly praising your dog?

17  A.        Yes.

18  Q.        Good boy, good boy, good boy, good boy.   You

19  said that 15 or 20 times, didn't you?

20  A.        I don't remember how many times.

21  Q.        You don't think that it was that many?

22  A.        I'm saying I can't --

23  Q.        I know you didn't count them.   Do you recall

24  that that's in the ballpark -- that's an

25  approximation?   You said it that many times?

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 113

```
 1              MR. EAST:  Object to the form.
 2    A.        It could be an approximation.
 3    Q.        Okay.  What does "yaya, yaya, yaya, yaya,
 4    yaya" mean?
 5    A.        That's just a form of praising.
 6    Q.        Is it more than praising?
 7    A.        No.
 8    Q.        Now, we've had testimony from another dog
 9    handler.  He said it is -- it is a command to the dog
10    to continue the attack, to not lose his -- to not lose
11    the attack, to continue and to attack?
12    A.        I've never heard it like that, explained to
13    me like that before.
14    Q.        You deny that you were encouraging your dog
15    to continue to attack Mr. Pettaway by yelling, "Yaya
16    yaya yaya yaya"?  You deny that?
17    A.        Correct.  That's just a -- like I said,
18    that's a form of verbal praise.
19    Q.        Who would know more about that than you or
20    your superior, your instructor?
21    A.        Sergeant Ezell.
22    Q.        Okay.  How about Sergeant Schnupp?
23    A.        Him, too.  But he's not like --
24
25
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 114

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

13   Q.      The release of the dog is a use of force,

14   correct?

15   A.      Correct.

16   Q.      When you released the dog into the house,

17   you knew and intended that the dog would attack

18   whoever it found in the house with its teeth, correct?

19   A.      Correct.

20   Q.      Like all other uses of force, you were

21   taught that the release of the dog, with the knowledge

22   and intent that a dog will attack, is a use of force

23   that is subject to Constitutional restraints and

24   limits, correct?

25   A.      Correct.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 116

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

```
 1   Q.        What's your understanding of the limits on the
 2   use of force and, in particular, the use of force
 3   releasing the dog?  What are the limits on it?
 4   A.        I mean, there need to be a crime is committed,
 5   some sort of noncompliance of some kind, or for safety
 6   purposes, like if they're armed or in a store that has
 7   -- seels firearms that they broke into. Q.        Do you
 8   have any other understanding of the limits?
 9   A.        That's all I can think about for right now.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 117

1

2

3

4

Q.      All right.  I'm asking you, what are the

5 Constitutional limits on the use of force by police

6 officers?  And you told me that it has to be

7 objectively reasonable, correct?

8 A.      Right.

9 Q.      All right.  I asked you what are the factors

10 that you use to judge.  And you said, one, there has to

11 be a crime committed.  I'm asking you any crime?Just --

12 speeding?

13 A.      For using force?  I mean --

14 Q.      Yes.

15 A.      It could turn into that, yes.

16 Q.      I'm not talking about what it might turn into.

17       Look, we can do this as long or as short as

18 you want.  But, again, what I'd like to have is an

19 answer to the question that I've asked.  And that is,

20 is any crime sufficient for you to turn a dog loose on

21 somebody?

22 A.      No.

23 Q.      Where is the dividing line?  Where do you draw

24 the line on what types of crimes authorize or

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 119

1    make it Constitutionally permissible for a policeman
2    to employ that amount of force against a person?
3    A.       It's a felony or -- and they're being
4    non-compliant in some sort of way, such as by running
5    or hiding, if the officer or -- if the handler or
6    another officer was being attacked themselves.
7    Q.       All right.  Anything else you can think of?
8    A.       Not that I can think of.
9    Q.       A leash is a means of controlling the dog,
10   isn't it?
11   A.       Yes, just keeping him by you.
12   Q.       I'm sorry?
13   A.       Keeping him near you.
14   Q.       Right.
15   A.       And used for --
16   Q.       And that's control.  You restrict his
17   movement away from you.  You keep him next to you by
18   putting him on the leash, right?
19   A.       Correct.
20   Q.       Okay.  When you take the dog off leash, you
21   lose a degree of control, don't you?
22   A.       Instead of having verbal and physical, it
23   only goes --
24   Q.       When you -- let me have an answer to my
25   question.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 120

```
 1              When you release a dog off the leash, you

 2     lose a degree of control, don't you?

 3              MR. EAST:  Object to the form.

 4     A.        Yes, a degree.

 5     Q.        The only practical way that you can control

 6     the dog after he's off leash is by your verbal

 7     commands, and then you actually having to physically

 8     wrestle the dog off or choke him off, correct?

 9     A.        Correct.

10     Q.        Okay.  This dog didn't respond to verbal

11     commands, did it?

12              MR. EAST:  Object to the form.

13     A.        No, he does.

14     Q.        Why did you choke him off rather than simply

15     tell him to -- is the signal to release "af liggen"?

16     A.        "Af liggen" is dual purpose,

17     Q.        I'm sorry?

18     A.        Yes, it is, but it also means down.

19     Q.        Okay.

20     A.        So, the -- choking off is a much quicker,

21     more efficient way as opposed to --

22     Q.        Well, I would differ with you.  I think that

23     was the only way to get this dog off of him.  He

24     wasn't going to release him if you just stood there

25     and yelled af liggen at him for a week, would he?
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 121

Walter Pettaway vs Nicholas D. Barber, et al.                                    Nicholas D. Barber
9/3/2021

```
 1   A.        That's --
 2             MR. EAST:  Object to the form.
 3   A.        That's not the full command.  For the
 4   verbal, out, you'd have to yell out "Standstill,
 5   pause, don't move.  Those are like preparatory
 6   commands.
 7   Q.        Okay.
 8   A.        You add that much time to the hold bite.
 9   Also, if the person is not standing still, then, if
10   they're still moving --
11   Q.        Your testimony is it's quicker to wrestle
12   the dog off of a bite that he's in the middle of, like
13   on Mr. Pettaway, than it is to say "Standstill" --
14   what's the other command?  What is the --
15   A.        Don't move.
16   Q.        "Standstill, don't move, af liggen," those
17   are -- those are -- take longer than wrestling him off
18   the dog?
19             MR. EAST:  Object to the form.
20   A.        Yes.
21
22
23
24
25
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 122

12    Q.        The dog was unconscious?

13    A.        Yeah, that's how you choke them off.  When

14    you do the -- put your thumbs in the chain and then

15    twist up, it cuts off the blood supply to the brain,

16    so then it --

17    Q.        You have to choke the dog to the point of

18    unconsciousness before he releases the bite?

19              MR. EAST:  Object to the form.

20    A.        Yeah.

21    Q.        That's your testimony?  Okay.  You said

22    "yes," didn't you?

23    A.        Yes.  You're not choking him out causing them

24    pain or anything along those lines.

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 124

1

2          Did you subsequently learn that Mr. Pettaway

3   was a workman who had been working at that house that

4   day and had eaten supper with Mr. Dickson and the

5   fellow you call the homeowner earlier that afternoon?

6   Did you learn that later?

7   A.          People -- I didn't hear it there on the

8   scene, so --

9   Q.          Just -- you've learned that since then?

10  A.          I've heard it.  I'm not sure if it's true or

11  not, but, yes, I've heard it.

12  Q.          And how soon after the event did you hear

13  that?

14  A.          I'd say a few months.

15  Q.          And did you understand and then know that

16  Mr. Pettaway was not a burglar there that night?  Did

17  you know that?

18          MR. EAST:  Object to the form.

19  A.          Did I find out later on that --

20  Q.          Yes, yes.

21  A.          Yes.

22

23

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 125

```
 1
 2
 3
 4
 5
 6              When you released the dog into the house,
 7    you didn't have any solid reliable information about
 8    the identify of the person in the house, did you?A.
 9    Correct.
10    Q.        You didn't have any solid reliable
11    information about whether that person had a right or
12    license to be in the house, did you?
13              MR. EAST:  Object to the form.
14    A.        The -- the way that the witness and -- I'm
15    sorry.  Can you repeat that question again?
16    Q.        You didn't have any solid reliable
17    information about the person's purpose being in the
18    house, did you?
19    A.        Correct.
20    Q.        You didn't have any solid, accurate,
21    reliable information about the person's activities in
22    the house, did you?
23    A.        Other than the witness, Mr. Gary Dickson.
24    Q.        What did he tell you about his activities?
25    A.        Just that he was in there and saw the hand.
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 126

1   Q.      "Activities."  You understand the word

2   "activities," don't you?

3   A.      Yes.

4   Q.      Did you have any solid, reliable information

5   about the person's activities in the house?

6   A.      No.

7   Q.      Did you have any solid, accurate

8   information, reliable information, about his intent?

9   A.      No.

10  Q.      Did you have any solid -- did you have any

11  reason to believe that the person inside the house had

12  a weapon?

13  A.      Potentially, but --

14  Q.      Did you have any solid information, reliable

15  information, reason to suspect or believe that the

16  person was armed?

17  A.      No.

18  Q.      Did you have any reliable information that

19  the person had committed or was committing any serious

20  violent criminal offense?

21  A.      Other than burglary.

22  Q.      You didn't have any information he was

23  committing burglary, did you, solid and reliable

24  information about that?

25  A.      Depends on what your definition of solid and

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 127

1    reliable, but we'll say there was -- he had --
2    Mr. Dickson, when he said he saw him, so somebody had
3    made entry into the house.
4    Q.       Right.  And what is entry into a house that
5    you don't have license or right to be in?  What is
6    that standing alone?
7    A.       Standing alone, it's trespassing.
8    Q.       Okay.  So, in order for it to be burglary,
9    there had to be some evidence that there was intent to
10   steal something, correct?
11   A.       Or --
12            MR. EAST:  Object to the form.
13   Q.       Huh?
14   A.       Or commit a crime therein.
15   Q.       Right, right.  And you didn't have any
16   information about that, did you?
17   A.       No, I didn't.
18   Q.       All right.  You didn't know that
19   Mr. Pettaway -- you didn't have any reason to believe
20   that he posed any immediate threat or danger to you or
21   anybody else outside the house there in the MPD or
22   otherwise, correct?
23   A.       Correct.
24   Q.       You didn't have -- Mr. Pettaway that night
25   did not actively resist the police in any way, did he?

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 128

1  A.          He did by not complying, so it would be
2  passive --
3  Q.          Do you understand the word -- you understand
4  the difference in the word "passively" and "actively,"
5  don't you?
6  A.          Yes, that's what I was getting at.
7  Q.          You didn't have any information that he
8  actively resisted the police, did you?
9  A.          Correct, I did not.
10  Q.          You didn't have him -- you don't know
11  whether he heard anything that you said?  That
12  sing-song chant, you don't know whether he heard that
13  or not, do you?
14          MR. EAST:  Object to the form.
15  A.          I said it loud enough to where --
16  Q.          You don't have any knowledge that he heard
17  it, do you?
18  A.          He -- correct.
19  Q.          Okay.  So, you don't know whether he
20  disobeyed your command to come out of the house or
21  not, then, do you?
22          MR. EAST:  Object to the form.
23  A.          When phrased like that, then correct.
24  Q.          Phrase it another way.  You don't have any
25  reason to know that -- what he knew about -- excuse

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 129

```
 1   me.  I'll strike that.
 2            You don't have any -- you've already said
 3   you don't have any way of knowing whether he heard you
 4   or not, correct?
 5   A.        Correct.
 6
 7
 8
 9
10
11
12
13
14   Q.
15            Again, I'm not asking you what you believe
16   was reasonable to think about whether he heard you or
17   not.  You don't know whether he heard that sing-song
18   chant you gave, or if he did hear it, you don't know
19   whether he understood it, do you?
20            MR. EAST:  Object to the form.
21   A.        Correct.
22   Q.        Mr. Pettaway didn't make any verbal threats
23   to the police, did he?
24   A.        Correct.
25   Q.        And he made no -- took no threatening
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 130

```
 1   actions?  He manifested no intent to strike or harm

 2   anyone, and certainly no police officer, did he?

 3            MR. EAST:  Object to the form.

 4   A.       Correct.

 5   Q.       So, he took no threatening actions, correct?

 6   A.       Correct.

 7   Q.       And you had absolutely no reason --

 8   reasonable belief that he was armed in any way,

 9   correct?

10   A.       Correct.

11   Q.       And he made no attempt to flee from the

12   police, did he?

13   A.       Correct.

14   Q.       You were outside the house after

15   Mr. Pettaway was brought out, weren't you?

16   A.       Yes.

17   Q.       Did you see him -- observe him out on the

18   sidewalk after he had been brought out of the house?

19   A.       Yes.

20   Q.       Now, he stayed in the house after the attack

21   for five or six minutes or so before he was brought

22   out, correct?

23   A.       I don't know the exact time, but I would --

24

25
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 131

1

2

3          Where on the -- you're familiar with continuum

4  force spectrum in the police force?

5  A.        Yes.

6  Q.        Where on the spectrum is the use of a police

7  dog as a type of use of force?

8  A.        It would be on the same level as, say, the

9  tasing or the mace, so you've got -- presence is at the

10  bottom, the verbal commands --

11  Q.        Soft hand, hard hand --

12  A.        Soft hand, that stuff, would be up there at

13  the same level as where the taser and the mace would

14  be.

15  Q.        Okay.  Is that sometimes referred to as

16  "intermediate use of force"?

17  A.        It could be, yes.

18  Q.        As a -- you were -- you've testified

19  again -- I think it's no question.  You were a -- part

20  of the K-9 Unit on July 8 of 2018, correct?

21  A.        Yes.

22  Q.        As a part of the K-9 Unit, did you carry the

23  same weaponry as patrol officers or different weapons

24  or more or less, or what was the policy with regard to

25  that?

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 133

1   A.        I still carry mace, if need be, and I had a

2   taser with me, but I had it on my belt on the outside.

3   Q.        You carried it back in the truck, then, or

4   what you call your vehicle?

5   A.        Correct, yes.

6   Q.        How about a handgun?

7   A.        Yes, and a handgun.

8   Q.        Okay.  What about a baton?

9   A.        Yes, I had one of those, too.

10  Q.        Okay.  So, you had the full kind of play of

11  weapons that a patrol officer has, correct, except

12  that you didn't carry your mace with you?

13  A.        I didn't carry the taser with me.  The mace

14  was on me.

15  Q.        I'm sorry?

16  A.        The mace was, the pepper spray, that was on

17  me, but the taser was not.

18  Q.        Okay.  I'm sorry.  I mixed them, then.  The

19  taser was back in the vehicle?

20  A.        Correct.

21  Q.        But other than the taser being back in the

22  vehicle, you had the same amount of weaponry that a

23  patrol officer has?

24  A.        Correct.

25  Q.        That includes, again, a -- what type of

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 134

1    firearm were you wearing?

2    A.        At this point, it was either the Sig P320 or

3    the Glock 22.

4    Q.        You said Sig, S-I-G?

5    A.        Yes, correct.

6    Q.        Speak up.  I don't know --

7              MR. SIKES:  You got Sig?

8              THE COURT REPORTER:  Yes.

9              MR. SIKES:  Okay.  All right.

10   Q.        (By Mr. Sikes)  Now, you're presently a

11   policeman?

12   A.        Correct.

13   Q.        And you have been a policeman since -- what

14   was that, 2000 and --

15   A.        '13.

16   Q.        '13.  Okay.  Do you like being a policeman?

17            A. It's still a job, but yes.

18   Q.        Anybody force you to become a policeman?

19   A.        No, sir.

20   Q.        You chose that?

21   A.        Yes.

22   Q.        In fact, even after the -- sort of being

23   forced out as a policeman here in Montgomery, you

24   applied and went to a job as a policeman in Tallassee,

25   correct?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 135

1           MR. EAST:   Object to the form.

2    A.        Yes.

3    Q.        Okay.  And you know and knew at the time you

4    applied for both jobs, Montgomery and Tallassee, that

5    the job of policeman requires on occasion that you use

6    physical force against other human beings, correct?

7    A.        Correct.

8    Q.        And you've had some training in, I suppose,

9    hand-to-hand fighting or physical take-downs or that

10   sort of thing?

11   A.        A little bit, yes.

12   Q.        Okay.  And the reason you were trained in

13   that regard is that it is expected that occasionally

14   you may have to fight with subjects, mix it up with

15   them physically?

16   A.        Yes.

17   Q.        Wrestle with them, fist fights, physical

18   confrontations with less than -- weapons -- with less

19   than guns, correct?

20           MR. EAST:   Object to the form.

21   A.        Correct.  I think I --

22   Q.        I'm sorry?

23   A.        Yes.

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 136

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10              MR. SIKES:  I'll let you look at those.
11                   (Plaintiff's Exhibit 6 was
12                   marked for identification.)
13 Q.       (By Mr. Sikes)  I'll let you look at those.
14 Let me ask you a question at the start, then, if you
15 can identify those, is -- all of those are individual
16 cell shots from your video body cam; is that accurate?
17 Take a minute and look and see.
18           What I want to do is, so that we have some
19 frame of reference with regard to the chain of events
20 that went on from the time that the police dog
21 attacked Mr. Pettaway and the time that the actual EMT
22 first arrived and touched him, touched Mr. Pettaway.
23           Do you recognize Plaintiff's Exhibit 6 as
24 one of the photographs at the -- I don't know if that
25 is the very second the attack started, but -- we
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 137

1    viewed the video just a moment ago.  Does that look to
2    be the photograph where your police dog first engaged
3    with Mr. Pettaway underneath the bed?
4    A.        Yes.
5    Q.        I'm sorry?
6    A.        Yes.
7    Q.        Okay.  And all these are taken from your
8    body cam, I will represent to you.  In fact, it's
9    marked at the bottom right-hand corner of all of them,
10   I think, to that effect.
11                  (Plaintiff's Exhibit 7 was
12                  marked for identification.)
13   Q.        Plaintiff's Exhibit 7, what I attempted to
14   do was take a photograph or take a single shot where
15   the -- there were two police officers, Montgomery
16   police officers, that were dragging Mr. Pettaway's
17   body out the door of the house.  And I'll represent to
18   you that that was -- you can go back and look at it if
19   you have any doubt about that.
20            Does that look to be an accurate -- as far
21   as you can tell, that that's what that portrays?
22   A.        I have no reason to dispute --
23   Q.        Well, again, look at the photograph and make
24   that determination.
25                  (Plaintiff's Exhibit 8 was

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 138

```
 1                    marked for identification.)
 2   Q.        Plaintiff's Exhibit 8 is Mr. Pettaway's body
 3   after it was laying on the sidewalk in front of the
 4   house.  Do you recognize that photograph?
 5   A.        Yes.
 6   Q.        All of these photographs are taken from your
 7   cell -- your body camera.
 8             Do they, as far as you can tell, accurately
 9   depict matters they portray?
10   A.        Yes.
11   Q.        All right.  There are a number of -- I see
12   five flashlights in the background of Plaintiff's
13   Exhibit 8.
14             Was there anybody out there beside police
15   officers ringing Mr. Pettaway's body at that time?
16             MR. EAST:  Object to the form.
17   A.        No.
18   Q.        So, all of those would be flashlights held
19   by policemen, as far as you can?
20   A.        As far as I can tell.
21   Q.        And to the best of your recollection, that
22   was the case?
23   A.        Yes.
24   Q.        Nobody out there -- there weren't any
25   bystanders or gawkers or neighbors that came by and
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 139

```
1    were shining a flashlight down at Mr. Pettaway that
2    you can recall?
3    A.        Not that I recall.
4              (Plaintiff's Exhibit 9 was
5              marked for identification.)
6    Q.        Plaintiff's Exhibit 9 similarly is a
7    photograph of Mr. Pettaway's body lying there.
8              (Plaintiff's Exhibit 10 was
9              marked for identification.)
10             (Plaintiff's Exhibit 11 was
11             marked for identification.)
12             (Plaintiff's Exhibit 12 was
13             marked for identification.)
14             (Plaintiff's Exhibit 13 was
15             marked for identification.)
16             (Plaintiff's Exhibit 14 was
17             marked for identification.)
18             (Plaintiff's Exhibit 15 was
19             marked for identification.)
20   Q.        (By Mr. Sikes)  I will ask you to take a
21   look maybe at these series of photographs of his body
22   lying on the sidewalk.  And some of them are -- you
23   walked around at different points, and you can't tell
24   exactly.
25             But does it appear to you that
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 140

1    Mr. Pettaway's body was moved at any time during this
2    period of time between Plaintiff's Exhibit 8, 9, 10,
3    11, 12, 13, 14, 15 being taken?
4         A.   You asked me if he was moved?
5         Q.   Yeah.  Does it look like he's moved -- he's
6    lying sort of catty-corner on the -- across the
7    border -- on one edge of the concrete walkway.  It
8    looks like he's lying in that posture in all of the
9    photographs to the extent you can tell.
10        Does it look like his body has been moved at
11   any time?
12        A.   Not -- not according to the pictures, no.
13        Q.   Right.  Well, it doesn't show on the
14   video also.  The video is more or less constant during
15   that period of time.
16        Well, let's look at some time spans now, if
17   you would.  The time that Plaintiff's Exhibit 6 was
18   taken is 3:15:40, correct?
19        A.   Yes.
20        Q.   And the next photograph, Plaintiff's Exhibit
21   7, shows two police officers bringing him out of the
22   house.  And it is time stamped at 3:23:14, correct?
23        A.   Correct.
24        Q.   If you subtract those two, it looks like
25   Mr. Pettaway, after the attack began, he remained in

Bain & Associates Court Reporting Services, Inc.
1-888-326-0594 depos@bainandassociates.com

1    the house after the -- after it began for
2    approximately seven and a half minutes; is that
3    correct?
4        A.   Yes.
5        Q.   Doing the subtraction?  Yeah.
6        A.   Yes.
7        Q.   Okay.  Now, I've looked at a number of
8    different videos.  I don't see that anybody attempted
9    to provide any first aid or medical care to him at
10   that time.
11       Do you know any different?  Do you know that
12   anybody at the Montgomery Police Department attempted
13   to provide first aid to Mr. Pettaway while he was
14   lying inside the house?
15       A.   Not that I'm aware of.
16       Q.   Okay.  The next series of photographs that
17   run from Plaintiff's Exhibit 8, it is -- 8 was taken
18   at 3:23:40, correct?
19       A.   Correct.
20       Q.   And the photograph of a fire and rescue
21   person reaching down to touch Mr. Pettaway's body is
22   Plaintiff's Exhibit 15, correct?
23       A.   Correct.
24       Q.   So, between the time that Mr. Pettaway was
25   laying on the sidewalk as shown in Plaintiff's Exhibit

1    8, which is at 3:23:40, and the time that the

2    paramedic first touched him in Plaintiff's Exhibit 15,

3    that's another roughly six minutes, correct?

4         A.   Correct.

5         Q.   Do you know if anybody provided any first

6    aid or any attempt to provide medical care to

7    Mr. Pettaway during that six-minute period?

8         A.   Not that I'm aware of.

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

Bald & Associates Court Reporting Services, Inc.
1-888-326-0594 depos@baldandassociates.com

Page: 143

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.
Page: 144

7    Q.   Okay.  I will represent to you that we have
8    taken prior depositions in this case, and one of the
9    depositions that we took was of former Police Chief
10   Ernest Finley.  We took another deposition of the City
11   itself through its designee, Lieutenant Andre Caslisle.
12   Did you know Lieutenant Caslisle?
13        A.   I do, yes.
14        Q.   Okay.  I'll represent to you that these are
15   excerpts from their deposition.
16             MR. SIKES:  Did I give you copies?  No.
17   I've renumbered them here.  They were B and C to
18   something else.
19             MR. EAST:  That's fine.
20             MR. SIKES:  C is 16, B is 17.  Top one
21   there, Finley, is 16.
22             (Plaintiff's Exhibit 17 was
23             marked for identification.)
24        Q.   (By Mr. Sikes)  I'll let you've take a look
25   at that and read those.  Those are brief portions of

Bain & Associates Court Reporting Services, Inc.
1-888-326-0594  depos@bainandassociates.com

```
 1   his deposition.  When you read through both of them,
 2   let me know and I'll ask you some questions.
 3        A.   Okay.   I read through them.
 4        Q.   All right.   One of the claims that is made
 5   in the complaint against you, as well as the other
 6   police officers who were out there at Cresta Circle
 7   that night, is that you and the other police officers
 8   out there failed to provide any first aid or other
 9   type of medical care to Mr. Pettaway as he lay there
10   on the sidewalk.
11        In former Police Chief Finley's deposition,
12   Plaintiff's Exhibit 16 -- see his testimony there --
13   he testified that Montgomery Police Department policy
14   did not require Montgomery Police Department policemen
15   who cause a life-threatening injury, such as arterial
16   bleeding, they don't have any obligation to themselves
17   provide first aid or reduce the flow of blood
18   necessary to avoid the loss of life.
19        Do you see that?
20        A.   I do see that.
21        Q.   Do you agree with that?   Is that what you
22   understood also, or do you disagree with that?
23        A.   Agreeing did I read that?
24        Q.   No.   Do you agree that that was -- were you
25   ever taught that you were supposed to give first aid?
```

1      A.      No, sir.

2      Q.      So, I think that -- do you read Chief Finley

3   as saying that neither you, nor the other police

4   officers out there, were required to provide first aid

5   to Mr. Pettaway?

6      A.      Correct.

7      Q.      Do you read that that way also?

8      A.      Yes, sir.

9      Q.      And do you agree with Chief Finely about

10   that, that you had no obligation to do that under the

11   policies and procedures of the Montgomery Police

12   Department at the time?

13      A.      It's really -- I mean, I don't make policy.

14   However, I'm also not trained in --

15      Q.      To give medical care?

16      A.      To give medical care.

17

18

19

20

21   I'm simply asking you, Chief Finley says that

22   neither you, nor any other policeman under there, under

23   City of Montgomery Police Department policy and

24   procedure at the time, that y'all didn't have any

25   obligation to provide medical care or first aid to

Bain & Associates Court Reporting Services, Inc.
1-888-326-0594  depos@bainandassociates.com

1  Mr. Pettaway under the circumstances.
2       Q.   Do you agree or disagree with that?
3       A.   Agree.
4       Q.   Okay.  I'll ask you to take a look at
5  Plaintiff's Exhibit 17.  This is Lieutenant Caslisle.
6  And his bridges two pages, but to shortcut the
7  question/answer a little bit, he says -- he testified
8  that, quote, under no circumstances that he knew of
9  between 2015 and January of 2021 of this year were
10  Montgomery police officers required to provide
11  hands-on first aid or medical care to an injured
12  person.
13       Do you see that?
14       A.   I do.
15       Q.   Do you understand that was what he was
16  testifying?
17       A.   Correct.
18       Q.   And, again, I'll ask you the same question.
19  Do you agree that under Montgomery Police Department
20  policies and procedures, as you understood them in
21  July of 2018, under no circumstances were you, on that
22  occasion, required to provide first aid or medical
23  care to Mr. Pettaway?
24       A.   Yes, I agree.
25       Q.   You agree with that?

Bail & Associates Court Reporting Services, Inc.
1-888-326-0594  depos@bailandassociates.com

```
1    A.    Yes.
2    Q.    Okay.  I'm going to show you also a series
3    of other photographs.
4          Did you know a police officer named Kelundra
5    Watts?
6    A.    Not to my knowledge, no, I don't.
7    Q.    I'll represent to you that she was one of
8    the police officers that was present, called out there
9    that -- she was one of the police officers standing
10   around with the flashlight looking down at
11   Mr. Pettaway on the sidewalk in the photographs that
12   we -- went in earlier as exhibits to your deposition.
13             (Plaintiff's Exhibit 18 was
14         marked for identification.)
15             (Plaintiff's Exhibit 19 was
16         marked for identification.)
17             (Plaintiff's Exhibit 20 was
18         marked for identification.)
19   MR. SIKES:  18, 19 and 20.  You want me to
20   read the times to make sure -- well, here.  I'll just
21   read the last -- 51, 14 and 17, 51, 14 and 17.  And
22   they are 18, 19 and 20 Plaintiff's Exhibits.
23   Q.    (By Mr. Sikes)  Those are photographs taken
24   from Policeman Watts' body camera, and they are taken
25   over, again, a roughly -- I guess it's a
```

Bath & Associates Court Reporting Services, Inc.
1-888-326-0594   depos@bathandassociates.com

1      five-and-a-half-minute period or so between the first

2      one at 3:23:15, which is Plaintiff's Exhibit 18, and

3      the last of them taken at 3:29:17, which is

4      Plaintiff's Exhibit 20.

5           Your video camera recording indicates that

6      you were present and that you observed Mr. Pettaway

7      laying out there on the sidewalk during that time

8      period, correct?

9      A.    Yes.

10     Q.    Okay.   Do those photographs accurately

11     depict the condition that Mr. Pettaway was in as he

12     was laying there on the sidewalk, Plaintiff's Exhibit

13     18, 19 and 20?

14     A.    Yes.

15

16

17

18

19

20

21

22

23

24

25

10   Q.   (By Mr. Sikes)   Do you recall standing
11   outside after Mr. Pettaway's body was laid out and
12   laid on the sidewalk, you were walking around
13   Mr. Pettaway's body, along with the other policemen
14   out there?
15   A.   Yes.
16   Q.   Yes?
17   A.   Yes.
18   Q.   Okay.   Do you remember on several occasions,
19   there was laughter among the policemen?
20   A.   No, not personally, no.
21   Q.   You didn't see that in the video?
22   A.   I mean, talking -- in the video, yes, I
23   remember hearing that person, yeah.   But having an
24   actual memory of standing there, I don't recall that.
25   Q.   But you saw it in the video?   You saw that

Page: 155
Bain & Associates Court Reporting Services, Inc.
1-888-326-0594 depos@bainandassociates.com
9/3/2021
Nicholas D. Barber
Walter Pettaway vs Nicholas D. Barber, et al.

Bain & Associates Court Reporting Services, Inc.
1-888-326-0594  depos@bainandassociates.com

```
25            photograph --
24       Q.   And you recall going back in and taking a
23       A.   Yes.
22       Q.   You recall seeing that?
21            (Video playing.)
20            right now.
19       Q.   Okay.  That's what I'm going to show you
18       A.   Yes.
17            Do you recall that?
16            real quick.
15            wait, before you do that, let me grab a picture of him
14            out?  One of them says, Yeah.  And then you say, Oh,
13            No, leave him for the medics.  You want to bring him
12            effect, are they're bringing him out, and they say:
11            one of the police officers said something to the
10            conversation -- there's a portion of the video where
 9            and you know what you're fixing to see, there's a
 8            video.  This is -- so that you know what's coming up
 7       Q.   I'm going to show you another portion of the
 6       A.   Yes.
 5       Q.   On a couple of occasions?
 4       A.   Correct.
 3       Q.   -- in the crowd there?
 2       A.   Yes.
 1            there was laughter --
```

Walter Pettaway vs Nicholas D. Barber, et al.

Walter Pettaway vs Nicholas D. Barber, et al.                    Nicholas D. Barber 9/3/2021

```
 1    A.   Yes.
 2    Q.        -- of Mr. Pettaway?
 3              This is when he's lying -- he was
 4    unconscious in the room where the attack had occurred,
 5    correct?
 6              MR. EAST:  Object to the form.
 7    A.   I don't know if he was unconscious or not,
 8    but he was in the same room, yes.
 9    Q.   Did you speak with him?
10    A.   No, I don't believe.
11    Q.   Did you see him move while he was in there
12         -- while you were in there?
13    A.   I don't recall seeing him move.
14    Q.   Was he lying on his side?
15    A.   Yes, I believe so.
16    Q.   Are these some of the -- you see there?  Are
17    those some of the supplies that were -- over on the
18    left side of the screen, some of the building supplies
19    that were in the house?
20    A.   I see it, yes.
21              (Video playing.)
22    Q.   This is just prior to you taking the
23    photograph?
24    A.   Yes, I believe so.
25    Q.   Does he appear unconscious to you?
```

1    A.    I don't really have a way of knowing.

2    Q.    Okay.   I want to ask you about this.   You

3    take the photograph here.   I'll show you the

4    photograph.

5    (Video playing.)

6    Q.    Did you hear what you said?

7    A.    "Awesome."

8    Q.    Yes, sir.   What did you mean?

9    A.    Just something I say, like good deal or

10   awesome or okay.   If someone asks me -- I'll give you

11   a random example.   Someone tells me, I came back from

12   lunch, I'll say "Awesome."

13   Q.    Let me show you another clip.

14   (Video playing.)

15   Q.    Do you recognize your voice in there?

16   A.    I do.

17   Q.    Okay.   Somebody asks, "Did you get a bite?"

18   And you sort of sounded like you were sort of

19   structting, "Sure did, haha."

20   MR. BAST:   Object to the form.

21   Q.    Is that accurate?

22   A.    That's what I said, yes.

23   Q.    I'll show you another clip here.

24   What I'd like for you to do -- on this clip,

25   if you can, there's some police officers that speak.

1-888-326-0594   depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

1  And I know -- did you say that you knew some of these
2  police officers, or you didn't know any of them?
3  A.  I knew Fluornoy, but he showed up later.
4  (Video playing.)
5  Q.  Who is speaking there?
6  A.  I believe that's Fluornoy.
7  Q.  All right.  Who speaks here?
8  A.  I don't know.
9  Q.  That's you talking about your puppy,
10  correct?
11  A.  Yes.  My partner, yes.
12  Q.  I'm sorry?
13  A.  Yes.  My canine partner, yes.
14  Q.  Your "puppy" is what it's referred to there,
15  correct?
16  A.  Yes.
17  Q.  Who's asking you if you put him up?
18  A.  I believe that was also Fluornoy.
19  Q.  Okay.  And you made a joke, didn't you, back
20  in response?
21  A.  Yes.
22  Q.  And the joke was?
23  A.  "No, I just let him run around."
24  Q.  Okay.  And everybody got a chuckle out of
25  that?

Bain & Associates Court Reporting Services, Inc.
1-888-326-0594 depos@bainandassociates.com

1  A.  Sounds like it, yes.
2  Q.  Huh?
3  A.  Sounds like it, yes.
4  Q.  Well, you heard it, didn't you?
5  A.  (Witness nods head.)
6  Q.  You need to answer out loud.
7  A.  Yes.
8  Q.  There's another spot on there that I
9      can't -- I thought I had it queued up, but I can't
10     find it.
11  Q.  Do you recall there being -- colloquy
12     about -- as these four or five police officers stand
13     over Mr. Pettaway's bleeding, unconscious, dying body
14     that they -- then one of them says:  Well, he's good.
15     And the other one says, Well, good is a relative term.
16     Let's get that clear.  He's breathing.
17     Do you recall that?
18  A.  I recall seeing it in the video.
19     (Plaintiff's Exhibit 21 was
20     marked for identification.)
21  Q.  I'm going to show you some select portions
22     of the video, and some of it is actions and some of it
23     is colloquy.  But what I'll ask you to review it and,
24     if we need to, we'll queue it up and look at it and
25     check it for accuracy.  I think I got it accurate.

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

1    What I've done is tried to transcribe the

2    times of different actions and also some of these --

3    some of the conversation.

4    Does any of it look inaccurate to you, or do

5    you take exception to any of it or think it didn't

6    happen or the time's wrong or, in general, does that

7    look like that's an accurate recitation of the facts

8    and events and the times that occurred and the

9    conversations that occurred?

10        MR. EAST:  Object to the form.

11    A.    Some of the wording, I wouldn't use.  I

12    don't think it's accurate, but --

13    Q.    Show me where.  Tell me what.

14    A.    Forcibly prised the dog's jaws off.

15    Q.    I thought you used force around his throat

16    to get his jaws to release?

17    A.    It's not like a prise.  I don't use that

18    word.

19    Q.    Okay.

20        MR. EAST:  While he's looking at it, am I

21    correct this is the time line you guys created?

22        MR. SIKES:  Uh-huh.

23        MR. EAST:  From y'all's observation?

24        MR. SIKES:  Uh-huh.

25        THE WITNESS:  What I remember, it seems

1    accurate.   I don't remember at the 3:20:16 hearing me

2    state he's not very happy right now.

3    Q.   You don't recall saying that?

4    A.   Yes, I don't recall hearing the video me

5    saying, He's not very happy right now.

6    Q.   All right.

7         (Video playing.)

8    Q.   Is your recollection refreshed now by

9    hearing the video?

10   A.   Yes, sir.

11   Q.   Is that your voice?

12   A.   Yes, sir.

13   Q.   And what did you say?

14   A.   "He's not very happy right now."

15   Q.   Okay.   Are you kind of being sarcastic about

16   that?

17   A.   Sounds like it.

18   Q.   It sounds like it?

19   A.   Correct.

20   Q.   Okay.

21   A.   I don't remember saying it, so I --

22   Q.   You don't deny saying it.   It's there on

23   video, isn't it?

24   A.   Yeah.   I'm saying I don't -- anyway --

25   Q.   Go ahead.   If there are any other -- let me

Bain & Associates Court Reporting Services, Inc.
1-888-326-0594 depos@bainandassociates.com

1    ask you while you were at -- what word would you use
2    instead of forcibly prise the dog loose?  You choked
3    him unconscious and got him to release the bite?
4    Would that be a more accurate way to say it?
5         A.   The most accurate way would say I conducted
6    a hard out.
7         Q.   Well, that's not very informative.  Nobody
8    knows what a hard out is other than policemen.
9    What you did -- and you described it.  You
10   choked him until he lost consciousness, and then he
11   released his bite; is that correct?
12        A.   Correct.  That's called a hard out.
13        Q.   It might be called a lot -- it may be called
14   a JIS for all I know.  But what you did was, you
15   choked the dog until it lost consciousness, and when
16   the dog lost consciousness, it released its bite; is
17   that accurate?
18        A.   Yes.
19        Q.   Okay.  I'll put that in there instead of
20   this, then.
21   Any other corrections you want to make about
22   what occurred on video and what the words -- your
23   words or others were on the video?
24        A.   No, I don't think so.
25        Q.   It's all accurate, then, other than the

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 163

1    correction we just made about you choking the dog to
2    the point of -- the dog went unconscious, and then you
3    released his bite. Other than that change, no others?
4        A.   To the best of my knowledge, this is --
5        Q.   Okay.  Let me ask you -- I want to make
6    certain I'm clear about all this, now.
7             The most severe crime that you could imagine
8    Mr. Pettaway or reasonably claim that he was
9    committing was third-degree burglary, correct?
10            MR. BAST:  Object to the form.
11       A.   Correct.
12       Q.   And that would depend upon whether you had
13   probable cause to believe there was an intent to steal
14   something, correct?
15            MR. BAST:  Object to the form.
16       A.   Or commit a crime therein.
17       Q.   And you had no reliable evidence of either
18   of those, correct?
19       A.   It was confirmed that -- the way we would --
20   a way that we -- I'm trying to think of the right way
21   to say it.
22       Q.   You're not answering my question.  My
23   question is, did you have reliable evidence of an
24   intent to steal or to commit a crime?
25       A.   Not that I can recall.

Bain & Associates Court Reporting Services, Inc.
1-888-326-0594 depos@bainandassociates.com
Page: 164

Walter Pettaway vs Nicholas D. Barber, et al.    Nicholas D. Barber 9/3/2021

```
 1        Q.   Okay.  So, the other crime, if it wasn't
 2   burglary, it would have been trespassing, correct;
 3   that is, going on a piece of property that you had no
 4   right to be on, legal right to be on, license?
 5        A.   Yes.
 6        Q.   Okay.  So, those are the only two crimes
 7   that were within the universe of what this might have
 8   been, correct?
 9             MR. BAST:  Object to the form.
10        A.   Yes.
11        Q.   I realize that to most people, I guess, any
12   crime is serious in some sense.  But within the police
13   and law enforcement community, is trespass considered
14   a serious crime?
15        A.   Yes, but no.
16        Q.   I'll take that answer.  At the time you
17   released the dog to attack Mr. Pettaway, was
18   Mr. Pettaway posing an immediate threat to the safety
19   of officers or others?
20        A.   Immediately, no.
21        Q.   Can you explain -- well, let me back up.
22   I'll leave it.
23             At the time you released the dog to attack
24   Mr. Pettaway was not actively resisting
25   arrest, was he?
```

Page: 166
Bain & Associates Court Reporting Services, Inc.
1-888-326-0594  depos@bainandassociates.com

```
 1    A.   Actively, no, he wasn't.
 2    Q.   And at that time, he was not trying to evade
 3         arrest by flight, was he?
 4    A.   By flight, no.
 5    Q.   Okay.  And state as convincingly as you can
 6         why there was a need to release the dog at that time.
 7         MR. EAST:  Object to the form.
 8    A.   Because the guy had already seen --
 9    Mr. Dixon had already seen him inside there.  He's the
10    one that called.  There wasn't a -- it wasn't like
11    other burglary calls where somebody says -- they think
12    they're breaking into this house, but they didn't
13    actually see it.  They just call.  So they already had
14    called the police.  He wanted to be seen.  He wasn't
15    trying to be -- a lot of times, you get people, they
16    will call and say:  I don't want to see the police.  I
17    just want them to know.  So, we had a natural
18    complainant in there that saw him in there.
19         And that's also part of the policy to
20    respond to burglaries and alarm calls and other
21    felonious-type cases or calls, rather.
22         So, given all those circumstances, it wasn't
23    anonymous 911 call, they don't want to be seen, no
24    answer on call back type of call.
25    Q.   All right.  That's the best explanation you
```

Bain & Associates Court Reporting Services, Inc.
1-888-326-0594 depos@bainandassociates.com

Walter Pettaway vs Nicholas D. Barber, et al.

Nicholas D. Barber
9/3/2021

```
 1    can give us?
 2    A.    For right now.
 3    Q.    For right now?
 4    A.    Correct.
 5    Q.    You're going to try to think up a better one
 6    later?
 7    MR. EAST:  Object to the form.
 8    A.    No.
 9    Q.    Well, again, I don't -- for right now --
10    tell us what it is that impressed on you.  We have got
11    to use force here.  There is no other alternative?
12    What made that necessary then, when you released the
13    dog in there?  Why was that needed other than what
14    you've told us?  Any other reason?
15    A.    Well, also when -- the whole purpose behind
16    using the dog is to keep the officers safer, so the
17    dog, which is a tool, can be used to go and find
18    anyone that's in there without putting any officers
19    potentially in danger.
20    Q.    Well, that excuse could be used -- every
21    time a police dog is called out, you could say, Well,
22    you know, it's safer to let the dog take the risk.
23    That reason disappears.  I mean, there's no reason for
24    any police officer to ever enter a building then, is
25    there?  There would be always -- the policy is to
```

Bain & Associates Court Reporting Services, Inc.
1-888-326-0594 depos@bainandassociates.com

1    release the dog?

2         MR. EAST:  Object to the form.

3         A.    Yes.  That's why the canine is a great tool

4    to have, and that's why it's in the policy we do

5    respond to that.  So, let's just say a business is

6    broken into.  You let the dog search first if we're on

7    duty and then secondary clear it later on.

8         Q.    The last factor is the extent of the injury

9    inflicted, death.  Death is the worst injury a police

10   officer can inflict, isn't it?

11        MR. EAST:  Object to the form.

12        A.    Yes.