1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                 NORTHERN DIVISION

4

5    WALTER PETTAWAY, as
     Administrator of the
6    Estate of Joseph Lee           CIVIL ACTION NUMBER
     Pettaway, deceased,
7                                        2:19-CV-0008
            Plaintiff,
8                                     DEPOSITION OF:
     VS.
9                                      JAMES JONES
     NICHOLAS D. BARBER
10   and MICHAEL D. GREEN,

11          Defendants.

12

13              S T I P U L A T I O N S

14          IT IS STIPULATED AND AGREED, by and between

15   the parties through their respective counsel, that

16   the deposition of:

17                 JAMES JONES

18   may be taken before Nancy S. Holland, Commissioner

19   and Notary Public, State at Large, at the law

20   office of H.E. Nix, 7505 Halcyon Pointe Drive,

21   Montgomery, Alabama, on the 24th day of September,

22   2021, commencing at approximately 9:05 a.m.

23

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 1

```
 1              IT IS FURTHER STIPULATED AND AGREED that

 2     the signature to and reading of the deposition by

 3     the witness is waived, the deposition to have the

 4     same force and effect as if full compliance had

 5     been had with all laws and rules of Court relating

 6     to the taking of depositions.

 7

 8              IT IS FURTHER STIPULATED AND AGREED that it

 9     shall not be necessary for any objections to be

10     made by counsel to any questions, except as to form

11     or leading questions, and that counsel for the

12     parties may make objections and assign grounds at

13     the time of the trial, or at the time said

14     deposition is offered in evidence, or prior

15     thereto.

16                              ***

17

18

19

20

21

22

23

24

25
```

```
 1                I, Nancy S. Holland, a Court Reporter
 2   and a Notary Public for the State of Alabama at
 3   Large, acting as Commissioner, certify that on this
 4   date, pursuant to the Federal Rules of Civil
 5   Procedure and the foregoing stipulation of counsel,
 6   there came before me on the 24th day of September,
 7   2021, at the law office of H.E. Nix, 7505 Halcyon
 8   Pointe Drive, Montgomery, Alabama, commencing at
 9   approximately 9:05 a.m, JAMES JONES, witness in the
10   above cause, for oral examination, whereupon the
11   following proceedings were had:
12                     THE COURT REPORTER:   Usual
13   stipulations?
14                MR. SIKES:   Yes.
15                MR. EAST:   Yes.
16                     JAMES JONES,
17   being first duly sworn, was examined and testified
18   as follows:
19                     EXAMINATION
20   BY MR. SIKES:
21   Q.           Would you state your name for the
22   record, please, sir.
23   A.           James Bernard Jones.
24   Q.           Okay.  And Mr. Jones, where do you
25   live?
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 6

```
 1   A.          At 3733 Gadsden Avenue, Montgomery,
 2   Alabama 36105.
 3   Q.          All right.  And how old are you,
 4   please, sir?
 5   A.          Fifty-five.
 6   Q.          Okay.  Are you employed?
 7   A.          Yes, sir.
 8   Q.          Okay.  Where are you employed
 9   presently?
10   A.          Capitol Containers.
11   Q.          I'm sorry?
12   A.          Capitol Containers.
13   Q.          Okay.  And what does Capitol
14   Containers do?
15   A.          Well, they currently make boxes for
16   Rheem.
17   Q.          For who?
18   A.          Rheem.
19   Q.          R-H-E-E-M?
20   A.          R-H-E-E-M.
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 7

```
 1

 2

 3

 4

 5

 6   Q.          All right, sir.  Mr. Jones, do you

 7   know -- did you know Joseph Lee Pettaway?

 8   A.          Yes, sir.

 9   Q.          Okay.  How long had you known Joseph

10   Lee Pettaway?

11   A.          Since 1972.

12   Q.          And how old were you in 1972?

13   A.          Seven.

14   Q.          All right.  And how old was

15   Mr. Pettaway?

16   A.          I think that I'm -- I'm thinking that

17   I'm two or three years older than him, so he was

18   like about five.

19   Q.          Okay.  Did Joseph Lee Pettaway have a

20   nickname?

21   A.          Yes.

22   Q.          What did y'all call him?

23   A.          Poppet.

24   Q.          P-O-P --

25   A.          P-O-P-P-E-T.
```

```
 1   Q.          Okay.  Back in the first of the year,

 2   January, February, March, April, May, through

 3   there, the first half of 2018, were you repairing a

 4   house over on Cresta Circle?

 5   A.          Yes.

 6   Q.          Okay.  I'm going to show you a

 7   photograph.  We'll make this Exhibit 1 to your

 8   deposition.

 9               (Plaintiff's Exhibit 1 was

10                marked for identification)

11   Q.          Is that a photograph of the house that

12   you were repairing?

13   A.          Yes.

14   Q.          And was Mr. Pettaway helping you

15   repair that house?

16   A.          Yes, sir, he was.

17   Q.          Okay.  Did you have anybody else

18   helping you repair the house also?

19   A.          Yes.  My cousin came down, Gary

20   Dickson.  He was helping me, too.

21

22

23

24

25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 9

```
 1

 2

 3

 4    Q.          All right.  And again, let me come

 5    back.  How long had you been working on the house

 6    as of July?

 7    A.          Four or five months.

 8    Q.          Okay.

 9    A.          Four or five months.

10    Q.          Did you own the house?

11    A.          No.

12    Q.          Okay.  Do you recall the address of

13    the house?

14    A.          Yes, 3809 Cresta Circle.

15

16

17

18

19

20

21

22    Q.          I'm going to also show you a diagram

23    of the house that I'll mark.

24                (Plaintiff's Exhibit 2 was

25                 marked for identification)
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 10

1  Q.          I'll represent to you that this was

2  made by the Alabama Law Enforcement Agency of the

3  house.

4  A.          Uh-huh.

5  Q.          And it diagrams the arrangement of the

6  rooms in the house.

7  A.          Right.

8  Q.          Do you recognize that as -- Is that an

9  accurate representation of the arrangement of the

10 rooms in the house?

11 A.          Yes.

12 Q.          All right.  Did you own the house?

13 A.          No.

14 Q.          Who owned the house?

15 A.          Mr. Norris Harris.

16 Q.          All right.  And who is Mr. Harris?

17 A.          He's a minister.

18 Q.          Okay.  Where does he live?

19 A.          910 Hugh Street, Western Hill.

20 Q.          Huge Street?

21 A.          Hugh, H-U-G-H.

22 Q.          Okay.  All right.  Were you paying

23 people to repair the house or was Mr. Harris paying

24 people to repair the house?

25 A.          I was.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 11

```
1    Q.              And what was the arrangement that you
2    had with Mr. Harris with regard to you paying
3    people to repair his house?
4    A.              Reduction, reduction on the rent.
5    Q.              Okay.  And had you been living in the
6    house?
7    A.              We lived in the house before.  My mom
8    rented the house before.
9    Q.              I know.  Twenty years before.
10   A.              Right.  Exactly.
11   Q.              I'm not talking about that.  I'm
12   talking about in -- At the first when you started
13   working on it in 2018, had you been living in the
14   house at that time?
15   A.              Yeah.  I lived there.
16   Q.              All right.  When did you live in the
17   house?
18   A.              Right after I made the repairs.
19   Q.              No, no.  I'm talking about before you
20   started making the repairs.
21   A.              Oh, no.  You couldn't live in the
22   house.
23   Q.              Okay.  And why couldn't you live in
24   the house?
25   A.              It was tore up.
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 12

```
 1    Q.          All right.  And what do you mean by
 2    "tore up"?
 3    A.          Sink on the floor.  I mean, it wasn't
 4    even in living condition.
 5    Q.          All right.  The house was not
 6    habitable.
 7    A.          No.  Of course not, no.
 8                Okay.
 9
10
11    Q.          That's fine.  How long had the house
12    been vacant before you started working on it?
13    A.          I can't say exactly.  Because when he
14    called me, he was like do you want to get this
15    house that your mom had?  I'm like yeah, I'll take
16    it, what's going on?  He said you fix it and I'll
17    reduce the rent, so I was like fine, I'll do it.
18    Q.          All right.  Let me come back to what I
19    was asking.  It had been vacant for some period of
20    time, maybe several months, maybe a year, maybe two
21    years.  Do you have any idea how long the house had
22    been vacant before you started working on it?
23    A.          I don't have no idea.
24    Q.          All right.  But it was vacant at the
25    time.
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 13

```
 1    A.          It was vacant, yeah.

 2    Q.          Okay.  And it was in terrible shape as

 3    you call it.

 4    A.          Yeah.  Had to get the plumbing --

 5    Q.          Is that accurate?

 6    A.          That's accurate.  Had to get the

 7    plumbing did and everything.

 8    Q.          Okay.  Now, in July of 2018, had you

 9    done a number of these repairs?

10    A.          Yes.

11    Q.          And had Poppet or Mr. Pettaway helped

12    you in doing that?

13    A.          Yes.

14    Q.          And you paid him for helping you

15    repair the house?

16    A.          Yes.

17    Q.          All right.  And you paid Gary Dickson

18    also --

19    A.          Right.

20    Q.          -- to help you repair the house?

21    A.          Uh-huh.

22    Q.          All right.  Was there anybody living

23    in the house during the time that you were

24    repairing it?

25    A.          No.  We were staying in there.  We
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 14

1  were staying in there.  I was.

2  Q.          Okay.  Did you stay in there sometimes

3  during the early months of 2018 at times?

4  A.          Once I got it prepared enough where I

5  could stay in it as far as -- like the water wasn't

6  on.

7  Q.          The water what?

8  A.          The water wasn't on, so I --

9  Q.          Didn't have running water in the

10  house.

11  A.          Didn't have running water.

12  Q.          The toilets didn't work?

13  A.          The toilets didn't work.

14  Q.          The sink?  You couldn't get drinking

15  water --

16  A.          No.

17  Q.          -- anywhere?

18  A.          There wasn't a sink in there.  I had

19  to put one in.

20

21

22

23

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 15

```
 1
 2                   Okay.  Was there electricity being
 3    supplied to the house in July of 2018?
 4    A.            No.
 5    Q.            Okay.  Alabama Power had cut it off?
 6    A.            Right.  Correct.
 7    Q.            Okay.  What was -- Do you know the
 8    last time that power had been supplied to the
 9    house?
10    A.            Probably May.
11    Q.            You think that there was power on in
12    the house in May?
13    A.            There was power on in the house in
14    May.
15    Q.            Okay.  All right.  What sort of work
16    on the house did Mr. Pettaway do?
17    A.            He was good.  He painted.  He helped
18    me paint.  He helped me put the floors in.  He kept
19    it clean around on the back areas and stuff.
20    Q.            And what did Mr. Dickson do?
21    A.            He was more like the -- What you call
22    it?  Sheetrock and stuff like that.
23    Q.            Okay.  And again, tell me the
24    agreement that you had with Mr. Harris about
25    repairing the house.  What was that agreement?
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 16

```
1    A.          The agreement was that I would repair
2    the house for reduction of rent.
3    Q.          Okay.
4    A.          Lower rent.
5    Q.          All right.  And who -- Were you
6    planning on living in the house after it was
7    repaired?
8    A.          Yes.
9    Q.          Okay.  And who was going to live in
10   the house with you?
11   A.          My girlfriend, my kid.
12   Q.          All right.  And who's your girlfriend?
13   A.          Shaunta Hood.
14   Q.          All right.  You're not married.
15   A.          No, sir.
16   Q.          Okay.  Do you have children by
17   Shaunta?
18   A.          Yes.
19   Q.          How many children do you have?
20   A.          I have one by her, a little girl.
21   Q.          Okay.  And your plan if I understand
22   you correctly was after you had repaired the house
23   at your expense --
24   A.          Right.
25   Q.          -- you were then going to move into
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 17

```
 1    the house and live there with Shaunta and your
 2    child.
 3    A.           Right.
 4    Q.           All right.  And in return for the work
 5    that you did on the house, Mr. Harris was going to
 6    reduce how much he charged you for rent on the
 7    house.
 8    A.           Right.  Exactly.
 9    Q.           Okay.  All right.  Did you have an
10    agreement in writing with Mr. Harris at that time?
11    A.           No.  We had an oral agreement.
12    Q.           Okay.  Again, describe the condition
13    of the house.  Was there Sheetrock that had been
14    pulled down or that was in disrepair when you
15    started working on it?
16    A.           Yeah.  You could go in the kitchen and
17    you could see the bathroom.
18    Q.           All right.  There just wasn't any
19    Sheetrock.
20    A.           There was Sheetrock, but there was
21    just holes everywhere.
22    Q.           You could see between the studs in the
23    wall.
24    A.           Right.
25    Q.           Straight through to the bathroom.
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 18

```
 1   A.            Yes, sir.

 2   Q.            All right.  Had you started putting

 3   that Sheetrock up?

 4   A.            Yeah.  I had already done that.

 5   Q.            Okay.  How about the flooring?  What

 6   was the condition of the flooring when you started

 7   working on it?

 8   A.            It was just concrete.

 9   Q.            Okay.  How about kitchen appliances

10   and cabinetry?

11   A.            There was cabinetry, but the cabinets

12   was -- it was all torn to pieces and hanging on the

13   floor.  The stove was -- you know, just wasn't --

14   Q.            Did you repair that cabinetry or did

15   you replace it with other cabinetry?

16   A.            I replaced it.

17   Q.            Okay.  So you took the old -- the

18   existing cabinetry that was -- This is in the

19   kitchen that we're talking about, right?

20   A.            Right, the cabinetry in the kitchen.

21   Q.            Okay.  That was in disrepair.  You

22   pulled it out of there, tore it out.

23   A.            Right.

24   Q.            Okay.  And you put in some new

25   cabinetry.
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 19

```
 1  A.          Yeah.
 2  Q.          All right.  And how about kitchen
 3  appliances?
 4  A.          Refrigerator.  I ended up putting a
 5  refrigerator in there.
 6  Q.          I'm sorry.  You did what?
 7  A.          Refrigerator.
 8  Q.          You put a new one in?
 9  A.          Yeah.  New refrigerator, yeah.
10  Q.          Okay.  You took the old one out and
11  threw it away.
12  A.          There wasn't none in there.
13  Q.          There wasn't any.  Okay.  How about
14  the stove?
15  A.          I took the stove and throwed it out.
16  Q.          And put a new one in.
17  A.          Put a new one in.
18  Q.          Okay.  How about in -- The night that
19  we're talking about is -- I think that it is a
20  Saturday night going over into Sunday morning.
21  A.          Uh-huh.
22  Q.          And the date, I think, is July the 7th
23  of 2018 and July 8 of 2018.
24  A.          Right.
25  Q.          I'm looking at what the condition of
```

1   the house -- I'm trying to ask what the condition
2   of the house was the night of July 7 and July 8 of
3   2018.  What was the condition of the house?  Was it
4   habitable then?
5   A.          Yes.  It was habitable.
6   Q.          By "habitable," you mean had running
7   water, electricity?
8   A.          Without -- No, not without -- Without
9   the electricity and the water, no.
10  Q.          Okay.  Well, had you finished all of
11  the repairs in the house?  Was it completely
12  finished?
13  A.          Everything but the floors.
14  Q.          Okay.  The flooring.
15  A.          The flooring and finish painting.
16  Q.          All right.  And had you spent some
17  nights over there during the cooler months in the
18  spring?
19  A.          Yes.
20  Q.          All right.  Did you cease spending the
21  night over there when it got warmer?
22  A.          Yeah.  It was hot.  You know what I'm
23  saying?  It was hot.  It was still hot.
24  Q.          All right.  Now, in July of 2018, the
25  house would have been habitable for a resident all

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 21

```
 1   except for the floor and the fact that there was
 2   not running water.
 3   A.           Or lights.
 4   Q.           Or electricity running in the house,
 5   right?
 6   A.           Yes, sir.
 7   Q.           Okay.  In the months leading up to
 8   July of 2018, had Joseph Lee Pettaway and Gary
 9   Dickson worked on the house together?
10   A.           Yeah.  All of us did, all three of us.
11   Q.           Right.  Did they know each other?
12   A.           Yeah.
13   Q.           Okay.
14   A.           I introduced them.
15   Q.           Okay.  Did they get along with each
16   other during the time that they were working on the
17   house?
18   A.           Yeah.
19   Q.           Huh?
20   A.           Yeah, they did.
21   Q.           Okay.  All right.  Did you ever see
22   them have any kind of dispute or problem between
23   the two of them?
24   A.           No.
25   Q.           Okay.  Did there come a time when
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 22

```
 1    Mr. Dickson began to spend the nights, some of the
 2    nights in the house?
 3    A.          Yes.
 4    Q.          Over in maybe the end of June or the
 5    first of July?
 6    A.          Yes.
 7    Q.          Okay.  Was Mr. Dickson paying you
 8    anything to live in the house?
 9    A.          No.
10    Q.          Okay.  Did you know that Joseph Lee
11    Pettaway on occasion stayed in the house or not?
12    A.          No.
13    Q.          You don't know about that.
14    A.          No.
15    Q.          Okay.  Tell me about -- Was July 7
16    the --
17    A.          Saturday?
18    Q.          That was a Saturday?
19    A.          I think so.
20    Q.          Okay.  What had y'all done at the
21    house that day?  When I say "y'all," I mean you and
22    Joseph Lee Pettaway and Mr. Dickson.
23    A.          We did windows, put the back window
24    in.  We put the back window in and then we just --
25    After that, he helped clean up around the yard.  We
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 23

1  barbecued and drunk a few beers.  That's it.

2  Q.          All right.  Who all was back there at

3  the barbecue that you can recollect?

4  A.          Man, there was a bunch of people back

5  there, Mr. Sikes.

6  Q.          All right.  Well, tell me the ones

7  that you know were back there.

8  A.          I knew all of them, but I don't know

9  all of them's names.

10  Q.          Tell me the names of the people that

11  you do know were there.

12  A.          Shaunta, me, Gary, Poppet.

13  Q.          And by Poppet, you mean James

14  Pettaway.

15  A.          Yeah, Joseph.

16  Q.          Joseph Pettaway, excuse me.  Joseph

17  Lee Pettaway.

18  A.          Yes.

19  Q.          Okay.

20  A.          There was a girl.  Her name was Bea.

21  A bunch of the neighbors.  It was just -- I can't

22  name them all.

23  Q.          Okay.  And in the summertime -- This

24  would have been sometime maybe -- it got dark maybe

25  8:00 or something like that?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 24

```
 1   A.          Probably.

 2   Q.          Okay.

 3   A.          During the Daylight Savings hours.

 4   Q.          Were y'all there -- Did y'all finish

 5   up at the house with the barbecue and the eating

 6   supper and having a beer --

 7   A.          Yeah.

 8   Q.          -- before dark or after dark?

 9   A.          It was after dark.

10   Q.          Okay.

11   A.          It was dark.

12   Q.          All right.  So sometime maybe after

13   8:00?

14   A.          Around about -- I think that I left

15   like ten, 10:30 or 11.

16   Q.          Okay.  That you left the house.

17   A.          Yeah.

18   Q.          All right.  Did you think that

19   everybody else was leaving the house also when it

20   broke up?

21   A.          Yeah.  We were leaving.  Everybody was

22   leaving.

23   Q.          All right.  Where did you go when you

24   left the house at 10:30 or 11 that night?

25   A.          I went to my mother-in-law's house.
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 25

```
 1   Q.          All right.  And is that Shaunta's
 2   mother?
 3   A.          Yeah, Shaunta's mother.
 4   Q.          Okay.  And where did she live?
 5   A.          South Mall Apartments.
 6   Q.          Okay.  All right.  Do you remember
 7   that you got a call later that night?
 8   A.          Right.
 9   Q.          And who called you?
10   A.          Gary, my cousin.
11   Q.          All right.  And what do you recall
12   that Gary told you when he called you?
13   A.          When he called, he said man, somebody
14   broke in the house.
15   Q.          Okay.
16   A.          He said I already called the police.
17   I said all right, I'm on my way.
18   Q.          All right.  Did he tell you anything
19   about who had broken in and who he had seen and how
20   many there were and where they were?  Give me all
21   the detail that you can recall.  Or did he have any
22   detail to supply to you?
23   A.          No.  All he said was that somebody
24   broke in the house and he thought that they were
25   there.  He said I think that they're still in
```

```
 1   there.  I said are you sure?  He said I'm sure that
 2   somebody broke in the house.
 3   Q.          All right.
 4   A.          And he said that -- He said -- I said
 5   did you see anybody?  He said no, I just seen a
 6   hand.  He said that he come out of the house.
 7   Q.          Okay.  Did he tell you anything about
 8   going outside to smoke a cigarette or --
 9   A.          Huh-uh.  No, he did not.
10   Q.          All right.  And about what time was
11   that?  Do you recall?
12   A.          I think that it was about one or two,
13   one, somewhere in there.
14   Q.          Okay.  All right.  But he told you
15   that he didn't see the person other than seeing his
16   hand?
17   A.          He just seen a hand.  That's all he
18   told me.
19   Q.          And where did he say that he'd seen
20   the hand?
21   A.          In the back room, back bedroom.
22   Q.          Okay.  All right.  And he obviously
23   didn't identify who the person was.
24   A.          No, he did not.
25   Q.          What did you do then?
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 27

```
1    A.           I got in the car and headed toward
2    that way.
3    Q.           Okay.
4    A.           Headed toward the house.
5    Q.           All right.  And what occurred?  Tell
6    me what you saw and did when you got to the house
7    that day or that night.
8    A.           Well, when I got there, I seen them
9    talking to Gary in the middle of the street.
10   Q.           You say "them."
11   A.           Police officers.
12   Q.           Okay.  Did you know any of the police
13   officers?
14   A.           No.
15   Q.           All right.  Did you learn any of their
16   names?
17   A.           There was one, but I don't remember
18   his name.
19   Q.           Okay.  How many policemen were there
20   at the time?
21   A.           It was -- It was at least six or
22   better.
23   Q.           Okay.  And did they have police cars
24   there?
25   A.           Yes.
```

```
 1   Q.          All right.  And what were they doing
 2   there?
 3   A.          They were standing around the house,
 4   like surrounding the house.
 5   Q.          Okay.  All right.  At any time did you
 6   see or hear anybody attempt to communicate with
 7   whoever might have been inside the house?
 8   A.          No.
 9   Q.          Okay.  Tell me all of what you --
10   Well, first of all, did you have any conversations
11   with the policemen?
12   A.          Yes, once I got there.
13   Q.          Okay.
14   A.          And they were standing around talking.
15   Once Gary told them who I was and I introduced
16   myself to them.  And then they was like do you own
17   the house?  I said no.  I said I'm renting the
18   house.  And they was like -- So I was like -- I
19   really didn't think nobody was in the house, so
20   once I talked to Gary, I said -- because I kept
21   asking him, I said are you sure?  He said yeah,
22   they're still in there.  I said are you sure?  So
23   when the officer asked me -- he was like well, can
24   we send the dog in?  And I was like yeah, you can
25   send the dog in.
```

```
 1   Q.           Why did you think that he was asking
 2   you about sending the dog in?  Did you have an idea
 3   about why that was?
 4   A.           Because I believe that they thought
 5   that somebody was still in the house.
 6   Q.           I know, but was the purpose -- Why
 7   were they asking you?  Why didn't they just go
 8   ahead -- Why were they asking you about putting the
 9   dog in the house?  Do you know?
10   A.           I think they said that they couldn't
11   just send the dog in the house.
12   Q.           Without permission?
13   A.           Without permission.
14   Q.           Okay.  Did you tell any police officer
15   out there at any time ever that you owned the
16   house?
17   A.           No.
18   Q.           You never identified yourself as the
19   homeowner.
20   A.           No.
21   Q.           In fact, you told them that you were
22   renting the house.  Is that correct?
23   A.           Yes.  That's correct.
24   Q.           All right.  Do you recall hearing or
25   seeing anything else out there other than what
```

1   you've told us about?  And that's at least six
2   police standing around outside the house and the
3   conversation that you had with one of the policemen
4   there --
5   A.          Uh-huh.
6   Q.          -- about him asking you if they could
7   let the dog into the house.  Do you recall any
8   other conversations out there?
9   A.          Huh-uh.
10  Q.          You need to answer "yes" or "no."
11  A.          No.
12  Q.          "Huh-uh" doesn't come out.
13  A.          I'm sorry.  No.
14  Q.          All right.  Was there anything in the
15  house to be stolen?
16  A.          A TV and tools.  That's it.
17  Q.          How old was the TV?
18  A.          It was new.
19  Q.          Okay.  There was a TV in there and
20  there were some tools.
21  A.          Yeah.
22  Q.          Okay.  Anything else of value in the
23  house?
24  A.          No.
25  Q.          Okay.  What's the next thing that you

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 31

```
 1   recollect occurring?
 2   A.          The situation with the dog.
 3   Q.          And tell me about that.
 4   A.          Well, after they asked me, he gets the
 5   dog out of the truck.  He goes to the door.  They
 6   got the door open.  He goes to the door and he says
 7   something.  He said it like twice.
 8   Q.          And what did he say?  Could you
 9   understand it?
10   A.          No.  I couldn't understand it.
11   Q.          All right.  Were you close enough to
12   him to --
13   A.          No.  I was on the -- outside on the
14   sidewalk.
15   Q.          I don't mean you were standing right
16   next to him, but you heard his voice.
17   A.          Yeah.  I heard his voice.
18   Q.          Okay.  Well, it's on tape what he
19   said.
20   A.          Okay.
21   Q.          You couldn't make any sense out of
22   what he said?
23   A.          No.
24   Q.          Is that correct?
25   A.          Not from where I was standing, no.
```

```
1    Q.          Okay.  Did it sound to you like it was
2    in a foreign language or something?
3    A.          It did.  It sounded like it because I
4    wasn't familiar with it.  That's why I say that.
5    Q.          All right.  Again, at this time, did
6    you think that there was somebody in the house?
7    A.          No.  I really didn't.  I didn't think
8    nobody was in there.
9    Q.          All right.  What happened after he --
10   whatever the policeman said at the -- standing
11   there at the front door?  What happened next?
12   A.          Then he turned the dog loose.  The dog
13   went in when he said the words that he said.
14   Q.          Did he go in with the dog?
15   A.          I don't know did he go in, but I know
16   that he was standing at the door when he turned him
17   loose.
18   Q.          All right.  But the dog was off of a
19   leash.  Is that right?
20   A.          Yes, sir.
21   Q.          Okay.  All right.  After the dog was
22   let into the house, what happened then?  Do you
23   recall?
24   A.          The only thing that I know happened, I
25   guess that he was in the house and then that's when
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 33

```
1    I heard a person hollering.
2    Q.          Okay.  And what was the person
3    hollering?
4    A.          He just said, "Oh."
5    Q.          Was he shouting some words to
6    communicate to somebody or was he crying out in
7    pain?
8    A.          He was crying out in pain.
9    Q.          Okay.  So the shouting was not any
10   kind of communicative act.  It was an exclamation
11   that indicated that he was in -- did you think
12   extreme pain from the voicing?
13   A.          Yes.
14   Q.          Okay.  Did you have any idea who it
15   was when you heard the screaming?
16   A.          No, I did not.
17   Q.          Okay.  Had you been -- Had the police
18   put you over and told you to stay over in some area
19   of the yard?
20   A.          After everything had took place, yes.
21   Q.          But not at this point.
22   A.          No.  No, sir.
23   Q.          Okay.  Not when the dog was let into
24   the house.
25   A.          No.
```

```
 1    Q.          Okay.  You were standing out on the
 2    street or in the yard?
 3    A.          On the street.
 4    Q.          Okay.  When was the first time that
 5    you saw and understood that this was Joseph Lee
 6    Pettaway that the dog had attacked?
 7    A.          Once they brought him out.
 8    Q.          Okay.  Was it some period of time
 9    after the attack?  It took a while for them to
10    bring him out?
11    A.          Yeah.
12    Q.          All right.  And what did they do with
13    him when they brought him out?
14    A.          When they brought him out, they had
15    him face down and then they turned him over.
16    Q.          All right.  And was there blood all
17    over him?
18    A.          Yes.
19    Q.          Okay.  Did anybody at the police
20    department or otherwise attempt to give him any
21    kind of medical treatment or first aid for the
22    bleeding?
23    A.          No.
24    Q.          Okay.  You've seen the video.
25    A.          Yes.
```

1   Q.          Correct?

2   A.          Correct.

3   Q.          Okay.  You watched it here with me and

4   Mr. Nix, correct?

5   A.          Correct.

6   Q.          Okay.  How long did it take -- After

7   Mr. Pettaway was brought out of the house and put

8   on the sidewalk and then turned over where he's

9   lying face up, how long after that was it that any

10  kind of medical attention or first aid was given to

11  him?

12  A.          I don't know the exact time, but when

13  the paramedics came, it was probably maybe five --

14  maybe five or ten minutes.

15  Q.          Okay.  During that five or ten

16  minutes, were all of the police officers just

17  standing around Mr. Pettaway shining flashlights

18  down on him on the sidewalk?

19  A.          Yeah.

20  Q.          Did anybody ever reach down and make

21  any effort to provide him any first aid or medical

22  care?

23  A.          No.

24  Q.          All right.  Were you shocked to see

25  that it was Joseph Lee Pettaway?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 36

```
1    A.            Yeah.  I was shocked.

2    Q.            Okay.  Were you concerned about him?

3    A.            Yeah.  He was my friend.

4    Q.            And --

5    A.            We grew up together.

6    Q.            And the amount of blood that you saw

7    there?

8    A.            Yeah.

9    Q.            All right.  Were you afraid for his

10   life?

11   A.            There was a lot of blood.

12   Q.            That's a "yes"?

13   A.            Yes, sir.

14   Q.            Okay.  How soon after he was brought

15   out did you recognize that it was Joseph Lee

16   Pettaway?

17   A.            Once they turned him over and I walked

18   up there.

19   Q.            Okay.  Did you tell the police that

20   this was your friend, this is a person that you

21   knew and identified him to the police?

22   A.            Yes.  He asked me, he said do you know

23   him?  I said yes, that's Poppet.

24   Q.            Okay.  And who was this that you told

25   this to?
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37

```
1   A.          Whoever the supervisor was on that

2   third shift.

3   Q.          Was he --

4   A.          He was a white guy.

5   Q.          It was a white guy by then?

6   A.          Yeah.  It was a white guy then.

7   Q.          Okay.  Is there anything else that

8   we've not talked about that you recall seeing or

9   hearing or doing out there after they brought

10  Mr. Pettaway out of the house that we haven't

11  talked about?

12  A.          No.  No, sir.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 38

```
 1

 2

 3

 4

 5

 6

 7               Okay.  Was anybody else standing out

 8     there other than policemen and you and Mr. Dickson

 9     and the police?

10     A.        No.

11     Q.        All right.  Did anybody -- Well, let

12     me ask you.  Did you talk -- or were you

13     interviewed by anybody else that night about the

14     incident?

15     A.        Yes.

16     Q.        Who?

17     A.        Some -- I don't know.  Police

18     officers, I guess.  They was dressed like

19     detectives.

20     Q.        Okay.  What did they ask you?

21     A.        My name.  I'm trying to remember.  My

22     name and --

23     Q.        They wanted to know what connection

24     you had with the house?

25     A.        Right.  I want to be for sure because
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 39

1  I don't really -- I forget what I told them, what

2  they really asked, but I know that they asked me my

3  name.  They wrote some stuff on the paper.

4  Q.          Okay.

5  A.          But I don't know what they -- They

6  should have the information.  I don't want to just

7  say something.

8  Q.          Was it a tape recorded statement or

9  were they just taking --

10  A.          It was a written statement.

11

12

13

14  .

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13   Q.          All right.  What else occurred that we

14   haven't talked about?  Is there anything else that

15   sticks out in your recollection that we haven't

16   discussed about the events that night and what you

17   said and heard and did?

18   A.          No.

19   Q.          Okay.  What did you -- Did you wind up

20   leaving that night at some point?

21   A.          No.

22   Q.          You spent the night there?

23   A.          Yeah.

24   Q.          All right.  Where did you spend the

25   night?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 41

```
 1    A.           I didn't go to sleep.  I sat in my

 2    car.

 3    Q.           Was your car parked out there on the

 4    street in front of Cresta Circle?

 5    A.           Yes, sir.

 6    Q.           Okay.  And you slept in the car that

 7    night.

 8    A.           Yes, sir.

 9    Q.           Okay.

10    A.           Basically.  You can say that.

11    Q.           Yeah.  Okay.

12    A.           Because I couldn't go nowhere.  They

13    told me that I couldn't go nowhere.

14    Q.           The police told you that you couldn't

15    go anywhere.

16    A.           Yes, sir.

17    Q.           All right.  What time did you finally

18    leave?

19    A.           It was probably -- Because the officer

20    took my door key, so I couldn't -- They told me

21    that I couldn't go in the house.  They took my key.

22    I couldn't go in the house until the people --

23    whoever cleaned the house, they had cleaned it out

24    and then they gave me my key back.  That was

25    probably like nine or 10:00 in the morning.
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 42

1                  (Plaintiff's Exhibit 3, Exhibit 4

2              Exhibit 5 and Exhibit 6, inclusive,

3              were marked for identification)

4

5

6

7

8

9              Q.          I'm going to show you

10   four photographs that were taken of Mr. Pettaway

11   lying on the sidewalk out there over a period of

12   five or six minutes or so, and these were taken from

13   a body video camera of one of the police officers.

14         Do those photographs fairly and

15   accurately depict what you recollect about how

16   Mr. Poppet, Joseph Lee Pettaway looked as he lay out

17   there on the sidewalk that night?

18   A.          Yes.

19   Q.          And the photographs that we're talking

20   about are Plaintiff's Exhibits 3, 4, 5 and 6,

21   correct?

22   A.          Yes.

23

24

25

1

2

3

4

5

6

7   Q.          Okay.   I believe that this photograph

8   was taken the next day by the ALEA, but I'm not

9   certain about that.   But I'll mark this photograph

10  as Plaintiff's Exhibit 7 to your deposition.

11                 (Plaintiff's Exhibit 7 was

12                  marked for identification)

13  Q.          The next morning, does that

14  photograph, Plaintiff's Exhibit 7, fairly and

15  accurately depict the sidewalk and the front of the

16  house, a portion of the front of the house at

17  Cresta Circle as it appeared on the morning of July

18  8, 2018?

19  A.          Yes.

20

21

22

23

24

25

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15                    (Plaintiff's Exhibit 8 was

16                    marked for identification)

17   Q.          I'm going to show you Plaintiff's

18   Exhibit 8.  It's, I think, a close-up of the

19   sidewalk area where Mr. Pettaway was lying.  Do you

20   recognize that as being in front of the house at

21   Cresta Circle and depicting the area in which

22   Mr. Pettaway was taken and lain by the police

23   officers?

24   A.          Yes, sir.

25   Q.          Okay.  Does that accurately depict
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 45

```
 1    what the sidewalk out there looked like with
 2    Mr. Pettaway's blood on it?
 3    A.          Yes.
 4    Q.          Okay.
 5                (Plaintiff's Exhibit 9 was
 6                 marked for identification)
 7    Q.          I'm going to show you Plaintiff's
 8    Exhibit 9 and ask you if you recognize this as
 9    being a hallway in the house at Cresta Circle.  Do
10    you recognize that as being a hallway?
11    A.          Yes.
12    Q.          Okay.  Did you ever see that -- Does
13    there appear to be blood in that photograph?
14    A.          Yes.
15    Q.          All right.  I will represent to you
16    that in the video that was the hallway it looks
17    like through which Mr. Pettaway was dragged by the
18    police officers in bringing him out to the front of
19    the house.  Did you ever see the hallway in that
20    condition?
21    A.          No.
22    Q.          They had cleaned it up by the time
23    that you returned -- they turned the house back
24    over to you?
25    A.          Yes, sir.
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 46

1    Q.          Okay.  But does that accurately --

2    Other the bloody trail in the photograph, other

3    than that, does that fairly and accurately depict

4    what the house -- that hallway, that portion of the

5    house, the hallway, looked like?

6    A.          Yes.

7    Q.          Okay.  And what is that in boxes there

8    along the wall?

9    A.          That's my flooring.

10   Q.          That's what?

11   A.          Flooring.

12   Q.          The flooring that you were going to

13   put in?

14   A.          Yeah, the hardwood floor.  Yes.

15   Q.          All right.  Is that a concrete floor

16   there?

17   A.          Yes.

18   Q.          Okay.  And that was the condition that

19   it was in on July 7 and July 8.

20   A.          Yes, sir.

21   Q.          The concrete floor I'm talking about.

22   A.          Yes.

23   Q.          Okay.  Now, were you subpoenaed to

24   come here today, sir?

25   A.          Yes, sir.

```
1    Q.          Okay.  And you were tendered an
2    appearance fee and mileage?
3    A.          Yes, sir.
4    Q.          Okay.  Give us just a minute and I
5    think that we can wrap this up.
6               MR. EAST:  I'm going to have a few
7    questions.
8               MR. SIKES:  Okay.  That's all that I
9    have.  Thank you, sir.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 48

1          C E R T I F I C A T E

2

3     STATE OF ALABAMA )

4

5               I hereby certify that the above and

6     foregoing deposition was taken down by me in

7     stenotype, and the questions and answers thereto

8     were reduced to computer print under my

9     supervision, and that the foregoing represents a

10    true and correct transcript of the deposition given

11    by said witness upon said hearing.

12

13              I further certify that I am neither of

14    counsel nor of kin to the parties to the action,

15    nor am I in anywise interested in the result of

16    said cause.

17

18

19                        _____
                          Nancy S. Holland, Commissioner
20                        RPR, ACCR #185

21

22

23

24

25