```
 1        IN THE UNITED STATES DISTRICT COURT

 2        FOR THE MIDDLE DISTRICT OF ALABAMA

 3               NORTHERN DIVISION

 4

 5   WALTER PETTAWAY, as   )

 6   Administrator of the )

 7   Estate of Joseph Lee )

 8   Pettaway, deceased,   )

 9        Plaintiffs,      )

10                         )

11   VS.                   )CIVIL ACTION NO:

12   NICHOLAS B. BARBER    ) 2:19-CV-0008

13   and MICHAEL B. GREEN,) DEPOSITION OF:

14        Defendants.   ) KEIUNDRA WATTS

15

16         S T I P U L A T I O N S

17

18        IT IS STIPULATED AND AGREED, by and

19   between the parties through their respective

20   counsel, that the deposition of:

21             KEIUNDRA WATTS,

22   may be taken before Merit Gilley, Commissioner

23   and Notary Public, State at Large, at the

24   Montgomery City Hall, 103 N. Perry Street,

25   Montgomery, Alabama 36104, on the 7th day of
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 1

1   October, 2021, commencing at approximately

2   9:00 a.m.

3

4          IT IS FURTHER STIPULATED AND AGREED

5   that the signature to and reading of the

6   deposition by the witness is waived, the

7   deposition to have the same force and effect as

8   if full compliance had been had with all laws

9   and rules of Court relating to the taking of

10  depositions.

11

12         IT IS FURTHER STIPULATED AND AGREED

13  that it shall not be necessary for any

14  objections to be made by counsel to any

15  questions, except as to form or leading

16  questions, and that counsel for the parties may

17  make objections and assign grounds at the time

18  of the trial, or at the time said deposition is

19  offered in evidence, or prior thereto.

20                         ***

21

22

23

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 2

1         I, Merit Gilley, a Court Reporter of

2    Birmingham, Alabama, and a Notary Public for the

3    State of Alabama at Large, acting as

4    Commissioner, certify that on this date, as

5    provided by the Federal Rules of Civil Procedure

6    and the foregoing stipulation of counsel, there

7    came before me on the 7th day of October, 2021,

8    at the offices of Montgomery City Hall, 103 N.

9    Perry Street, Montgomery, Alabama 36104,

10   commencing at approximately 9:00 a.m., KEIUNDRA

11   WATTS, witness in the above cause, for oral

12   examination, whereupon the following proceedings

13   were had:

14                    KEIUNDRA WATTS,

15   being first duly sworn, was examined and

16   testified as follows:

17                     EXAMINATION

18   BY MR. SIKES:

19   Q         Good morning, ma'am.

20   A         Good morning.

21             How are you?

22   Q         Would you state your name, please.

23   A         Keiundra Watts.

24   Q         Would you state your full name.

25   A         Keiundra Watts.

Walter Pettaway vs Nicholas D. Barber, et al.

Keiundra Watts
10/7/2021



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25      Q          (By Mr. Sikes)   And you made

1  application with the City of Montgomery to be a

2  police officer; correct?

3  A          Yes, sir.

4  Q          And when was that?

5  A          March 2017, 2018.  I don't remember.

6  Q          Which was it?

7  A          2017.

8  Q          Okay.  Did you -- you went to the

9  academy?

10  A          Yes, sir.

11  Q          And got APOST training?

12  A          Yes, sir.

13  Q          Was that here in Montgomery?

14  A          Yes, sir.

15  Q          All right.  And when were you sworn

16  in as a Montgomery -- City of Montgomery Police

17  Department officer?

18  A          November 13, 20 -- November 30th,

19  2017.

20  Q          On this event that we're here about,

21  which is the death of Joseph Lee Pettaway -- you

22  know that of course?

23  A          Yes, sir.

24  Q          You were -- you had only been a

25  police officer then for about six or seven

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 14

1   application with the City of Montgomery to be a

2   police officer; correct?

3   A          Yes, sir.

4   Q          And when was that?

5   A          March 2017, 2018.  I don't remember.

6   Q          Which was it?

7   A          2017.

8   Q          Okay.  Did you -- you went to the

9   academy?

10  A          Yes, sir.

11  Q          And got APOST training?

12  A          Yes, sir.

13  Q          Was that here in Montgomery?

14  A          Yes, sir.

15  Q          All right.  And when were you sworn

16  in as a Montgomery -- City of Montgomery Police

17  Department officer?

18  A          November 13, 20 -- November 30th,

19  2017.

20  Q          On this event that we're here about,

21  which is the death of Joseph Lee Pettaway -- you

22  know that of course?

23  A          Yes, sir.

24

25

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 14

1
2          And what I'm looking for now is what
3   all you saw, what all you heard, what all you
4   said, what all you did, whatever you saw other
5   people do as best you can put it together and
6   your recollection of it; tell me all that you
7   can recollect as it occurred that night.
8   A          It was approximately 2:00 or 3:00 in
9   the morning.  We got a call from dispatch in
10  reference to a subject in a house unauthorized.
11  We got dispatched.  Got to the scene.  I can't
12  remember who was on scene first.  I think I was
13  maybe the second or third officer on scene.  We
14  set up a perimeter.  I know some officers walked
15  around the house.  Our supervisor got on scene
16  and advised us to set up a perimeter, and we
17  would call K-9 in because we could see entry in
18  through a back window.  I'm not sure of who or
19  what had entered.
20          He called K-9.  We waited
21  approximately maybe ten minutes on him to
22  arrive.  I can remember him giving a few
23  commands before going in.  Him and the dog
24  entered.  We held the perimeter.  I can remember
25  him saying a few things.  Exactly what --

```
1   Q          Who is him?
2   A          Officer Barber.  I think he was the
3   officer.
4   Q          Okay.
5   A          Officer Barber and his K-9.  I can't
6   remember what he said, but I know I heard him
7   saying a few commands.  Then he announced
8   that --
9   Q          Is this commands to his dog?
10  A          To the person in the house.
11  Q          Okay.
12  A          I -- I can't remember what he said
13  in reference to the subject, but I know he said
14  -- I can't remember if he said subject bitten or
15  what, but I know he said -- I can remember him
16  saying that he found the subject.  We still held
17  the perimeter.  He came out.  Once he came out
18  and gave the all clear, they had us go in.  We
19  went in and located.  He let us know where the
20  subject was.  A few officers, I think they got
21  him from under the bed, if I can remember, and
22  took him outside.  At that point we were told to
23  step back and medics were on the way.
24
25
```

```
1    Q              -- that you recall?
2    A              Medics arrived.  I think I may have
3    got into it with one of the medics.
4    Q              I'm sorry?
5    A              I think I may have got into it with
6    one of the medics in reference to them not
7    having the stuff they need --
8    Q              Uh-huh.
9    A              -- to render aid.  It took them a
10   few minutes to render aid.  They loaded him onto
11   the stretcher as they worked on him.  I think I
12   left before he even -- they even pulled off with
13   him because we had calls holding.  After that
14   they called and told us to meet them at
15   headquarters, to get on a break and meet them at
16   headquarters.
17   Q              Okay.  All right.  Anything else you
18   can recollect?
19   A              No, sir.
20   Q              I'm sorry?
21   A              No, sir.
22   Q              Okay.  Let me go back and ask you a
23   -- a little bit more specifically about what you
24   have just told us.
25                  By set up a perimeter --
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 21

```
1    A            Uh-huh.
2    Q            -- is what you mean that several of
3    the police officers surrounded the house?
4    A            Yes, sir.
5    Q            Got on --
6    A            Yes, sir.
7    Q            -- all sides of it?
8    A            Yes, sir.
9    Q            And the purpose of that was to
10   ensure that whoever was in -- if there was
11   somebody in the house that they did not escape.
12               Is that part of the reason for that?
13   A            Yes, sir.  If they come out, we can
14   have eyes on them.
15   Q            Okay.  All right.
16   A            Yes, sir.
17   Q            All of y'all were armed; correct?
18   A            Yes, sir.
19   Q            Okay.  And by that -- by armed, I
20   mean you had a side arm, a pistol, a
21   semiautomatic pistol?
22   A            Yes, sir.
23   Q            Okay.  Tell me as best you can
24   recollect approximately how many police officers
25   were there.
```

```
 1   A           Maybe eight or less.
 2   Q           Okay.  So eight or less you say?
 3   A           Yes.
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 23

1

2

3

4

5

6

7

8

9    Q          Okay.  Did you remain continuously

10   there up until -- at least until Mr. Pettaway was

11   brought out of the house?

12   A          Yes, sir.

13   Q          Okay.  You had -- you mentioned that

14   Mr. Barber made some announcement of his

15   presence?

16   A          Yes, sir.

17   Q          You recall that?

18   A          Yes, sir.

19   Q          Okay.  Other than that, do you

20   recall at any time anybody from the police

21   department or otherwise trying to communicate

22   with the person in the house before the dog went

23   into the house?

24   A          I can't recall.

25   Q          Okay.  Does your vehicle have a loud

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 30

Walter Pettaway vs Nicholas D. Barber, et al.

Keiundra Watts
10/7/2021

```
 1   speaker on it, a microphone that allows you to
 2   speak into it and have your voice amplified?
 3   A          Yes, sir.
 4   Q          Okay.  Do most all of the police
 5   vehicles have that on them?
 6   A          Depending on the model.
 7   Q          I know.  But -- certainly would
 8   depend on the model.
 9              What I'm wondering is that most all
10   of them, to your best recollection, have such a
11   device on them --
12   A          Most of them.
13   Q          -- correct?
14   A          Yes.  Most of them.
15
16
17
18
19
20
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 31

1

2

3

4

5

6

7

8

9

10

11

12

13    Q          I understand.  You can do it a lot of

14    different ways, ma'am.  But the PA system is

15    specifically designed to amplify your voice to

16    make certain that your voice can be heard far

17    away or be -- inside of a building or it -- it

18    helps communicate with people.

19              I'm asking:  It doesn't seem like

20    it's logical to you to try to do that; is that

21    correct?

22    A          Correct.

23    Q          Okay.  I'm going to show you

24    photographs.  And I'll represent to you that we

25    have -- we have been produced copies of the --

```
 1   the video recording of -- made by your body cam
 2   and that all of these are images that were taken
 3   from the recording that your body cam -- camera
 4   made.
 5   A          Okay.
 6   Q          I'll ask if you can take a look at
 7   these photographs, please, ma'am.  They are
 8   marked Plaintiff's Exhibits 1, 2, 3, and 4 to
 9   Officer Flournoy's deposition.
10           (Plaintiff's Exhibit Flournoy 1,
            Plaintiff's Exhibit Flournoy 2,
11          Plaintiff's Exhibit Flournoy 3, and
            Plaintiff's Exhibit Flournoy 4
12           were produced for reference.)
13   Q          Do those photographs fairly and
14   accurately depict what you recollect seeing out
15   there on the sidewalk?
16   A          Yes, sir.
17   Q          Okay.  Do you know the amount of
18   time that Mr. Pettaway lay out on the sidewalk
19   out there -- outside the house?  And I know that
20   you don't know that it was so many minutes and
21   so many seconds.
22           What I'm asking for is:  What is
23   your best estimation of how long that he was out
24   there on the sidewalk?
25   A          Approximately five to ten minutes
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37

1   prior to the medics.

2   Q          All right.  And during that period

3   of time, did you see or observe any police

4   officer attempt to provide any first aid or any

5   medical care to Mr. Pettaway?

6   A          No, sir.

7   Q          Okay.  You didn't do that, and no

8   other police officer that you know of did that;

9   correct?

10  A          No, sir.

11  Q          What I said is correct?

12  A          Correct.

13  Q          Okay.  I'm going to show you what's

14  been marked as Plaintiff's Exhibit 3 to -- this

15  was from Ernest Finley's deposition.

16          (Plaintiffs' Exhibit Finley 3

17          was marked for identification.)

18  Q          He was formerly the police chief

19  here in Montgomery; correct?

20  A          Correct.

21  Q          Okay.  Have you seen that document

22  before?

23  A          Yes, sir.

24  Q          I'm sorry?

25  A          Yes, sir.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 38

```
1    Q          And did -- had you seen it prior to
2    July the 8th, of 2018?
3    A          Yes, sir.
4    Q          Okay.  And what do you understand
5    that document to be?
6    A          To render aid to a person needing
7    aid.
8    Q          Do you understand that document to
9    be part of the Montgomery Police Department
10   policies and procedures?
11   A          I do.
12   Q          Okay.  And do you -- do you recall
13   that you did -- were you required to sign off on
14   this or initial a copy of it or do it
15   electronically in some way?
16   A          Yes, sir.
17   Q          Okay.  And did you do that prior to
18   July 18th -- July 8th, of 2018?
19   A          I can't recall.  Probably so.
20   Q          Okay.  What was the procedure for
21   how the -- I think the -- the Plaintiff's
22   Exhibit 3 to Mr. Finley's deposition indicates
23   that it was -- he put it out or put it in force
24   in April of 2018.
25              What would have been the way that
```

```
 1    that would have been communicated to you in
 2    April, May, or June or the first part of July of
 3    2018?
 4    A           Through power DMS, a website where
 5    we go in and sign our documents.
 6    Q           Okay.  And are you and the other
 7    police officers at the Montgomery Police
 8    Department, were you, in the spring and summer
 9    of 2018, were you required to check on that
10    periodically and to look for new --
11    A           Update.
12    Q           -- policies?
13    A           Yes, sir.
14    Q           Okay.  And how often were you
15    required to do that?
16                Was it daily, or was it weekly or --
17    A           Weekly.
18    Q           Okay.  So if it was pull out in
19    April, you would have had all of the remaining
20    part of April and of May and June and July.
21                It would -- does it continue to come
22    up for several weeks, or does it come up once?
23    A           It comes up -- I think it remains
24    until you sign it or --
25    Q           Okay.
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 40

```
 1   deposition.  It was C to a deposition taken
 2   earlier also.
 3                   (Plaintiffs' Exhibit C was
 4                   marked for identification.)
 5   Q          And I'd ask you to take a look at
 6   the question on -- beginning on line five and
 7                   the answer on line 13.
 8
 9
10
11
12                   If you would read it aloud, please,
13   ma'am.
14   A          Yes, sir.
15                   Okay.  "Your testimony is that MPD
16   policy 3.3.5 did not require MPD policemen who
17   cause, say, a life-threatening injury such as
18   arterial bleeding, they don't have any
19   obligation to themselves provide first aid to
20   stop or reduce the flow of blood necessary to
21   avoid loss of life; correct?"
22   Q          That's fine.  Thank you, ma'am.
23                   Do you agree or disagree with that
24   statement by Mr. Finley.
25   A          I agree.
```

1  Q          Okay.  Had anybody at the police

2  department ever in your time you were -- that

3  you were a police officer prior to July 8th, of

4  2018; anybody ever tell you or direct you that

5  you are to provide first aid if you see somebody

6  who has suffered an injury that looks to you to

7  be life threatening?

8  A          No.

9  Q          Okay.  I'm going to show you these

10  Plaintiff's Exhibit -- or I will -- I'll read

11  for you the testimony of Lieutenant Carlisle.  I

12  put his testimony in as Plaintiff's Exhibit B.

13  And, basically, I asked him some -- somewhat

14  similar question.

15          And that is:  From 2015, which was

16  when Mr. Finley began as the police chief, until

17  January of 2021; during that period of time,

18  there were no circumstances under which

19  Montgomery police officers were required to

20  provide hands-on first aid or medical care to an

21  injured person; correct?

22          And he went through and asked me to

23  clarify the question.  And then he said, That's

24  correct, that that -- there is not any

25  circumstances.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 45

```
 1              I then repeated it and said:  Under
 2  no circumstances that you know of was that,
 3  providing medical care, required?
 4              And he said, Under no circumstances
 5  that I know of.
 6              Is that also consistent with what
 7  you know and were trained and were taught by the
 8  Montgomery Police Department?
 9  A          Yes, sir.
10             Okay.
11             MR. EAST:  Are you introducing that?
12             MR. SIKES:  Yeah.
13             MR. EAST:  As an exhibit to this
14  one?
15             MR. SIKES:  Yes.  Yeah.
16                  (Plaintiffs' Exhibit B was
17                  marked for identification.)
18
19
20
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 46

1

2

3

4

5   Q          Okay.  Did the Montgomery Police

6   Department ever provide you with any kind of

7   medical training or first aid training prior to

8   2021?

9   A          Yes, sir.

10  Q          What was that?

11  A          CPR.

12  Q          You were taught that back at the

13  academy?

14  A          Right.

15  Q          Police academy?

16  A          Yes.

17  Q          I'm not -- I'm talking about the

18  police -- I'm talking about the Montgomery

19  Police Department.

20  A          That's part of the training.  No,

21  sir.  Other than that, no.

22  Q          Okay.  And you -- you -- do you know

23  what CPR is?

24  A          Yes, sir.

25  Q          What is CPR?

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 47

```
 1   A            To resuscitate a subject if unable
 2   to breathe or as --
 3   Q            Okay.  It has to do with when
 4   someone ceases breathing or their heart stops --
 5   A            Correct.
 6   Q            -- right?
 7   A            Yes, sir.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21   .
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 48

1

2

3

4  Q        So -- but nothing you were ever

5  taught had anything to do with how to treat a

6  heavily-bleeding person?

7  A        No, sir.

8  Q        Okay.  There was a lot of blood out

9  there on the sidewalk and in the house, wasn't

10 there?

11 A        Yes, sir.

12

13

14

15

16

17

18 Q        Did he ever say anything?

19 A        I can't recall.

20 Q        Did he ever move, turn over, or sit

21 up or change positions in any way on the

22 sidewalk?

23 A        No, sir.  Not that I can recall.

24 Q        So he didn't -- he didn't speak as

25 best you can recollect?

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 49

1

2

3

4

5

6

7    Q          You know that when someone is

8    heavily bleeding from a wound and is either

9    unconscious, or semiconscious at least; if

10   nothing is done to stop the bleeding, that

11   person is in danger of dying, isn't he?

12   A          Yes.

13              MR. EAST:  Object to the form.

14   Q          I'm sorry?

15   A          He can be.

16   Q          Right.  Well, he is in danger of

17   dying, isn't he, if he's heavily bleeding and

18   nobody does anything to stop it and he's

19   unconscious or semiconscious and can't take care

20   of himself; he's in danger of dying, isn't he?

21              MR. EAST:  Object to the form.

22   A          Can be.

23   Q          Uh-huh.  Well, I'm saying he is in

24   danger of dying, isn't he?

25   A          Okay.

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 53

Walter Pettaway vs Nicholas D. Barber, et al.                                        Keiundra Watts
                                                                                       10/7/2021

```
 1

 2

 3

 4    Q            That people that are heavily bleeding

 5    -- this isn't something you learned in the last

 6    three years.

 7                 This is something you knew out there

 8    also in -- on July 8th, of 2018, that people who

 9    were heavily bleeding, if you don't do something

10    about it, they can likely die; correct?

11    A            They can likely die.  Yes, sir.

12    Q            And you knew that in July of 2018?

13    A            Yes, sir.

14    Q            Okay.  In fact, I -- most people of

15    average or above average intelligence know that,

16    don't they?

17    A            Yes, sir.

18

19

20

21

22

23

24

25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 54

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13   Q          Okay.  Take a look at Plaintiff's

14   Exhibit 3 to Mr. Pettaway -- excuse me -- to Mr.

15   Finley's deposition.

16              Would you read the last line of that

17   starting with C, read it out loud for us.

18   A          Medical aid is to be rendered by only

19   those trained and/or certified to render such

20   aid.

21   Q          Okay.  And you said that you were not

22   trained or certified to render first aid for

23   somebody who was heavily bleeding; right?

24   A          No, sir.

25   Q          What I said is correct?
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 55

```
 1    A              Correct.
 2    Q              Okay.  do you know of anybody else
 3    in the Montgomery Police Department that was out
 4    there with you that night that was trained in or
 5    medically certified in being -- in stopping
 6    bleeding?
 7    A              No, sir.  Not that I can think of.
 8    Q              Okay.  Do all of y'all get the same
 9    training in the Montgomery Police Department?
10    A              (Witness nods head.)
11    Q              Your training isn't any different
12    than the other police officers, is it?
13    A              No, sir.
14    Q              Y'all all go to the same police
15    academy?
16    A              Yes, sir.
17    Q              And then whatever training you get
18    from the police department after you leave the
19    academy, everybody gets the same training;
20    correct?
21    A              Yes, sir.
22    Q              Do you -- do you judge from that
23    that if you weren't trained in any kind of how
24    to stop somebody who is bleeding heavily that
25    nobody else at the police department was trained
```

Walter Pettaway vs Nicholas D. Barber, et al.

Keiundra Watts
10/7/2021

```
 1   either; correct?
 2   A          Correct.
 3   Q          Okay.  And you understand there's a
 4   difference in -- in whether the Montgomery
 5   Police Department requires officers to provide
 6   first aid to somebody who is heavily bleeding or
 7   in danger of dying from something else and
 8   prohibiting them from doing that.  They're two
 9   different things.  One is you require it to be
10   done; the other one is -- says that you can't do
11   that.
12   A          Right.
13   Q          Do you understand there's a
14   difference in those two?
15   A          Yes, sir.
16   Q          Okay.  Do you understand from the
17   sentence at the bottom of page -- or the first
18   page of Plaintiff's Exhibit 3 where medical aid
19   is to be rendered only by those trained or
20   certified to render such aid; do you understand
21   that to be that you are prohibited from
22   providing medical care unless you are trained?
23   A          Yes, sir.
24   Q          Okay.  So not only the police
25   department didn't -- didn't require you to
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 57

```
 1   provide first aid, they prohibited you from
 2   doing that; correct?
 3   A          Yes.
 4   Q          Because they didn't provide you any
 5   training --
 6   A          Yes, sir.
 7   Q          -- in medical care?
 8   A          Right.
 9   Q          And they didn't require you to be
10   trained in medical area?
11   A          No, sir.
12   Q          What I said is correct?
13   A          Correct.
14   Q
15
16
17
18
19
20
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 58