1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  NORTHERN DIVISION

4

5   WALTER PETTAWAY, as   )

6   Administrator of the )

7   Estate of Joseph Lee )

8   Pettaway, deceased,  )

9        Plaintiffs,     )

10                        )

11  VS.                   )CIVIL ACTION NO:

12  NICHOLAS B. BARBER    ) 2:19-CV-0008

13  and MICHAEL B. GREEN,) DEPOSITION OF:

14       Defendants.   )   BIANKA RUIZ

15

16        S T I P U L A T I O N S

17

18          IT IS STIPULATED AND AGREED, by and

19  between the parties through their respective

20  counsel, that the deposition of:

21               BIANKA RUIZ,

22  may be taken before Merit Gilley, Commissioner

23  and Notary Public, State at Large, at the

24  Montgomery City Hall, 103 N. Perry Street,

25  Montgomery, Alabama 36104, on the 8th day of

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 1

```
 1   October, 2021, commencing at approximately
 2   9:00 a.m.
 3
 4              IT IS FURTHER STIPULATED AND AGREED
 5   that the signature to and reading of the
 6   deposition by the witness is waived, the
 7   deposition to have the same force and effect as
 8   if full compliance had been had with all laws
 9   and rules of Court relating to the taking of
10   depositions.
11
12              IT IS FURTHER STIPULATED AND AGREED
13   that it shall not be necessary for any
14   objections to be made by counsel to any
15   questions, except as to form or leading
16   questions, and that counsel for the parties may
17   make objections and assign grounds at the time
18   of the trial, or at the time said deposition is
19   offered in evidence, or prior thereto.
20                            ***
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 2

```
 1              I, Merit Gilley, a Court Reporter of
 2   Birmingham, Alabama, and a Notary Public for the
 3   State of Alabama at Large, acting as
 4   Commissioner, certify that on this date, as
 5   provided by the Federal Rules of Civil Procedure
 6   and the foregoing stipulation of counsel, there
 7   came before me on the 8th day of October, 2021,
 8   at the offices of Montgomery City Hall, 103 N.
 9   Perry Street, Montgomery, Alabama 36104,
10   commencing at approximately 9:00 a.m., BIANKA
11   RUIZ, witness in the above cause, for oral
12   examination, whereupon the following proceedings
13   were had:
14                   BIANKA RUIZ,
15   being first duly sworn, was examined and
16   testified as follows:
17                   EXAMINATION
18   BY MR. SIKES:
19   Q        Would you state your name, please,
20   ma'am, your full name for the record.
21   A        Bianka Caldwell-Ruiz.
22   Q        Would you spell the middle name.
23   A        I hyphenate -- when I got married, I
24   hyphenated.  So -- or it's going to be just --
25   when I worked there, it's going to be Bianka
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 6

```
1    Raquel Ruiz, R-a-q-u-e-l.
2    Q          All right.  And you have since
3    married?
4    A          Yes, sir.
5    Q          And what is your married name that
6    you go by now?
7    A          Caldwell, C-a-l-d-w-e-l-l, hyphen,
8    Ruiz.
9    Q          All right.  Tell us where you're --
10   give us your date of birth, please, ma'am.
11   A          Going to be
12   Q          Where do you presently live?
13   A          In Tulsa, Oklahoma.
14   Q          And where in particular in Tulsa?
15   A          It's going to be
16              , Tulsa, Oklahoma 74116 I believe.
17
18   Q          How long have you lived there?
19   A          Three weeks.
20   Q          You formerly were a Montgomery --
21   City of Montgomery Police Department officer;
22   correct?
23   A          That's correct.
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 7

Walter Pettaway vs Nicholas D. Barber, et al.

Bianka Raquel Ruiz
10/8/2021

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Q          Okay.  And when were you sworn in as

25   a police officer for the City of Montgomery?
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 13

Walter Pettaway vs Nicholas D. Barber, et al.

Bianka Raquel Ruiz
10/8/2021

1    A           I -- I was sworn in -- I was sworn

2    in at city hall in August of 2017.

3    Q           So in July of 2018 when the events

4    that we are -- you are taking your deposition

5    about; when those occurred, you had been a

6    police officer for then roughly nine months --

7    excuse me -- 11 months?

8    A           Yes, sir.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3
 4
 5
 6   Q          Okay.  How were you first summoned
 7   to come to Cresta Circle where this -- where
 8   Mr. Pettaway died?
 9   A          They -- I was -- received a call
10   through dispatch.  Dispatch gave me the call.
11   Q          And you didn't -- you proceeded
12   there in your vehicle, police vehicle?
13   A          That's correct.
14
15
16
17
18
19
20
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 16

1

2

3

4

5

6

7

8  Q

9              When you and -- you and Mr. or --

10  Officer Powell got there at about the same time?

11  A          I believe so.  I'm not for sure who

12  pulled up first.  I just know that we were both

13  on scene.  We were the first two on scene.

14  Q          You and Officer Powell were the

15  first two on the scene to the best of your

16  memory?

17              That's your testimony?

18  A          Yes, sir.

19              Okay.  Go ahead, please.

20  A          Myself and several other officers

21  had set a perimeter around the residence waiting

22  on K-9.  K-9 arrived.  We waited a few more

23  moments because, per Montgomery -- City of

24  Montgomery, K-9 has to have permission to --

25  from the homeowner to enter the residence.  I

```
 1   believe that K-9 had got permission from the
 2   homeowner because we walked up to the front of
 3   the residence.  He yelled, I believe, two -- at
 4   least I know two times stating he was a K-9
 5   officer and that he was -- wanted to see if
 6   anybody was inside before he let the dog in.
 7   Q          By "he," who are you speaking of?
 8   A          The K-9 officer.  The K-9 officer
 9   had acknowledged himself at least two times
10   stating --
11   Q          Who -- what was his name is what I'm
12   asking you?
13   A          Oh, Officer Barber.  Barber.
14   Q          Okay.  You were there, I think you
15   testified, as one of the first two officers on
16   the scene?
17   A          To the best of my knowledge; yes,
18   sir.
19   Q          Right.  And other than what -- and
20   we have it on -- on another body cam video audio
21   of whatever it is that Officer Barber said at
22   the front door.  We have that on video.  I know
23   about that.
24              Other than that, did you ever hear
25   any police officer make any attempt to
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 19

1   communicate with whoever maybe inside the house?

2   A          Before Officer Barber announced

3   himself?

4   Q          Yes.

5   A          To my knowledge, I don't recall.  I

6   don't think anybody did.

7   Q          Okay.  Do you have a microphone, a

8   loud speaker, or amplification device on your

9   police vehicle?

10  A          That's correct.

11  Q          Okay.  Did most all of the police

12  vehicles have that kind of device on there so

13  that they could take a microphone and amplify --

14  make their voice louder and heard a greater

15  distance from their vehicles?

16  A          To the best of my -- to the best of

17  my knowledge; yes, sir.

18  Q          Okay.  Let me get your best idea of

19  how many police officers were there at the

20  house.

21  A          Before K-9, I believe five to six.

22  To the best of my knowledge, I believe five to

23  six.

24  Q          Tell me names of any of the police

25  officers that you recall being there.

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 20

```
 1    A            Officer Powell, Officer Watts,
 2    Officer Smith.  I know another gentleman, but I
 3    cannot recall his name, and then myself.
 4    Q            Okay.  Do you remember Justin
 5    Thrasher?
 6    A            Thrasher.  Yes.  Officer Thrasher.
 7    Yeah.  That's the gentleman I could not
 8    remember.
 9    Q            All right.  Do you remember Officer
10    Flournoy?
11    A            Yes, sir.  Officer Flournoy as well.
12    Q            Okay.
13    A            But I don't know if he was on -- the
14    reason why I didn't mention him is I don't
15    recall him being on scene before K-9.  I don't
16    know when Officer Flournoy had showed up.
17
18
19
20
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 21

```
 1   Sergeant Green arrived also; correct?
 2   A          Yes, sir.  He was on scene.
 3   Sergeant Green was on scene as well.
 4   Q          Okay.  But all of these officers
 5   that we're talking about arrived after you to
 6   the best of your recollection; correct?
 7   A          Yes, sir.  They arrived after.
 8   Uh-huh.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22   Q          And when you say "setting a
23   perimeter," what you mean, I think I believe, is
24   that you and other officers, the five or six
25   officers that were there, surrounded the house;
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 22

1   is that correct?

2   A          That's correct.

3   Q          Okay.  What is the first time that

4   you -- well, let me back up a second and let you

5   go ahead and continue to narrate or tell us what

6   occurred and what you heard and said and did and

7   saw after Officer Barber released the dog into

8   the house.

9   A          He released the dog in the

10  residence.  I remember him going into the

11  residence as well.  He announced over the radio

12  -- he announced over the radio, Subject in

13  custody, and then he also stated after, We need

14  medical attention or paramedics or medics on

15  scene.  Once Officer Barber came outside the

16  residence with his dog, he advised that it was

17  clear for officers to go inside.

18             Officers went inside.  We were

19  inside for a little bit, and then Sergeant Green

20  advised for us to take the subject outside.  So

21  myself and I don't know who else took the

22  subject outside.  We waited outside for the

23  paramedics for a good bit.  And they finally

24  arrived.  They worked on it -- worked on the

25  subject for a good bit.  And then they put him

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 23

1    believe I had a position on his cuffs to hold

2    him up, either his cuffs or his arms to hold him

3    up.  And somebody held his legs, and we just

4    carried him out of the residence.

5

6

7

8

9

10

11

12   Q         All right.  I want -- I want to show

13   you a series of -- these are four photographs.

14   They are Plaintiff's Exhibits 1, 2, 3, and 4 to

15   Officer Flournoy's deposition.

16            (Plaintiff's Exhibit Flournoy 1,
              Plaintiff's Exhibit Flournoy 2,
17       Plaintiff's Exhibit Flournoy 3, and
              Plaintiff's Exhibit Flournoy 4
18            were produced for reference.)

19   Q         I will represent to you that they

20   are images that are taken from your body camera

21   that night.  They are imprinted at the top with

22   the date and time.

23            That's usual, isn't it, to do that?

24   A         Yes, sir.

25   Q         Okay.  Will you take a look at those

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 25

1    four photographs.  They're going to be displayed

2    on the screen.

3              MR. EAST:  Mr. Sikes, were these

4    from her body cam or from Watts' body cam?

5              MR. SIKES:  Pardon me.  They are

6    from Watts' body cam.  Watt's body cam.  Sorry.

7    I misspoke.  Thank you.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 26

6      Q            Right.  Let me ask you if it -- are

7      those photographs, do they fairly and accurately

8      depict what you can recollect about

9      Mr. Pettaway's condition as he lay out on the

10     sidewalk in front of the house during this five

11     or six minutes or so?

12     A            Yes, sir.

13     Q            And do you see that there is a lot

14     of blood there?

15     A            Yes, sir.

16     Q            You see that it both -- in some --

17     in the photographs, both his pants and shirt are

18     glistening with blood?

19     A            Yes, sir.

20     Q            And do you see blood there, several

21     good-sized pools of blood on the sidewalk beside

22     him?

23     A            Yes, sir.

24     Q            Okay.  And all of this had occurred

25     within a matter of minutes, that amount of

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 27

```
 1    blood; correct?
 2    A          Yes, sir.
 3    Q          Obviously, these photographs show
 4    Mr. Pettaway bleeding heavily; correct?
 5    A          Yes, sir.
 6    Q          Heavy loss of blood is a potentially
 7    life-threatening circumstance, is it not?
 8    A          What I've been told.  Yes, sir.
 9    Q          You know that from common sense,
10    don't you?
11               If somebody is bleeding heavily,
12    they are in danger of dying if nothing is done
13    to stop or reduce the flow of blood; correct?
14               MR. EAST:  Object to the form.
15    Q          Go ahead.  You may answer, ma'am.
16    A          Yes.  Yes, sir.
17
18
19
20
21
22
23
24
25
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 28

```
 1
 2
 3
 4
 5    Q          All right.  Did -- did you or did any
 6    other police officer there attempt to make any
 7    effort to stop or retard or reduce
 8    Mr. Pettaway's loss of blood from his -- from
 9    this wound?
10    A          No, sir.
11               MR. EAST:  Object to the form.
12    Q          Well, I'll ask it again since there's
13    been an objection to the form.
14               Did you or any other officer attempt
15    to stop the flow of blood or make any effort to
16    provide first aid to Mr. Pettaway?
17               MR. EAST:  Same objection.
18    Q          Go ahead, ma'am.
19    A          No, sir.
20
21
22
23
24
25
```

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 30

1

2

3

4

5

6

7

8

9          Plaintiff's Exhibit 3 is a

10   Montgomery Police Department written directive,

11   and it addresses rendering aid after use of

12   force.

13          Have you -- did you see that

14   document prior to July of 2018?

15   A          Yes, sir.

16

17

18

19

20

21

22

23

24

25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 31

1
2              (Plaintiff's Finley Exhibit 3
3              was produced for reference.)
4    Q           Okay.  So you're familiar with the
5    Plaintiff's Exhibit 3 to Mr. Finley's
6    deposition?
7    A           Yes, sir.
8
9
10
11
12
13
14
15
16
17
18   Q           And how were -- how did you review it
19   or know of it prior to July 8, of 2018?
20   A           Through Power DMS.  We have a system
21   that puts our policies that -- and we have --are
22   required to read our policies, so I reviewed
23   that.
24   Q           All right.  Let maybe shortcut this.
25   Let me -- there has been testimony about that

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 34

1    earlier by other police officers.

2                And what they testified is that

3    there is -- this Power DMS that you're talking

4    about enables police officers, either with an

5    app on their phone or with a computer, that they

6    can pull up and look and view new policies,

7    regulations, or other communications from police

8    department addressing different issues with

9    regard to police operations; correct?

10   A          Correct.

11   Q          All right.  And there was also

12   testimony that these -- these type of policy

13   directives or policies and procedures as they

14   are -- as the police department puts them out,

15   they are put on that app; and you are required

16   to sign off on it that you have read and

17   understood it; correct?

18   A          That's correct.

19   Q          And you did that with this

20   particular 3.3.5 or Plaintiff's Exhibit 3 to

21   Mr. Finley's deposition; correct?

22   A          That's correct.

23   Q          I'm also going to direct your

24   attention to Plaintiff's Exhibits B and C that

25   were --

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 35

1

2

3

4

5

6

7

8   Q            And take a moment and read that, if

9   you would, please, ma'am.  And tell us when you

10  have read it, and then we will turn to the next

11  page of it.

12  A            You can turn to the next page. Okay.

13  Q            I will represent to you that is the

14  deposition testimony -- or a portion of the

15  deposition testimony of lieutenant Andre

16  Carlisle.

17           Do you know or do you recognize the

18  name Lieutenant Andre Carlisle?

19  A            Lieutenant Carlisle?  Yes, sir.

20  Q            And who is Lieutenant Carlisle?

21  A            I just know -- I -- I just know he's

22  a lieutenant.  I've never personally worked with

23  him through patrol.

24  Q            Okay.  I'll represent to you that he

25  was produced by the City of Montgomery as their

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 36

```
 1   designee to give testimony with regard to police
 2   training.
 3   A          Uh-huh.
 4              MR. EAST:  With -- with regard to
 5   the -- the policies.
 6              MR. SIKES:  Right.
 7              MR. EAST:  Yeah.  You said
 8   "training."
 9              MR. SIKES:  I'm sorry.
10
11
12
13
14
15
16
17
18
19              And do you understand it to mean
20   that in July of 2018 and for some time prior to
21   that there were no circumstances under which
22   Montgomery police officers were required to
23   provide hands-on first aid or medical care to a
24   person they injure or who was injured in the
25   course of him being taken into custody; correct?
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37

```
 1   A           That's correct.

 2   Q              Okay.  Is that -- is that what you

 3   understood Montgomery Police Department policy

 4   was in July of 2018?

 5   A           Yes, sir.

 6              (Plaintiff's Exhibit C was

 7               produced for reference.)

 8   Q           I'll show you Plaintiff's Exhibit C

 9   also, and I'll represent to you this is a

10   portion of the deposition of Ernest Finley who

11   was taken in this case.

12              MR. SIKES:  Can you show us the

13   second page and let Ms. Ruiz read that.

14   Q           Tell us when you have finished

15   reading it, ma'am.

16   A           (Witness complies.)  I'm done.

17   Q           All right.  You understood then that

18   Mr. Finley, the former police chief, testified

19   that Montgomery Police Department policies and

20   procedures did not require Montgomery Police

21   Department policemen who cause a

22   life-threatening injury, such as arterial

23   bleeding, they don't have any obligation to

24   provide first aid to stop or reduce the flow of

25   blood necessary to avoid loss of life.
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 38

```
 1                    Do you understand that?
 2      A             That's correct.
 3      Q             That's what you were reading?
 4      A             Yes, sir.
 5      Q             Do you agree that that is what you
 6      understood Montgomery Police Department policy
 7      to be in July of 2018?
 8      A             Yes, sir.
 9
10
11
12
13
14
15      Q             All right.  Now, you saw and -- that
16      Mr. Pettaway as he lay out there on the sidewalk
17      was bleeding heavily; correct?
18      A             Yes.  I saw all the blood.  Yes,
19      sir.
20      Q             And you knew that if -- there was a
21      danger of him possibly dying if something wasn't
22      done to stop or reduce or retard the flow of
23      blood; correct?
24      A             It -- yes, sir.
25      Q             All right.  Is the reason that you
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 39

```
 1    didn't have a -- or take any action to reduce
 2    Mr. Pettaway's loss of blood was that you hadn't
 3    been trained in that and that Montgomery Police
 4    Department policies prohibited you from --
 5    prohibited you from doing that?
 6                 Are those reasons why you didn't do
 7    that?
 8    A            That's correct.  Yes, sir.
 9    Q            Are there any other reasons you can
10    think of that you didn't provide -- make any
11    attempt to provide first aid to Mr. Pettaway?
12                 Any other reasons you can think of?
13    A            I just don't have medical knowledge.
14    I don't have knowledge of assisting in that --
15    in that manner.
16    Q            All right.  The Montgomery Police
17    Department doesn't require you to be trained and
18    doesn't train you in first aid to stop bleeding,
19    does it; or did it?
20    A            At -- at that time; no, sir.  We
21    were only trained to do CPR.
22    Q            And -- well, Montgomery Police
23    Department didn't train you to do that.
24                 You got that in -- in the police
25    academy; correct?
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 40

1              MR. EAST:  Object to the form.

2    A              That's correct.

3    Q              Okay.  Did the -- after you left the

4    police academy, did the Montgomery Police

5    Department train you in any aspect of first aid

6    or providing medical care in any area?

7    A              No, sir.

8    Q              I think that's all, ma'am.  Thank

9    you.

10   A              Yes, sir.

11     (THE DEPOSITION WAS CONCLUDED AT 9:47 A.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25