IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NOTHERN DIVISION

WALTER PETTAWAY, as administrator )
of the Estate of Joseph Lee Pettaway, )
deceased, )
                           )
       Plaintiff, )
                           )
v. )     CIVIL ACT. NO. 2:19-cv-008-ECM
                           )              (WO)
NICHOLAS D. BARBER, *et al.*, )
                           )
       Defendants. )

**MEMORANDUM OPINION and ORDER**

Now pending before the Court are the Defendant Ryan Powell's ("Powell") motion for summary judgment (doc. 374), the Defendants Nicholas D. Barber ("Barber"), Ernest N. Finley ("Finley"), Neal Flournoy ("Flournoy"), Michael Green ("Green"), Powell, Bianka Ruiz ("Ruiz"), Joshua Smith ("Smith"), The City of Montgomery, Alabama ("Montgomery"), Justin Thrasher ("Thrasher"), and Keiundra Watts' ("Watts") motion for summary judgment (doc. 378), and multiple motions to exclude evidentiary submissions and expert testimony.   After briefing was completed, the Plaintiff Walter Pettaway ("Pettaway") dismissed Green, Thrasher, Powell, Smith, Watts, Ruiz, and Flournoy as Defendants.[1]  (Doc. 424).   On January 12, 2023, the Court held oral argument on the

---

[1] Because Green, Thrasher, Powell, Smith, Watts, Ruiz, and Flournoy are no longer Defendants, their motions for summary judgment (docs. 374, 378) are DENIED as moot.

pending dispositive motions.  The relevant party arguments and concessions are referenced herein.

Pettaway now brings four claims against the remaining Defendants.[2]  Count One is a Fourth Amendment unlawful seizure claim against Barber, brought pursuant to 42 U.S.C. § 1983.  Count Two is a Fourth Amendment[3] excessive force claim against Barber, brought pursuant to § 1983.  Count Three is a Fourteenth Amendment claim against Finley[4] and Montgomery for implementing customs and practices that violated their constitutional obligation to provide medical care.  Count Four is a wrongful death claim under Ala. Code § 6-5-410 against Barber, Finley, and Montgomery.

Upon consideration of the briefs, evidence, and applicable law, and for the reasons that follow, the Defendants' motion for summary judgment is due to be GRANTED in part and DENIED in part.

---

[2] The operative complaint also alleged a Fourth or Fourteenth Amendment deliberate indifference claim against Barber, brought pursuant to § 1983.  At oral argument, Pettaway moved to dismiss this claim, which the Court granted.

[3] The operative complaint alleges that Barber used excessive force in violation "of the Fourth and/or Fourteenth Amendments." (Doc. 205 at 11).  At oral argument, Pettaway conceded that his claim derives only under the Fourth Amendment.  To the extent Pettaway asserts a cause of action under the Fourteenth Amendment, that claim is due to be dismissed.

[4] While Pettaway alleged in the complaint that "[a]ll claims made herein are made against each of the individual defendants in their individual capacities," (doc. 205 at 3), he clarified at oral argument that his claims against Finley were in his official capacity only.  Pettaway conceded that the official capacity claims against Finley were duplicative of the claims against the city.  Accordingly, the claims against Finley in his official capacity are due to be dismissed. *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("[S]uits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents."); *Holley v. City of Roanoke*, 162 F. Supp. 2d 1335, 1341 n.2 (M.D. Ala. 2001) (dismissing claims against municipal officer as duplicative of claims against city).

# I.  JURISDICTION

The Court has original subject matter jurisdiction of this matter pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction of the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

# II.    LEGAL STANDARDS

## A.  Motion to Exclude Under Rule 702

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

This Rule requires a trial judge to ensure that an expert's testimony rests on a reliable foundation and is relevant. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587 (1993).  In determining the admissibility of expert testimony under Rule 702, a court must conduct a rigorous three part inquiry, considering whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or

3

to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

## B.  Motion for Summary Judgment

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).  "[A] court generally must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016).  However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018).  If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.*  The burden then shifts to the non-moving party to establish, by going beyond the pleadings, that a genuine issue of material fact exists. *Id.* at 1311–12.

4

The Court construes the facts in the light most favorable to the non-movant plaintiff[5] and draws all reasonable inferences in his favor. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000) ("In assessing whether there is any 'genuine issue' for trial, the court 'must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party' and 'resolve all reasonable doubts about the facts in favor of the non-movant.' Moreover, the court must avoid weighing conflicting evidence or making credibility determinations." (citations omitted)).

## III.   FACTS

Plaintiff Walter Pettaway is decedent Joseph Lee Pettaway's brother and the Administrator of Pettaway's estate.  On July 8, 2018, Finley was the Police Chief of the City of Montgomery, Barber was a canine officer for the Montgomery Police Department ("MPD"), and Green, Thrasher, Powell, Smith, Watts, Ruiz, and Flournoy were MPD officers.

This case concerns a tragic chain of events that took place at 3809 Cresta Circle ("the home") in Montgomery, Alabama on July 8, 2018.  The home[6] was owned by Norris Harris ("Harris").  Prior to July 2018, the home fell into a state of disrepair and was uninhabitable.  Harris came to an agreement with James Jones ("Jones"), who had previously lived in the home, to repair the home.  Jones would organize and fund the home's repair in exchange for a reduction in rent to live in the home once it was restored.

---

[5] Because this ruling addresses the Defendants' motion for summary judgment, the Court considers Pettaway the non-movant.
[6] While Pettaway challenges whether the structure located at 3809 Cresta Circle could be considered a home on July 8, 2018, the distinction does not impact the Court's legal analysis.

Garry Dixon[7] and Pettaway, Jones' cousin and childhood friend respectively, helped Jones repair the home.  In the months leading up to July 2018, Dixon and Pettaway helped Jones paint, install flooring, and complete similar tasks around the home.  As repairs made the home more habitable, Jones and Dixon would occasionally stay the night at the home after making repairs.  There is no evidence that Pettaway ever stayed overnight in the home. The home did not have running water or electricity in July 2018.

On Saturday July 7, 2018, Jones, Pettaway, and Dixon installed a back window in one of the home's bedrooms.  After finishing work for the day, they had a barbecue in the home's back yard with friends and family.  Around 10:30 or 11:00 that evening, everyone in attendance began to go home.  Dixon, who had Jones' permission to stay the night, was the only person that remained at the home after the barbecue.  Jones did not give anyone else permission to stay the night in the home.

Early Sunday morning, Dixon awoke to what sounded like knocking at the door. Dixon did not open the door but soon heard another noise.  When Dixon investigated that noise, he saw a man's hand inside a bedroom closet.  Dixon exited the home and called the police from outside.  Dixon also called Jones, who decided to drive to the home.

After Dixon's call, police sent out a dispatch for a suspected burglary and requested a canine unit on the scene.  Watts and other early-arriving officers formed a perimeter around the home.  Those officers observed that a back window had been removed from its frame.  There is no evidence that these officers made any attempt to communicate with the

---

[7] The spelling of Dixon's last name varies throughout the parties' evidentiary submissions.  The Court has adopted the spelling used on the Docket. (Doc. 371-25).

person inside the home, despite several officers having access to loudspeakers. Barber was the canine officer on duty that night and reported to the home after Watts but before Jones. Barber was wearing his body camera, and the footage has been submitted into evidence. The following facts are taken from Barber's and Watts' body camera footage.

Barber arrives at the home around 2:58 A.M. Barber is told that police are still waiting for Jones, the homeowner, to arrive.[8] Because MPD Canine Bureau Policies and Procedures provided that a canine unit may not search a residential home without the permission of the homeowner, Barber waited for Jones to arrive before taking further action. While waiting for Jones, Barber has a conversation with Green and Dixon. Dixon tells officers that, other than the intruder, there are no people, weapons, or animals in the home. Dixon also tells officers that when he was in the home, he heard a knocking sound. Dixon did not answer the door because he did not know a reason that anyone would be at the door. Dixon explains that he saw a man's hand in a bedroom closet and describes where that room is located. Dixon tells officers that the home is located in a rough neighborhood. Dixon does not tell officers that the home lacks power, and Barber did not know this fact when he entered the home. (Doc. 372-6 at 63).

When Jones arrives, he gives officers permission to search the home with a canine. At 3:11, Barber approaches the front door with Niko, his canine partner. Barber knocks on the door at 3:11:26 and calls out at 3:11:34. Barber knocks a second time at 3:11:39 and

---

[8] Dixon mistakenly told police that Jones was the homeowner.

calls out a second time at 3:11:42.  Barber deploys Niko into the home off-leash at 3:11:45.  Initially, Barber remains outside the front door.

At 3:12:15, Barber enters the home's living area.  Niko is down the hallway searching another room.  Niko searches the home for the next two minutes and at 3:14:22 bites down on bedding before Barber redirects him.  At 3:15:37, Niko crawls under a bed and Pettaway cries out.  Presumably, Niko initiates his bite at this point.

Barber calls out at 3:15:41 as Niko crawls further under the bed, and Pettaway continues to scream.  Barber first instructs Pettaway to get out from under the bed at 3:15:45.  Pettaway moves around under the bed at 3:15:47 and pleads with Barber to let the dog off.  Barber continues to tell Pettaway to get out from under the bed and encourages Niko.  Pettaway's leg emerges from under the bed at 3:15:58.  Barber continues to encourage Niko and instruct Barber to get out from under the bed as Pettaway continues to scream.

At 3:16:01 Pettaway tells Barber that he is trying to get out from under the bed but cannot; Barber continues to instruct Pettaway to get out from under the bed.  Pettaway's arms emerge at 3:16:32, and Barber tells Pettaway to show his hands and get on his stomach.  Niko is seen attached to Pettaway's leg at 3:16:39.  When Pettaway's hands are visible at 3:16:44, Barber tells Pettaway to give him his hands.  Pettaway immediately complies, and Barber begins to handcuff Pettaway at 3:16:48.  Barber appears to finish handcuffing Pettaway at 3:16:57.  At 3:17:00 Barber tells Pettaway that "he's coming," and then Barber physically chokes Niko off of Pettaway to disengage the bite.

8

At 3:18:08, Barber requests medical assistance for Pettaway on his radio.  Barber tells Pettaway to "hang tight" on the bedroom floor and walks Niko out of the house.  After Barber and Niko exit, Watts and several other officers enter the home to monitor Pettaway.

At 3:22:33, officers begin moving Pettaway outside the home to await emergency medical technicians ("EMTs").  A large amount of blood is left on the hallway floor as Pettaway is dragged outside.  Officers set Pettaway on the ground outside the home around 3:23:20 and stand around him.  The officers do not attempt first aid or medically assist Pettaway.  An EMT approaches the scene at 3:27:26.  Pettaway is sent to the hospital but dies shortly afterwards.  At the time, the MPD had a policy prohibiting officers from providing medical assistance to persons injured in a police endeavor unless the officer had medical training in that form of assistance.  Besides CPR, MPD did not, at the relevant time, provide any first aid training to its officers.

On September 8, 2021, Walter Pettaway, representing Joseph Pettaway's estate, filed the Third Amended Complaint ("complaint") alleging five claims against the Defendants, four of which remain pending: Fourth Amendment unlawful seizure, brought pursuant to § 1983 against Barber; Fourth Amendment excessive force, brought pursuant to § 1983 against Barber; a Fourteenth Amendment claim against Finley and Montgomery for implementing customs and practices that violated their constitutional obligation to provide medical care; and wrongful death under Ala. Code § 6-5-410 against Barber, Finley, and Montgomery.  The Defendants have moved for summary judgment on all claims.

## IV.   DISCUSSION

The Court will first address the motions to exclude.  The Court will then address the motion for summary judgment on Pettaway's federal and state law claims, beginning with the federal claims.

### A.  Motions to Exclude

#### 1. Pettaway's Motion to Exclude Ricky Farley.

Pettaway moves to exclude the testimony of Ricky Farley ("Farley"). (Doc. 373). The Defendants offer Farley as an expert in police canines.  Farley works as a canine trainer at Alabama Canine Law Enforcement Training Officer's Center, Inc.  Pettaway argues that Farley is not qualified to testify because Farley has never been employed as a police officer, is not an expert in excessive force, has not been trained on various police standards, is not an expert on *Graham v. Connor*,[9] did not diligently review the record, and impermissibly draws conclusions of fact.

Specifically, Pettaway argues that Farley cannot testify that Barber's warnings were loud enough for Pettaway to hear or that Pettaway knew police were outside the home. Pettaway further argues that Farley cannot testify about the severity of Pettaway's crime because Farley did not read Barber's deposition.

The Defendants argue that Farley is qualified because he trains service canines, is familiar with the choke-off procedure, and trains handlers on how to properly utilize police

---

[9] *Graham v. Connor*, 490 U.S. 386 (1989).

dogs.  The Defendants argue that Farley is qualified to testify that deploying Niko was justified under the circumstances.

After reviewing the motions, the Court finds that Farley is qualified as an expert in canine training and procedures and that Pettaway's criticism regarding Farley's testimony goes to weight and not to admissibility.  The Motion to Exclude is, therefore, due to be DENIED.[10]

### 2. The Defendants' Motion to Exclude Ernest Burwell.

Pettaway offers Ernest Burwell ("Burwell") as an expert in police procedures. (Doc. 384).  The Defendants argue that Burwell is not qualified to testify as an expert because his methodology is flawed, his testimony draws improper legal and factual conclusions, and he is not competent to provide opinions on police standards in Alabama.

In response to the Defendants' motion to exclude, Pettaway simply rests his defense on copies of Burwell's opinion, supporting reports, and curriculum vitae.  This response is legally insufficient to overcome the Defendants' arguments in favor of exclusion.  Further, Burwell's report merely summarizes the evidence and concludes that the force used was excessive.  Burwell's impermissible legal conclusion on the ultimate issue is not proper expert testimony and is not helpful to the Court.  The Motion to Exclude is, therefore, due to be GRANTED.

---

[10] The Court has considered Farley's testimony and has given it the appropriate weight in ruling on summary judgment.

### 3. Motions to Exclude William T. Gaut, Bennet L. Omalu, Scott Thomas Trexler, and Stephen Boudreau.

The parties have also filed motions to exclude the testimony of William T. Gaut, Bennet L. Omalu, Scott Thomas Trexler, and Stephen Boudreau ("Boudreau"). (Docs. 384–86). The testimony from these experts addresses whether the officers at the scene could have prevented Pettaway's death by rendering first aid. Ultimately, this testimony goes to the issue of causation on Pettaway's *Monell* claim. Because the Court finds that Pettaway's *Monell* claim fails on another element, it need not address the issue of causation. Accordingly, these Motions to Exclude (docs. 384–86) are due to be denied as moot.

### 4. The Defendants' Motion to Strike Pettaway's Evidentiary Submissions.

The Defendants have also moved to strike Pettaway's evidentiary submissions supporting his motion to exclude the testimony of Boudreau. (Doc. 397). The Defendants argue that these submissions should be excluded because Pettaway submitted them fifteen days late without receiving or even requesting an extension from the Court. Pettaway admits that his submissions were late because of technical difficulties but argues that the Defendants have not been prejudiced by the delay. While the Defendants do not claim that they were prejudiced by the late submissions, they respond that Pettaway did not follow the proper procedure for technical difficulties with submissions.

The Court agrees that Pettaway has failed to show good cause for filing his submissions fifteen days late. Pettaway has not explained why he could not notify the Court of his technical difficulties or request an extension of his submission deadline. In

any event, the Court has resolved to deny Pettaway's motion to exclude Boudreau's testimony. As Pettaway's motion is due to be denied, the Court need not strike evidentiary submissions in support of that motion. The Defendants' motion to exclude those evidentiary submissions is accordingly due to be denied.

## B. Fourth Amendment Unlawful Arrest

Pettaway's first claim, brought pursuant to 42 U.S.C. § 1983, asserts that Barber committed an unlawful seizure in violation of Pettaway's Fourth Amendment rights. Pettaway's complaint alleges that Barber did not have probable cause to seize and arrest Pettaway because he did not have reliable evidence to believe that Pettaway committed a serious criminal offense inside the home.

Pettaway clarifies in his summary judgment response that this claim is for unlawful arrest. (Doc. 403 at 62). Pettaway argues that Barber's right to conduct a warrantless search of the home does not preclude Pettaway's unlawful arrest claim. Pettaway does not otherwise argue that summary judgment is inappropriate on this claim. Barber argues that Pettaway's failure to respond constitutes his abandonment of this claim. The Court agrees. While Pettaway briefly addresses this claim in his response, he merely clarifies the basis of the claim and does not set forth an argument against summary judgment. Accordingly, Barber's motion for summary judgment on this claim is due to be granted.[11] *Resol. Tr.*

---

[11] Aside from Pettaway's abandonment of this claim, the Court finds that Barber had arguable probable cause to arrest Pettaway because a reasonable officer in his position could have believed that a criminal offense was being committed. *Skop v. City of Atlanta*, 485 F.3d 1130, 1138 (11th Cir. 2007) (granting qualified immunity to arresting officers because they "possessed probable cause or arguable probable cause to arrest" suspect for criminal offense); *see also Montanez v. Carvajal*, 889 F.3d 1202, 1211 (11th Cir. 2018) (holding that officers had probable cause to suspect a burglary after observing suspects acting suspiciously outside a residence); *Rivera v. Carvajal*, 777 F. App'x 434, 439 (11th Cir. 2019) (holding

*Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citing *Rd. Sprinkler Fitters Loc. Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994)) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

### C.  Fourth Amendment Excessive Force

Pettaway next brings a Fourth Amendment Excessive Force claim against Barber pursuant to 42 U.S.C. § 1983.  Barber has moved for summary judgment, asserting the defense of qualified immunity.  Qualified immunity protects government officials from suit when they are "performing discretionary functions" and "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The Court finds, and Pettaway does not dispute, that Barber was performing a discretionary function.

#### 1.Constitutional Violation

Once a government official establishes that he was performing a discretionary function, a plaintiff must satisfy a two-pronged inquiry to defeat a qualified immunity defense. *See Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (quoting *Andujar v. Rodriguez*, 486 F.3d 1199, 1202 (11th Cir. 2007)).  The first prong asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

---

officer had arguable probable cause to arrest suspects for burglary after observing them acting suspiciously outside a residence).

Excessive force claims under the Fourth Amendment look to whether the force exceeds that which would be applied by an objectively reasonable officer on the scene. *Shaw*, 884 F.3d at 1099. Factors from *Graham v. Connor*, 490 U.S. 386 (1989), guide the court's assessment of reasonableness, and the court examines "(1) the severity of the crime; (2) whether the individual 'pose[d] an immediate threat to the safety of the officers or others'; and (3) whether the individual 'actively resist[ed] arrest or attempt[ed] to evade arrest by flight.'" *Patel v. City of Madison*, 959 F.3d 1330, 1338–39 (11th Cir. 2020) (quoting *Graham*, 490 U.S. at 396). The Eleventh Circuit assesses three additional reasonableness factors: "(4) the need for force to be applied; (5) the amount of force applied in light of the nature of the need; and (6) the severity of the injury." *Id.* at 1339. As the Court is bound to apply all six factors, the Court refers to them collectively as the *Graham* factors.

Four key Eleventh Circuit cases examine an officer's decision to deploy a canine. *See Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000); *Crenshaw v. Lister*, 556 F.3d 1283 (11th Cir. 2009); *Edwards v. Shanley*, 666 F.3d 1289 (11th Cir. 2012); *Jones v. Fransen*, 857 F.3d 843 (11th Cir. 2017). In *Priester*, police responded to a burglary at a store and searched for the perpetrator with a leashed canine. *Priester*, 208 F.3d at 923. The plaintiff was not involved in the burglary but was hiding nearby for other reasons. *Id.* When police shone their flashlight on the plaintiff, he stood up and put his hands in the air. *Id.* The defendant officers told the plaintiff to lie down on the ground or they would deploy the canine. *Id.* The plaintiff complied, but the defendant officer deployed the canine. *Id.* The officers allowed the dog to bite the plaintiff for up to two minutes, resulting in fourteen

puncture wounds on his legs. *Id.* at 924–25.  The Eleventh Circuit held that it was clearly established that this use of force was unconstitutional despite the absence of similar case law. *Id.* at 927.  The Circuit reasoned that the plaintiff's suspected crime was a burglary involving around $20 in stolen snacks, the plaintiff immediately complied with police instructions, the plaintiff was not attempting to flee or resist arrest, and the plaintiff did not pose a threat of harm to the officers or others. *Id.*  Despite these circumstances, the officers allowed the dog to bite the plaintiff for up to two minutes, which no reasonable officer could have believed to be constitutional. *Id.*

In *Crenshaw*, defendant police officers pursued the plaintiff in a vehicular chase after receiving reports that the plaintiff was involved in two armed robberies. *Crenshaw*, 556 F.3d at 1285.  The plaintiff crashed into a patrol car and fled on foot into a wooded area. *Id.* at 1285, 1291.  The officers tracked the plaintiff into the wooded area with a canine. *Id.* at 1285.  The plaintiff told officers his location and communicated his intent to surrender but was bitten by the canine thirty-one times. *Id.* at 1285–86.  Officers did not call off the attack until the plaintiff had been handcuffed. *Id.* at 1291.  The officers did not issue a canine warning before deploying the canine. *Id.* at 1286.  The Eleventh Circuit held that no constitutional violation occurred because the use of force was reasonable. *Id.* at 1292.  First, the plaintiff was suspected of armed robbery, a serious crime. *Id.*  Second, he fled from police in a vehicular chase and on foot. *Id.*  Third, because the plaintiff was suspected of armed robbery, the officers had reason to suspect that the plaintiff was armed. *Id.*  The probability that the plaintiff was armed made it reasonable for officers to use the canine until the plaintiff was handcuffed. *Id.* at 1293.  Not issuing a canine warning was

reasonable because, due to the likelihood that the plaintiff was armed, the officers were not required to give up their location in a dark, unfamiliar wooded area. *Id.* at 1293 n.6.

In *Edwards*, the plaintiff attracted police attention because he failed to stop at a stop sign. *Edwards*, 666 F.3d at 1293. The plaintiff then exited his vehicle and fled into the woods. *Id.* The defendant officers approached the wooded area with a canine, announced their presence twice, and warned that they would deploy the canine if the plaintiff did not surrender. *Id.* When the police approached the plaintiff, he was lying down with his hands visible. *Id.* The police told the plaintiff to show his hands. *Id.* The plaintiff did not move but told police, "[Y]ou got me. I only ran because of my license." *Id.* By this time, the defendant officer had released the canine. *Id.* The canine bit the plaintiff's leg for the next five to seven minutes. *Id.* Although the plaintiff did not further resist, the officers allowed the bite to continue. *Id.* The plaintiff's leg sustained significant damage. *Id.* at 1294. The Eleventh Circuit held that initially deploying the canine was constitutional but that allowing the dog to continue the bite constituted excessive force. *Id.* at 1295. The Circuit noted that "using a dog to track a fleeing suspect is reasonably tailored to the risk that a fleeing suspect presents." *Id.* However, once the bite began, the plaintiff's threat level decreased while the level of force applied increased. *Id.* at 1296. Accordingly, the second and third *Graham* factors weighed in the plaintiff's favor as the bite continued. *Id.*

In *Jones*, police received a report from the plaintiff's ex-girlfriend that the plaintiff broke into her home and stole a television. *Jones*, 857 F.3d at 848. Officers on the scene believed that the plaintiff fled into a nearby ravine. *Id.* A canine officer approached the ravine and issued a canine warning. *Id.* When he did not receive a response, the officer

entered the ravine and released his canine. *Id.* The officer then saw the plaintiff motionless at the bottom of the ravine. *Id.* The canine bit the plaintiff for what the plaintiff described as "a lifetime." *Id.* The Eleventh Circuit held that no clearly established constitutional violation occurred. *Id.* at 851. The court recognized that the crime involved was more serious than in *Priester* but less serious than in *Crenshaw*. *Id.* at 854. The situation was not "extremely serious and dangerous" and did not indicate that the plaintiff was violent or armed. *Id.* However, the plaintiff fled from police into challenging terrain, did not respond to canine warnings, and did not voluntarily surrender. *Id.* Thus, the officer could have feared ambush when he first released the canine. *Id.* As the situation fell between *Priester* and *Crenshaw* and did not lie so obviously at the core of the Fourth Amendment's prohibitions on force, no clearly established constitutional violation occurred. *Id.* at 855.

Here, Barber responded to the scene pursuant to a request for a canine officer. When he arrived, officers had formed a perimeter around the home. Barber learned that an unknown person was inside the home that did not have permission to be there. He was also told that no other people, animals, or guns were inside the home. While he waited for the homeowner to arrive, Barber did not make contact with or attempt to communicate with the person inside the home. After receiving permission to perform a canine search, Barber approached the front door with his canine. Barber called out twice in rapid succession in a manner that was unintelligible. Eleven seconds after first calling out, and three seconds after calling out the second time, Barber released the off-leash canine into the home.

At oral argument, Barber conceded that once the canine was deployed, the bite was inevitable. *See Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1550 (11th Cir. 1989) ("The

distinctive aspect of [the 'bite and hold'] method is its aggressive nature: unless the handler countermands his order, the dog will seek to seize a suspect even if that individual complies with the officer's orders. Thus, injury to the apprehended suspect is often inevitable."). Thus, the Court will focus the excessive force analysis on whether the initial deployment of Niko was justified.

This case resembles *Crenshaw*, where no warning was given before the canine was deployed, because the rapid, unintelligible nature of the attempted warning here was the functional equivalent of no warning at all. In *Crenshaw*, however, officers knew that an armed robbery suspect actively fled from police and concealed himself in unfamiliar terrain. Thus, the officers had reason to believe that the suspect was armed and dangerous when they deployed the canine. A reasonable officer in that situation could fear that issuing a canine warning would place his life at risk by revealing his location to an armed, dangerous suspect. A reasonable officer in Barber's situation, however, would not have those same safety concerns about issuing an adequate canine warning. Here, Barber knew that the suspect was surrounded by a police perimeter, reducing the likelihood of flight from the premises. While Barber did not know whether the suspect inside the home was armed, he had no information that it was likely, as did the officers in *Crenshaw*. When he deployed Niko, Barber knew that an unknown person remained inside the home without permission. Although Barber knew someone was inside the home, he did not know the person was concealed under a bed when Niko entered the house. On the information Barber had at that time, a reasonable officer would not have the same reason to fear that issuing an adequate canine warning would place his life at increased risk as under the facts in

19

*Crenshaw*.  Thus, the *Graham* factors weigh less heavily in favor of deploying a canine than they did in *Crenshaw*.

This case shares some similarities with *Priester*.  As in *Priester*, Barber had reason to believe that Pettaway committed a burglary.[12]  The burglary here, however, is arguably more severe than in *Priester* because it involved an occupied residence.  This case also resembles *Priester* because a canine was deployed against a suspect that was not obviously non-compliant at the time.  However, the suspect in *Priester* surrendered before the canine was deployed.  When Barber deployed Niko, Pettaway was inside a home without the homeowner's permission.  Thus, while the *Graham* analysis resembles that in *Priester*, some of those factors weigh less heavily against the use of force than they did in *Priester*.

However, the *Graham* factors weigh more heavily against deploying a canine than they did in *Edwards* or *Jones*.  In both of those cases, officers issued canine warnings and allowed the suspect time to respond to those warnings before deploying a canine.  Here, Barber did not give an adequate warning with sufficient time for Pettaway to respond, and perhaps, surrender.  Further, the suspects in *Edwards* and *Jones* presented a threat because they actively fled from police and concealed themselves in unfamiliar terrain.  When Barber deployed Niko, he knew that the police perimeter around the home reduced the risk of flight therefrom.  Although deploying a canine is not deadly force per se, it is "extraordinary force." *Edwards*, 666 F.3d at 1295.  Here, Barber bypassed steps on the

---

[12] Pettaway argues that Barber did not have probable cause to believe that Pettaway committed burglary. When Barber deployed Niko, he knew that an unknown individual was inside the home without permission. A reasonable officer in that situation would have reason to suspect that a burglary was taking place.

continuum of force that officers did not bypass in *Edwards* or *Jones*.  Unlike in those cases, the scenario here, at the time the canine was deployed, was not a tense, rapidly evolving situation requiring split-second decision-making.  There is no suggestion that prior to deploying Niko, a clear, verbal warning that the dog would be released if the suspect did not surrender, and adequate time allowed to surrender, were not possible or could have placed officers in danger.  Thus, Barber had less need to deploy a canine than in *Edwards* or *Jones*.

The final *Graham* factor examines the severity of the injury.  Deploying a canine is extraordinary force and, as *Kerr* points out, often leads to injury.  As this case illustrates, albeit unlikely, death is one of those potential injuries.  *Graham* looks to the severity of the injury *caused*, not the severity of the injury intended.  Death is the most severe injury possible, and this factor weighs in Pettaway's favor.

Taken together, this case falls between *Priester* and the initial canine deployments in *Crenshaw*, *Jones*, and *Edwards*.  Material portions of Barber's body camera footage reveal that Barber's rapid statements at the front door were unintelligible.  To be clear, the Court does not suggest that officers have an affirmative duty to provide a canine warning; they do not.  *Crenshaw*, 556 F.3d at 1293 n.6 (providing canine warning was not required when doing so could place officer at risk).  Under these facts, however, the situation was not rapidly evolving, Pettaway was alone inside a home that was surrounded by police, and Barber could have provided a sufficient canine warning from outside the home.  Barber's deployment of the canine without a sufficient warning was not a reasonable use of force under these circumstances. *But see Robinette v. Barnes*, 854 F.2d 909, 913–14 (6th Cir.

21

1988) (deploying canine to extract suspect from building was reasonable when officers provided multiple canine warnings and allowed one minute to respond to those warnings).

### 2. Clearly Established Law

The second prong of the qualified immunity analysis asks whether the violation of the federal right was "clearly established" at the time of the violation. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). The relevant question is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The unlawfulness of such conduct can be clearly established in three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005) (citations omitted)).

In *Mercado*, officers were dispatched to the plaintiff's residence on a report that the plaintiff was attempting suicide. *Mercado*, 407 F.3d at 1154. For twenty minutes, the officers tried to communicate with the plaintiff from outside his residence. *Id.* When officers entered the residence, the plaintiff was crying, seated on the floor, pointing a knife towards his heart, and had a telephone cord wrapped around his neck. *Id.* Officers twice told the plaintiff to drop the knife but did not warn him that they would use force if he did not comply. *Id.* The plaintiff did not make any threatening movements but did not immediately drop the knife. *Id.* In violation of department policy, the defendant officer

22

fired a "less lethal" weapon at the plaintiff's head, causing permanent brain injuries. *Id.* at 1154–55.  The Eleventh Circuit denied qualified immunity, finding the case "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the [officer], notwithstanding the lack of case law." *Id.* at 1160.  The Circuit reasoned that the plaintiff did not actively resist arrest, make threatening movements, or pose an immediate threat to the officers. *Id.* at 1157–58.  Arguably, the plaintiff had not had time to comply with orders to drop the knife. *Id.* at 1158, 1160.  The Circuit also noted that the use of force violated department policy. *Id.* at 1160.

Here, Barber failed to provide a sufficient warning and opportunity to respond before deploying Niko.  Although Barber called out twice prior to deploying the canine, the warnings were rapid and unintelligible.  Furthermore, Barber's two, quick, unintelligible warnings were not in compliance with MPD protocol, which provided that officers should give three warnings before deploying a canine.  The Court does not suggest that a violation of MPD policy clearly establishes a constitutional violation, but policy can indicate how a reasonable officer would behave in the situation. *See Gutierrez v. City of San Antonio*, 139 F.3d 441, 449 (5th Cir. 1998) ("[I]t may be difficult to conclude that the officers acted reasonably if they performed an action that had been banned by their department.").

Here, this case resembles *Mercado* because force was prematurely used against a suspect that did not actively resist arrest, make threatening movements, or have the opportunity to comply with police commands.  A reasonable officer would not need prior case law to know that sending an off-leash canine into a surrounded home before

23

adequately communicating with a solitary suspect or providing that suspect an opportunity to respond, in violation of department policy, constitutes excessive force.[13]   Accordingly, Barber is not entitled to qualified immunity, and his motion for summary judgment on this claim is due to be denied.

### D. *Monell* Claim

Pettaway also asserts a §1983 *Monell* claim against the City of Montgomery. Pettaway claims that MPD Written Directive 3.3.5 ("3.3.5") prohibited MPD officers from providing first aid to suspects injured in the course of their arrest.  Directive 3.3.5 provides in pertinent part that "Personnel are required to request the Medics to provide appropriate medical aid after the use of force . . . [t]o all persons with suspected injuries." (Doc. 371-4 at 1).  This directive also provides that "[m]edical [a]id is to be rendered by only those trained and/or certified to render such aid." (*Id.*).  At all material times hereto, CPR was the only first aid training MPD provided its officers.

Municipalities "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978).  Municipalities "may be sued for constitutional deprivations . . . even though such a custom has not received formal approval through the body's official

---

[13] Although the standard is one of objective reasonableness, there is evidence in the record that Barber had subjective concerns about the reasonableness of his actions, specifically the manner and effectiveness of the canine warnings.  At 3:34:42, after Pettaway was taken away from the scene, Barber asked Jones and Dixon, "Y'all heard me give the warnings, right?"

decisionmaking channels." *Id.* at 690–91.  However, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id.* at 694.  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.*

"[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). "[A]n inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred." *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996).  Pettaway argues that 3.3.5, in conjunction with MPD's custom of not training officers in first aid beyond CPR, violated Pettaway's Fourteenth Amendment right to prompt and proper medical care.  The Court must first determine whether Pettaway was deprived of his Fourteenth Amendment right to prompt and proper medical care.

The seminal Supreme Court case on the Fourteenth Amendment constitutional right to prompt and proper medical care is *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239 (1983).  In *Revere*, a criminal suspect was shot by a police officer. *Id.* at 240.  Officers on the scene called an ambulance, and the suspect was taken to a hospital where he was treated for his injuries. *Id.* at 241.  After the city's Chief of Police refused to pay the suspect's hospital bill, the treating hospital sued the city, arguing that paying the suspect's hospital bill was part of the city's constitutional obligation to provide the suspect medical care under

the Fourteenth Amendment. *Id.*  The Supreme Court acknowledged that the Fourteenth Amendment "require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police." *Id.* at 244.  It noted that these protections are at "least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.*  However, the Court declined to clearly define a municipality's obligations. *Id.*  It held that, "[w]hatever the standard may be, [the city] fulfilled its constitutional obligation by seeing that [the suspect] was taken promptly to a hospital that provided the treatment necessary for his injury." *Id.* at 245.

"To succeed on a claim for deprivation of medical care, a plaintiff must prove (1) the existence of an objectively serious medical need, and (2) that the officer was deliberately indifferent to that need." *Wade v. Daniels*, 36 F.4th 1318, 1326 (11th Cir. 2022).  The plaintiff can establish deliberate indifference by showing that "(1) the officer was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, (2) the officer actually drew that inference, (3) the officer disregarded the risk of serious harm, and (4) the officer's conduct amounted to more than gross negligence." *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015).  "Even when medical care ultimately is provided, the officer might still act with deliberate indifference 'by delaying the treatment of serious medical needs.'" *Id.* (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)).

When an officer promptly calls for medical assistance, courts have not required officers to personally provide first aid to individuals injured in the course of an arrest. *Davis v. Edwards*, 2017 WL 6544847, at *8 (M.D. Ala. Sept. 5, 2017) ("There is no suggestion

26

in [*Revere*] that the apprehending officers were obligated to render medical assistance on the scene. Likewise, here, there was no constitutional obligation for [the officers] to personally render medical assistance . . . where there is no allegation they delayed in calling for emergency medical services."); *Aaron* ex rel *Aaron v. Hudson*, 2022 WL 1085608, at *3 (N.D. Ala. Apr. 11, 2022) ("[A]ll relevant and binding case law holds there is no obligation for a police officer to personally provide medical care."); *Peacock v. Smith*, 2018 WL 5649899, at *7 (M.D. Ga. Oct. 31, 2018) ("[N]either the Supreme Court [nor the] Eleventh Circuit . . . have ever distinctively held that an officer must personally render aid to an injured individual.").

Pettaway asserts that the consistent holdings in these cases are not relevant because they deal with the obligations of individual officers rather than the obligations of a municipality in a *Monell* claim.  This argument overlooks the framework of a *Monell* claim. While a *Monell* claim does not derive vicariously from the acts of a municipality's agent, an agent's unconstitutional act is a prerequisite to a *Monell* claim.  The basis behind a *Monell* claim is that the municipality's policy was the driving force behind an agent's unconstitutional act.  If the agent's act is constitutional, the municipality did not bring about an unconstitutional act.

Thus, a municipality does not have a separate, individual constitutional obligation to provide medical aid to suspects injured by a police officer beyond the obligation placed on individual police officers.  If the police officer, acting as an agent of the city, fulfills his constitutional obligation by calling for medical aid, the municipality's constitutional obligations are fulfilled alongside it.  Such an effect is clear in *Revere*, which found that

27

the municipality's constitutional obligation was fulfilled when police officers ensured that the injured suspect was promptly taken to a hospital where he received the necessary treatment. *Revere*, 463 U.S. at 240, 245.

Thus, Montgomery's constitutional obligation to provide medical aid was satisfied when the officers on the scene promptly summoned medical aid for Pettaway. Barber called for medical assistance less than one minute after Niko released his bite. Pettaway has not argued that Barber delayed medical assistance or did not promptly call for such assistance. Thus, Pettaway has not established that Barber was deliberately indifferent to Pettaway's medical needs. Accordingly, Pettaway cannot show that his Fourteenth Amendment right to prompt medical aid was violated.

Because Barber did not violate Pettaway's Fourteenth Amendment right to medical aid, neither did Montgomery. As such, Pettaway has not established the first requirement of a *Monell* claim: that a constitutional violation occurred. Thus, there is no need to inquire into Montgomery's policies or customs. Because Pettaway cannot establish the requisite constitutional violation, Montgomery's motion for summary judgment on this claim is due to be granted.

### E. Wrongful Death

Finally, Pettaway brings a wrongful death claim under Ala. Code § 6-5-410 against Barber, Finley,[14] and Montgomery. The Defendants moved for summary judgment,

---

[14] Although Pettaway clarified at oral argument that he only brought his *Monell* claim against Finley in his official capacity, it remains unclear to the Court whether Pettaway's state law claim against Finley is brought in his individual capacity. To the extent Pettaway brings a state law claim against Finley in his individual capacity, the Court finds that Finley is entitled to summary judgment on this claim for the reasons

arguing that the claim was pleaded in an impermissible shotgun manner, that Pettaway cannot establish the Defendants' negligence, that Barber and Finley are entitled to state agent immunity, and that Montgomery is entitled to sovereign immunity.  They also argue that, because Pettaway did not address this claim in response to the Defendants' motion for summary judgment, Pettaway has abandoned his wrongful death claims.

Pettaway did not address this claim in his response to the Defendants' motion for summary judgment.  Because Pettaway wholly fails to address his wrongful death claim in response to the motion for summary judgment, he has abandoned this claim. *Resol. Tr. Corp.*, 43 F.3d at 599.  Accordingly, the Defendants' motion for summary judgment on Pettaway's wrongful death claim is due to be granted.

## V.    CONCLUSION

For the reasons discussed above, it is hereby ORDERED as follows:

1.  The Plaintiff's motion to exclude testimony of the Defendants' expert Ricky Farley (doc. 373) is DENIED.

2.  The Defendants' motion to exclude testimony of the Plaintiff's expert Ernest Burwell (doc. 384) is GRANTED.

3.  The Defendants' motion to exclude testimony of the Plaintiff's experts William T. Gaut and Bennet L. Omalu (doc. 384) is DENIED.

4.  The Defendants' motion to exclude testimony of the Plaintiff's expert Scott Thomas Trexler (doc. 385) is DENIED.

---

stated herein.  To the extent this claim is brought against Finley in his official capacity, it is duplicative of the claim against the city and is due to be dismissed on that basis as well.

5.  The Plaintiff's motion to exclude testimony of the Defendants' expert Stephen Boudreau (doc. 386) is DENIED.

6.  The Defendants' motion to strike Plaintiff's evidentiary submissions (doc. 397) is DENIED.

7.  Defendants Flournoy, Green, Powell, Ruiz, Smith, Thrasher, and Watts' motions for summary judgment (doc. 374, 378) are DENIED as moot.

8.  The Defendants' motion for summary judgment (doc. 378) is DENIED as to Count Two, the Fourth Amendment claim against Barber for excessive force, and is GRANTED in all other respects, as set forth in the opinion above.

Done this 31st day of January, 2023.

/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE